DLA PIPER US LLP
Eric M. Falkenberry
Andrew L. Deutsch
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
eric.falkenberry@dlapiper.com
*Attorneys for Plaintiff*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

PARTMINER INFORMATION SERVICES, INC.,

      Plaintiff,

      -vs-

AVNET, INC., THOMAS CASEY REED, JOHN KENNETH SHARPE, and NEIL R. VANEK,

      Defendants.

------------------------------------------------------

**07 CV 11482**

07 CV _____ ( )

**COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

    Plaintiff, PartMiner Information Services, Inc. ("PartMiner"), by its attorneys, and as and for its Complaint for Injunctive Relief and Damages against Defendants, Avnet, Inc. ("Avnet"), Thomas Casey Reed ("Reed"), John Kenneth Sharpe ("Sharpe") and Neil R. Vanek ("Vanek"), states as follows:

### NATURE OF THE ACTION

    1.    PartMiner brings this action for an injunction and damages to enjoin and remedy the customer and employee raiding by Defendants through the use of PartMiner's most valuable trade secrets and other confidential information, and the disparagement of PartMiner and its

products and services through false and misleading advertising and promotion. The individual Defendants are all former PartMiner sales employees who left one after another to establish a competing sales office for Defendant Avnet. Defendants obtained the PartMiner trade secrets by, among other ways, improperly keeping detailed PartMiner customer lists and related confidential information.

2.      Defendants' actions are all the more egregious because PartMiner already sued Defendant Reed and believed that it had resolved the disputes with all Defendants in January 2006. Since that time, Defendants have resumed their improper conduct by utilizing PartMiner confidential sales information and false promotion in an organized campaign to, in Defendant Reed's words, "take [all of PartMiner's customers] away and put PartMiner out of business."

## PARTIES

3.      PartMiner is a New York corporation with its principal place of business located at 7807 East Peakview Avenue, Suite 400, Centennial, Colorado.

4.      Defendant Avnet is a New York corporation with a branch located at 135 Engineers Rd., Suite 140, Hauppauge, New York.

5.      Defendant Reed is a former PartMiner Vice President, CAPS Sales and Service, and resides in Arapahoe County, Colorado.

6.      Defendant Sharpe is a former PartMiner Senior Account Manager, CAPS Sales and Service, and resides in Arapahoe County, Colorado.

7.      Defendant Vanek is a former PartMiner Account Manager, CAPS Sales and Service, and resides in Arapahoe County, Colorado.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction over PartMiner's false advertising and promotion cause of action arising under the Lanham Act, 15 U.S.C. § 1125, et seq., pursuant to 28 U.S.C. § 1338(a).

9.    This Court has supplemental jurisdiction over PartMiner's causes of action arising under New York State statutory and common law pursuant to 28 U.S.C. § 1367(a).

10.    This Court has continuing jurisdiction over this matter because some of the causes of action relate to the breach of a Settlement Agreement, signed by all parties to this litigation, which resolved a prior action brought in this Court by PartMiner entitled, *PartMiner Information Services, Inc. v. Thomas Casey Reed*, Civ. Action No. 05-CV-10486 (WHP).

11.    Venue in this District is proper pursuant to 28 U.S.C. § 1391(c) because the Confidentiality Agreements and Settlement Agreement between PartMiner and the individual Defendants, which this action is based upon, provide the following, respectively:

> Section 15.  Applicable Law and Forum.  This Agreement shall be construed and interpreted and its performance shall be enforced according to the laws of the United States and the State of New York.  The Employer and the Employee consent to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

> 9.  Governing Law and Forum

> This Agreement shall be construed, and its terms enforced, in accordance with the substantive laws of the State of New York, without regard to its conflict of laws provisions. Each party to this Agreement hereby consents to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

12.     Personal jurisdiction over the Defendants is conferred pursuant to Section 15 of the Confidentiality Agreement, Paragraph 9 of the Settlement Agreement and Rule 4(k) of the Federal Rules of Civil Procedure.

## FACTUAL ALLEGATIONS

### PartMiner's Business

13.     PartMiner is a leading global provider of component information needed by engineers, purchasers and other supply chain professionals in the electronics industry.

14.     PartMiner's customers are located throughout the world, including the United States.

15.     PartMiner offers a subscription-based proprietary and confidential online electronic parts database, known as the CAPS™ Database.  PartMiner also offers enterprise solutions for managing electronic component bills of materials and electronic components inventories, known as CAPS™ Connect™ and Connect ES™ (collectively with the CAPS ™ Database, the "CAPS™ Databases").

16.     The CAPS™ Database is owned by PartMiner and is the largest, most extensive database of electronic component information in the world.

17.     PartMiner has invested many millions of dollars to obtain, update and improve the CAPS™ Database.

18.     PartMiner allows customers to use the CAPS™ Database under restrictive subscription license agreements that prohibit unauthorized commercial use of the database,

software and related data, and that require customers to keep the contents of the database confidential.

## PartMiner's Customers

19.    PartMiner's success depends on finding new customers and maintaining existing ones.

20.    PartMiner spends significant time, resources and money in maintaining its relationships with existing customers.

21.    PartMiner develops and maintains detailed information about its existing customers, including customer contact information, contract start and end dates, customer preferences, records of communications with customers, sales strategies, and other details about the customers' relationship with PartMiner.  This information may also include the operation of the customers' office and the types of individuals who may have a need for the product, business issues the customer is having that may be solved by the products, customer credit information, and budget and key internal approvers (collectively, the "Customer Information").

22.    PartMiner's Customer Information has significant economic value to PartMiner and gives it an advantage over its competitors.

23.    PartMiner's Customer Information is not readily available from any public source.

24.    PartMiner's Customer Information would be highly valuable to PartMiner's competitors were they able to obtain it, since they could use it to identify and solicit PartMiner's existing customers and undercut PartMiner's goodwill and terms with customers.

25.    PartMiner spends significant time, resources and money identifying and marketing to prospective customers.

26.    PartMiner develops and maintains detailed information about its sales prospects including, but not limited to, their contact information, source of referral, the products and pricing that PartMiner is offering them, where they are in the sales process, the likelihood of closing a sale, PartMiner's communications with them, and PartMiner's sales strategies, (the "Prospective Customer Information").

27.    PartMiner's Prospective Customer Information has significant value to PartMiner and gives it an advantage over its competitors.

28.    PartMiner's Prospective Customer Information is not readily available from any public source.

29.    PartMiner's Prospective Customer Information would be highly valuable to PartMiner's competitors were they able to obtain it, since they could use it to identify and solicit PartMiner's prospective customers and undercut PartMiner's goodwill and terms with the prospects.

30.    PartMiner has invested considerable time, resources and money into developing a customer relationship management program, known as CARES, for PartMiner sales.

31.    The CARES customer relationship management program has significant value to PartMiner.

32.    The information regarding PartMiner's CARES customer relationship management program is not readily available from any public source.

33.    The information regarding PartMiner's CARES customer relationship management program would be valuable to PartMiner's competitors.

34.     PartMiner takes reasonable measures to maintain the confidentiality of its Customer Information, Prospective Information and the CARES customer relationship management program (collectively, the "Confidential Information") including, but not limited to, the use of employee Confidentiality Agreements, the promulgation of the PartMiner Employee Manual and Electronic Code of Conduct to which all PartMiner employees are bound, limitations on access to Confidential Information contained in databases, and a requirement that PartMiner employees return all PartMiner materials, including Confidential Information, when their employment with PartMiner ends.

## Defendants Reed, Sharpe and Vanek

35.     Reed became employed with PartMiner in 1999 and attained the position of Vice President, CAPS Sales and Service.  In that position, Reed was responsible for selling the products and services of PartMiner, managing sales staff, and managing the customer support group.

36.     By virtue of his role as an officer and employee of PartMiner, as well as his long tenure with the company, Reed had full access to the CAPS™ Databases and Confidential Information.

37.     Reed was also the administrator of the primary database in which PartMiner retained its customer lists and information.

38.     Reed received copies of the pipeline reports and other reports, which the PartMiner sales team used to track and manage sales activity, that contained Confidential Information and other proprietary information concerning the company's operations and sales.

39.    Sharpe became employed with PartMiner in 2002 as a Senior Accounts Manager, CAPS Sales and Service.

40.    Sharpe managed sales efforts directed at current and prospective PartMiner customers.

41.    As a part of his employment with PartMiner, Sharpe had access to and used PartMiner's Confidential Information.

42.    As part of his employment with PartMiner, Sharpe reported to Reed.

43.    Vanek became employed with PartMiner in 2004 as an Account Manager, CAPS Sales and Service.

44.    Vanek managed sales efforts directed at current and prospective PartMiner customers.

45.    As a part of his employment with PartMiner, Vanek had access to and used PartMiner's Confidential Information.

46.    As part of his employment with PartMiner, Vanek reported to Reed.

### PartMiner Confidentiality Agreements

47.    PartMiner maintains a number of databases that contain Confidential Information.

48.    The PartMiner Confidentiality Agreements require employees to keep all Confidential Information, including customer information, confidential.

49.    In consideration for their respective employment with PartMiner, Reed, Sharpe and Vanek each entered into a Confidentiality Agreement.

50.    Reed entered into his Confidentiality Agreement on May 4, 2001.  (Attached as Exhibit "A").

51.    Sharpe entered into his Confidentiality Agreement on July 1, 2002.  (Attached as Exhibit "B").

52.    Vanek entered into his Confidentiality Agreement on November 16, 2004. (Attached as Exhibit "C").

53.    Reed, Sharpe and Vanek's Confidentiality Agreements are identical in their terms.

54.    The Confidentiality Agreements prohibit Reed, Sharpe and Vanek, "during and after employment" from "disclo[ing] or us[ing] in whole or in part" any PartMiner Confidential Information.

55.    The Confidentiality Agreements define "Confidential Information" in pertinent part as follows:

> Section 1.  Confidential Information.  The term "Confidential Information" as used in this Agreement, shall mean, individually and collectively, any and all information, including, without limitation, information relating to products; compositions; processes; technologies; inventions; know how; designs; specifications; formulas; methods, including manufacturing procedures and technical methods; materials; devices; developmental or experimental work; improvements; discoveries; past, current, planned, and future research and data, including financial and cost data; databases; software; manuals; reports; internal policies and procedures; patent applications; licenses; research and development programs or agreements; marketing plans and survey and trade information (including customer lists, customer usages and requirements); and inventions, as described in Section 2, (a) that the Employer may furnish or otherwise make available to the Employee directly or indirectly and which is identified as "confidential", (b) that the Employee originates, conceives, and/or develops as a result of any work for the Employer, the use of the Employer's premises, property, or Confidential Information, or (c) that the Employee in the exercise of reasonable judgment should know is confidential, regardless of whether it is so marked or in an intangible form (e.g. disclosed orally).

56.    Under Section 7 of the Confidentiality Agreement, Reed, Sharpe and Vanek acknowledged and agreed that:

> [They] occupie[d] a position of trust and confidence with [PartMiner] and will have access to and may develop Confidential Information of actual or potential

value to or otherwise useful to [PartMiner]. [Reed, Sharpe and Vanek] agree[] that during and after employment he or she shall treat as confidential and shall not, without written authorization from [PartMiner], disclose or use in whole or in part any Confidential Information that the Employee may acquire regarding or relating to the Employer's present or future businesses, sales, financials, products, operations, processes, personnel, or business associates, including any present or future subsidiaries or affiliates, or regarding improvements, inventions or know-how.

57.    Under Section 8 of the Confidentiality Agreement, Reed, Sharpe and Vanek agreed that they would not:

...at any time take from the Employer's premises without written authorization from the Employer any software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever, or copies thereof, which reflect or deal with Confidential Information in relation to the Employer's business, or any Inventions or any physical property of the Employer, and will promptly return the same to the Employer if taken with the aforesaid content. At the termination of the employment or at any time that the Employer may request, the Employee shall promptly deliver to the Employer all software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever made or compiled by the Employee or in the Employee's possession concerning or relating to any business, product, process, operation, personnel, or business associate of the Employer.  All such items shall be and remain at all times the Employer's property.

58.    Section 16 of each Confidentiality Agreement signed by Reed, Sharpe and Vanek contains a covenant that they would not, for two years post employment with PartMiner, "directly or indirectly solicit or encourage any other employee of [PartMiner] to leave the employment of [PartMiner]..."

59.    With respect to any disputes in connection with the Confidentiality Agreements, the parties agreed that the substantive laws of New York should apply and that each party consented to personal jurisdiction in this Court:

Section 15.  Applicable Law and Forum.  This Agreement shall be construed and interpreted and its performance shall be enforced according to the laws of the

United States and the State of New York. The Employer and the Employee consent to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

### Defendant Avnet

60.     Avnet is a direct competitor to PartMiner in the business of selling subscriptions to an online electronic parts database.

61.     Avnet's sales office is located about three (3) miles from PartMiner's headquarters.

62.     On or about October 4, 2005, Reed gave notice that he was resigning from his employment with PartMiner.

63.     About a week before he resigned, Reed asked his sales team to give him updated customer contact information and their respective sales pipelines.

64.     Upon information and belief, Reed took additional PartMiner Confidential Information about PartMiner's sales prospects, customers and other related information with him.

65.     Shortly after leaving PartMiner, Reed began employment with Avnet as a Vice President in its sales division, a position substantially similar to his position with PartMiner.

66.     Reed took PartMiner Confidential Information with the intention of using it in his employment with Avnet to compete against PartMiner.

67.     Upon information and belief, Reed solicited and encouraged Sharpe to leave PartMiner and take a job with Avnet.

68.    On or about November 18, 2005, Sharpe gave notice that he was resigning from his employment with PartMiner.

69.    Just prior to leaving PartMiner, Sharpe asked his sales team to give him updated customer contact information and their respective sales pipelines.

70.    Upon information and belief, Sharpe took additional PartMiner Confidential Information about PartMiner's sales prospects, customers and other related information with him.

71.    Shortly after leaving PartMiner, Sharpe began employment with Avnet in a position substantially similar to his position with PartMiner.

72.    Sharpe took PartMiner Confidential Information with the intention of using it in his employment with Avnet to compete against PartMiner.

73.    Upon information and belief, Reed and Sharpe solicited and encouraged Vanek to leave PartMiner and take a job with Avnet.

74.    On or about November 21, 2005, Vanek gave notice that he was resigning from his employment with PartMiner.

75.    On the day of his resignation, Vanek emailed to himself, at a personal email account, approximately eighty-five separate emails containing numerous spreadsheets and pipeline reports which were filled with PartMiner Confidential Information concerning customers and sales prospects.

76.    Upon information and belief, Vanek took additional PartMiner Confidential Information about PartMiner's sales prospects, customers and other related information with him.

77.     Shortly after leaving PartMiner, Vanek began employment with Avnet in a position substantially similar to his position with PartMiner.

78.     Vanek took PartMiner Confidential Information with the intention of using it in his employment with Avnet to compete against PartMiner.

79.     Upon information and belief, at the time that Reed, Sharpe and Vanek began employment with Avnet, Avnet knew that each of them was contractually obligated to maintain the confidentiality of PartMiner's Confidential Information.

80.     When the individual Defendants began employment with Avnet, Defendants started using PartMiner Confidential Information about its customer and sales prospects to compete against PartMiner.

81.     Because Reed is an officer of Avnet, his wrongful actions and knowledge of the other individual Defendants' wrongful actions are imputed to Avnet.

82.     Avnet is vicariously liable for the actions of the individual Defendants.

**First Federal Action**

83.     Shortly after Reed, Sharpe and Vanek resigned from PartMiner, PartMiner received information causing it to suspect that Defendants were using PartMiner Confidential Information to compete against PartMiner.

84.     At about the same time, PartMiner received information that Reed had recruited Sharpe and Vanek for employment at Avnet and was soliciting other PartMiner employees to work for Avnet in violation of Reed's Confidentiality Agreement.

85.     On December 13, 2005, PartMiner filed suit against Reed in the United States District Court for the Southern District of New York (Civ. Action No. 05-CV-10486) (WHP)

("the First Federal Action") alleging, among other things, breach of contact and claims for injunctive relief.

## Settlement Agreement

86.    On January 31, 2006, the First Federal Action was settled by the parties through a Settlement Agreement, Undertaking and Release (the "Settlement Agreement") (Attached as Exhibit "D").

87.    The Settlement Agreement was entered into by PartMiner, on one hand, and by Reed, Sharpe, Vanek and Avnet, on the other.   Reed agreed to pay (or cause to be paid) PartMiner's legal fees in the sum of $25,000.00.

88.    Paragraph 3 of the Settlement Agreement restated the definition of "Confidential Information" as found in Reed, Sharpe and Vanek's Confidentiality Agreements.

89.    In Paragraph 3(b) of the Settlement Agreement, Reed warranted that he did not have any of PartMiner's Confidential Information in his possession and that he had never disclosed any such information:

> Reed hereby represents that he has not in the past disclosed, in whole or in part, any of PartMiner's Confidential Information to any third party, and that he does not have any documents (including any information in electronic or other media) containing PartMiner's Confidential Information in his possession, custody or control. Reed further represents that any such documents that he had in his possession, custody or control upon his termination of employment from PartMiner or at any time thereafter have been returned to PartMiner or destroyed.

90.    In Paragraph 3(c) of the Settlement Agreement, Reed promised that he would not use or disclose any PartMiner Confidential Information:

> Reed hereby promises not to use or disclose, in whole or in part, any of

PartMiner's Confidential Information that he may have acquired while an employee of PartMiner or at any time thereafter, through third parties, without the written authorization of PartMiner.

91.    In Paragraph 4 of the Settlement Agreement, Avnet and Reed agreed that they would not solicit employees of PartMiner:

> In consideration of the dismissal of the Federal Court Action against Reed, and for other good and valuable consideration, the sufficiency of which is acknowledged, Reed and Avnet hereby agree that, for the period of time to and including October 18, 2007, neither Reed nor Avnet will solicit, hire or otherwise employ any individual, who, at the time, is then currently employed by PartMiner, provided that nothing in this Agreement shall be deemed to restrict Reed or Avnet in any way from engaging in general solicitation to the public that are not specifically directed or targeted to employees of PartMiner, including but not limited to such as advertisements, internet posting, participation in job fairs, etc.

92.    In Paragraphs 5(c)(i)-(ii) and 5(d)(i)-(ii) of the Settlement Agreement, Vanek and Sharpe, respectively, warranted that they did not have any of PartMiner's Confidential Information in their possession and that they had never disclosed any such information:

> [Vanek and Sharpe] hereby represents that he has not in the past disclosed, in whole or in part, any of PartMiner's Confidential Information to any third party, and that he does not have any documents (including any information in electronic or other media) containing PartMiner's Confidential Information in his possession, custody or control. [Each] further represents that any such documents that he had in his possession, custody or control upon his termination of employment from PartMiner or at any time thereafter have been returned to PartMiner or destroyed.

> [Vanek and Sharpe] hereby promises not to use or disclose, in whole or in part, any of PartMiner's Confidential Information that he may have acquired while an employee of PartMiner or at any time thereafter, through third parties, without the written authorization of PartMiner.

93.    PartMiner entered into the Settlement Agreement with Defendants in reliance on their representations that they did not have PartMiner Confidential Information in their

possession and that they would not further disclose any PartMiner Confidential Information. Without such representations, PartMiner would not have agreed to enter into the Settlement Agreement.

94.    In Paragraph 10 of the Settlement Agreement, Reed and Avnet agreed that PartMiner would be irreparably injured and entitled to an injunction if they violated the Settlement Agreement:

> In the event Reed and/or Avnet breaches Paragraph 3 of this Agreement and Reed and/or Avnet has not remedied such breach within the ten-day period referenced above, Reed and/or Avnet agree and acknowledge that PartMiner will have no adequate remedy at law and will be entitled to seek injunctive relief, in addition to any remedies at law or in equity.

### Defendants' Conduct Subsequent to the Settlement Agreement

95.    After the parties resolved the First Federal Action, PartMiner began to learn that not only Reed, but the other Defendants, were continuing to use PartMiner's Confidential Information.

96.    PartMiner received eyewitness accounts revealing that the Defendants not only had possession of Confidential Information, including customer lists, but were using it to identify and contact PartMiner's customers, target their preferences, and undercut PartMiner's price immediately before a PartMiner contract was up for renewal.

97.    PartMiner also received information that Defendants duplicated PartMiner's CARES customer relationship management program, which Reed had access to and helped develop while he was a PartMiner employee, using PartMiner Confidential Information.

98.    Upon information and belief, Reed has continued to obtain PartMiner Confidential Information by soliciting existing PartMiner employees to provide him with updated Confidential Information on PartMiner customers and sales efforts.

99.    Upon information and belief, since the settlement of the First Federal Action, Reed and Avnet have directly or indirectly solicited other individuals at PartMiner for employment with Avnet.

100.    Upon information and belief, since settlement of the First Federal Action, Defendants have continued to use and benefit from the use of PartMiner Confidential Information to solicit business from PartMiner's current and prospective customers.

101.    Upon information and belief, as a result of this wrongful use of PartMiner Confidential Information, Avnet has obtained the business of PartMiner customers and prospects that, absent such use, PartMiner would have received.

102.    Defendants have also been making false and misleading statements about PartMiner and its products and services in their sales and advertising pitches to PartMiner's current and prospective customers.

103.    For example, on nearly a daily basis between January 2006 and March 2007, one or more of the Defendants made, verbatim or in substance, one or more of the following statements via telephone and/or email to PartMiner's current and prospective customers:

   a.   PartMiner's data cannot be trusted due to integrity issues, including the fact that the data is out-of-date, not good, contains inconsistent information and that there is nothing new in the database;

   b.   The individual Defendants "jumped ship" from PartMiner because of PartMiner's data integrity issues;

   c.   There are many more engineers inputting information into the database marketed by Avnet relative to the number of PartMiner engineers performing

the same task, and specifically that there are 300 to 500 engineers inputting information into the database marketed by Avnet;

d. PartMiner makes up part numbers to make it appear that it has more parts in its database than Avnet;

e. The database marketed by Avnet is updated and made available to customers every night; and

f. PartMiner is going out of business.

104.  The foregoing statements are false or misleading and Defendants, at the time they made them, knew that they were false or misleading.

105.  Upon information and belief, Defendants continued to make such false and misleading statements to PartMiner's current and prospective customers from March 2007 to the present.

106.  The statements described above are part of Defendants' widespread, organized promotional campaign to lure customers away from PartMiner.

107.  Over the last two years, Defendants, through the wrongful conduct described above, have acquired at least fifty-one accounts from PartMiner, resulting in a loss of over $1.4 million in revenue to PartMiner. (A chart identifying these lost accounts and itemizing the monetary losses is attached as Exhibit E).

108.  Upon information and belief, Defendants' wrongful conduct as alleged above, has caused PartMiner to lose many sales to prospective customers that it would otherwise have made.

109.  Defendants' wrongful conduct has also caused PartMiner to lose opportunities for repeat business and the opportunities for referrals from each lost customer.

110.  Loss of PartMiner customers has damaged the valuation of PartMiner.

111.    PartMiner is contemplating raising capital through an IPO, and PartMiner's valuation is critical in determining how much money PartMiner can raise in the market. PartMiner's valuation is sensitive to revenue fluctuations, and PartMiner's losses to Avnet, caused by the wrongful conduct alleged above, have significantly decreased PartMiner's revenues. These reduced revenues are jeopardizing PartMiner's ability to have a successful IPO.

112.    PartMiner has also spent a great deal of time, energy and money on significant efforts to combat Defendants' wrongful conduct and convince its current customers and prospects to choose PartMiner over Avnet.   If the Defendants had not used PartMiner's Confidential Information and false and misleading advertising and promotion to try to lure customers to Avnet, PartMiner would not have had to make these extra efforts, including contract price reductions and other concessions, concerning such customers and prospects.

## CLAIMS FOR RELIEF

### First Cause of Action
### Breach of Contract (Confidentiality Agreements)

113.    PartMiner repeats and realleges paragraphs 1 through 112 of its Complaint as if fully set forth herein.

114.    Reed's Confidentiality Agreement with PartMiner prohibits him from possessing, disclosing or using PartMiner Confidential Information as that term is defined in that Agreement.

115.    Sharpe's Confidentiality Agreement with PartMiner prohibits him from possessing, disclosing or using PartMiner Confidential Information as that term is defined in that Agreement.

116.    Vanek's Confidentiality Agreement with PartMiner prohibits him from possessing, disclosing or using PartMiner Confidential Information as that term is defined in that Agreement.

117.    The Confidentiality Agreements signed by Reed, Sharpe and Vanek prohibit them, for two years post employment with PartMiner, from soliciting or encouraging PartMiner employees to leave the employ of PartMiner.

118.    Reed, Sharpe and Vanek have breached their Confidentiality Agreements by possessing, disclosing and using PartMiner Confidential Information to solicit PartMiner customers and prospects.

119.    Reed and Sharpe have also breached their Confidentiality Agreements by soliciting PartMiner employees to work for Avnet.

120.    Defendants' breaches of the Confidentiality Agreements has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

121.    As a direct and proximate result of Defendants' breaches, PartMiner has been damaged in an amount to be proven at trial.

**Second Cause of Action**
**Tortious Interference with Contractual Relations**

122.    PartMiner repeats and realleges paragraphs 1 through 121 of the Complaint as though fully set forth herein.

123.    PartMiner had a contractual relationship with Reed, Sharpe and Vanek through their Confidentiality Agreements with PartMiner.

124.    The Confidentiality Agreements prohibited the individual Defendants from possessing, disclosing or using or disclosing any PartMiner Confidential Information.

125.    Upon information and belief, prior to Reed, Sharpe and Vanek's breaches of the Confidentiality Agreements, Avnet knew about the Confidentiality Agreements and the fact that the individual Defendants were contractually prohibited from possessing, disclosing or using any PartMiner Confidential Information.

126.    In addition, because Reed is an officer of Avnet, his knowledge that the individual Defendants' Confidentiality Agreements, and the fact that they were contractually prohibited from possessing, disclosing and using PartMiner Confidential Information, is imputed to Avnet.

127.    PartMiner's existing relationships with its customers confer an economic advantage on PartMiner.

128.    Upon information and belief, Avnet has knowingly and intentionally interfered with PartMiner's contractual relations with Reed, Sharpe and Vanek by inducing them to breach their respective Confidentiality Agreements, and continues to do so.

129.    Upon information and belief, Reed knowingly and intentionally interfered with PartMiner's contractual relations with Sharpe and Vanek by inducing them to breach their respective Confidentiality Agreements, and continues to do so.

130.    Because Reed is an officer of Avnet, his wrongful conduct in knowingly and intentionally interfering with PartMiner's contractual relations with Sharpe and Vanek are imputed to Avnet.

131.    Defendants' conduct, as set forth above, was willful, wanton, malicious and/or without due regard for the rights of PartMiner.

132.    Defendants' conduct, as described above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

133.    As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

134.    PartMiner is entitled to recover punitive damages from Defendants.

### Third Cause Of Action
### Fraud In The Inducement (Settlement Agreement)

135.    PartMiner repeats and realleges paragraphs 1 through 134 of the Complaint as though fully set forth herein.

136.    In entering into the Settlement Agreement, Defendants made several material misrepresentations of fact including, but not limited to, the claim that:

> [they] had not in the past disclosed, in whole or in part, any of PartMiner's Confidential Information to any third party, and [they do] not have any documents (including any information in electronic or other media) containing PartMiner's Confidential Information in [their] possession, custody or control. [Each] represents that any such documents that he had in his possession, custody of control upon his termination of employment from PartMiner, or at any time thereafter have been returned to PartMiner or destroyed.

137.    Upon information and belief, the Defendants knew these were false representations because they had possession of PartMiner Confidential Information when they entered into the Settlement Agreement.

138.    Defendants made such representations with the express intention of inducing PartMiner to rely on them and agree to the Settlement Agreement.

139.    The Settlement Agreement is subject to rescission.

140.    As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

141.    PartMiner is entitled to recover punitive damages from Defendants.

**Fourth Cause of Action**
**Breach Of Contract (Settlement Agreement)**

142.    PartMiner repeats and realleges paragraphs 1 through 141 of the Complaint as though fully set forth herein.

143.    The Settlement Agreement prohibits the Defendants from possessing, disclosing or using any PartMiner Confidential Information.

144.    The Settlement Agreement also prohibits the Defendants from soliciting PartMiner employees to come work at Avnet.

145.    The Defendants have breached the Settlement Agreement by possessing, disclosing and using PartMiner Confidential Information to solicit PartMiner customers and prospects.

146.    Upon information and belief, the Defendants have also breached the Settlement Agreement by soliciting PartMiner employees for not only positions with Avnet, but also for additional PartMiner Confidential Information.

147.    Defendants' conduct, as described above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including,

but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

148.    As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

**Fifth Cause of Action**
**Misappropriation Of Trade Secrets**

149.    PartMiner repeats and realleges paragraphs 1 through 148 of the Complaint as though fully set forth herein.

150.    As alleged above, the PartMiner Confidential Information constitutes or includes trade secrets and other information that the law protects against misappropriation and unauthorized disclosure and use.

151.    PartMiner's Confidential Information is highly valuable to PartMiner and requires significant investment to develop and maintain.

152.    PartMiner's Confidential Information is not known outside of PartMiner and is very difficult to acquire or duplicate.

153.    PartMiner takes reasonable measures to guard the secrecy of its trade secrets and Confidential Information, as alleged above.

154.    Reed, Sharpe and Vanek acquired PartMiner Confidential Information during their employment with PartMiner and under circumstances giving rise to a duty to maintain its secrecy and limit its use to the benefit of PartMiner.

155.    Upon information and belief, Defendants are using such Confidential Information in violation of their Confidentiality Agreements, the Settlement Agreement, and duty owed to PartMiner.

156.    Upon information and belief, Avnet knew or had reason to know that Reed, Sharpe and Vanek were under a duty not to disclose PartMiner's Confidential Information or use it for the benefit of Avnet.

157.    Defendants have misappropriated PartMiner's Confidential Information as alleged above.

158.    Defendants' wrongful conduct, as described above, was willful, wanton, malicious and/or committed without due regard for PartMiner's rights.

159.    Defendants' conduct, as described above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

160.    As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

161.    PartMiner is entitled to recover punitive damages from Defendants.

## Sixth Cause of Action
## Violation of Section 43 (a) of the Lanham Act (15 U.S.C. §1125(A))

162.    PartMiner repeats and realleges paragraphs 1 through 161 of the Complaint as though fully set forth herein.

163.    As alleged above, the Defendants organized and conducted widespread promotional campaigns designed to lure current and prospective PartMiner customers to Avnet.

164.    As an integral part of these campaigns, Defendants have repeatedly made the following false and misleading statements concerning the nature and quality of PartMiner's business, services and products to PartMiner's current and prospective customers::

    a.    PartMiner's data cannot be trusted due to integrity issues, including the fact that the data is out-of-date, not good, contains inconsistent information and that there is nothing new in the database;

    b.    The individual Defendants "jumped ship" from PartMiner because of PartMiner's data integrity issues;

    c.    There are many more engineers inputting information into the database marketed by Avnet relative to the number of PartMiner engineers performing the same task, specifically that there are 300 to 500 engineers inputting information into the database marketed by Avnet;

    d.    PartMiner makes up part numbers to make it appear that it has more parts in its database than Avnet;

    e.    The database marketed by Avnet is updated and made available to customers every night; and

    f.    PartMiner is going out of business.

165.    These false and misleading statements have been made in commerce, and specifically in the context of numerous telephone and email sales campaigns directed to current and prospective PartMiner customers.

166.    Upon information and belief, these false and misleading statements were part of a standard script utilized by the Defendants in their widespread and organized promotional campaign.

167.   Upon information and belief, as part of a continuing promotional campaign, Defendants continue to make these false and misleading statements in their sales solicitations to current and prospective PartMiner customers.

168.   The foregoing acts and conduct by Defendants constitute misrepresentation of the nature, characteristics and qualities of PartMiner's goods and services in commercial advertising and promotion in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

169.   Defendants' acts, as set forth above, have caused and continue to cause irreparable injury to PartMiner's goodwill and reputation, and has resulted and will continue to result in PartMiner losing current and prospective customers.   An award of monetary damages alone cannot fully compensate PartMiner for its injuries and, therefore, PartMiner lacks an adequate remedy at law.

170.   PartMiner is entitled to a permanent injunction enjoining Defendants from making false statements, as well as all other remedies available under the Lanham Act including, but not limited to, compensatory damages, treble damages, disgorgement of profits, attorney's fees and costs.

**Seventh Cause of Action**
**Defamation**

171.   PartMiner repeats and realleges paragraphs 1 through 170 of the Complaint as though fully set forth herein.

172.   As alleged above, the Defendants intentionally published the following defamatory statements about PartMiner's business, products and services through telephone calls and electronic communications to PartMiner's current and prospective customers:

a.   PartMiner's data cannot be trusted due to integrity issues, including the fact that the data is out-of-date, not good, contains inconsistent information and that there is nothing new in the database;

b.   The individual Defendants "jumped ship" from PartMiner because of PartMiner's data integrity issues;

c.   There are many more engineers inputting information into the database marketed by Avnet relative to the number of PartMiner engineers performing the same task, specifically that there are 300 to 500 engineers inputting information into the database marketed by Avnet;

d.   PartMiner makes up part numbers to make it appear that it has more parts in its database than Avnet;

e.   The database marketed by Avnet is updated and made available to customers every night; and

f.   PartMiner is going out of business.

173.   These statements are factual in nature and provably false.

174.   At the time they were made, Defendants knew that the defamatory statements were false or made them with reckless disregard for whether they were true or false.

175.   The defamatory statements constitute defamation per se because they tend to cause injury to PartMiner's business.

176.   Defendants' conduct, as set forth above, was willful, wanton, malicious and/or without due regard for the rights of PartMiner.

177.   Defendants' conduct, as set forth above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

178.    As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

179.    Alternatively, if the defamation does not constitute defamation per se, PartMiner has suffered special damages therefrom, including, but not limited to, loss of fifty-one different accounts to Avnet, resulting in a loss of over $1.4 million in revenue to PartMiner.  (A chart identifying these lost accounts and itemizing the monetary losses is attached hereto as Exhibit E).

180.    PartMiner is entitled to recover punitive damages from Defendants.

## Eighth Cause of Action
## Business/Product Disparagement

181.    PartMiner repeats and realleges paragraphs 1 through 180 of the Complaint as though fully set forth herein.

182.    As alleged above, Defendants intentionally published the following false and disparaging oral and written statements about PartMiner's business, products and services through telephone calls and electronic communications to PartMiner's current and prospective customers:

   a.    PartMiner's data cannot be trusted due to integrity issues, including the fact that the data is out-of-date, not good, contains inconsistent information and that there is nothing new in the database;

   b.    The individual Defendants "jumped ship" from PartMiner because of PartMiner's data integrity issues;

   c.    There are many more engineers inputting information into the database marketed by Avnet relative to the number of PartMiner engineers performing the same task, specifically that there are 300 to 500 engineers inputting information into the database marketed by Avnet;

   d.    PartMiner makes up part numbers to make it appear that it has more parts in its database than Avnet;

   e.    The database marketed by Avnet is updated and made available to

customers every night; and

f.  PartMiner is going out of business.

183.  Upon information and belief, Defendants published the statements described above with actual knowledge that they were false, or with reckless disregard as to their truth or falsity. Defendants knew or should have known that the publications were substantially likely to cause PartMiner pecuniary injury. Defendants published the statements out of spite in order to harm PartMiner and interfere with PartMiner's relations with its customers and prospects.

184.  Defendants' conduct, as set forth above, was willful, wanton, malicious and/or without due regard for the rights of PartMiner.

185.  Defendants' conduct, as described above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

186.  As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

187.  As a result of Defendants' wrongful conduct as alleged above, PartMiner has suffered special damages including, but not limited to, loss of fifty-one different accounts to Avnet, resulting in a loss of over $1.4 million in revenue to PartMiner. (A chart identifying these lost accounts and itemizing the monetary losses is attached hereto as Exhibit E).

188.  PartMiner is entitled to recover punitive damages from Defendants.

## Ninth Cause of Action
### Tortious Interference With Prospective Business Advantage

189.   PartMiner repeats and realleges paragraphs 1 through 188 of the Complaint as though fully set forth herein.

190.   PartMiner has the potential to acquire contracts with new customers and continue its relationships with current customers for PartMiner's products and services.

191.   PartMiner's existing relationships with its customers confer an economic advantage on PartMiner.

192.   Defendants have employed wrongful means to interfere with these prospective and ongoing relationships, including (a) use of Confidential Information to solicit current and prospective customers, in violation of the Confidentiality Agreements and Settlement Agreement and (b) the making of false and defamatory representations to current and prospective customers concerning PartMiner and its goods and services, as alleged above.  As a result of this wrongful conduct, many of PartMiner's existing customers, who would otherwise have renewed their contracts with PartMiner, instead switched their business to Avnet, and many of its prospective customers, which would otherwise have given their business to PartMiner, instead gave that business to Avnet.

193.   Defendants committed such wrongful conduct for the purpose of injuring PartMiner in its prospective business and commercial relations.

194.   Such wrongful conduct constitutes tortious interference with PartMiner's prospective contractual relations.

195.   Defendants' conduct, as set forth above, was willful, wanton, malicious and/or without due regard for the rights of PartMiner.

196.    Defendants' conduct, as described above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

197.    As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

198.    PartMiner is entitled to recover punitive damages from Defendants.

### Tenth Cause of Action
### Unfair Competition

199.    PartMiner repeats and realleges paragraphs 1 through 198 of the Complaint as though fully set forth herein.

200.    Defendants wrongful conduct, as alleged above, constitutes unfair competition under New York common law.

201.    Defendants' conduct, as set forth above, was willful, wanton, malicious and/or without due regard for the rights of PartMiner.

202.    Defendants' conduct, as described above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

203. As a direct and proximate result of Defendants' conduct, as described above, PartMiner has been damaged in an amount to be proven at trial.

204. PartMiner is entitled to recover punitive damages from Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, PartMiner demands judgment against the Defendants as follows:

a) Granting a preliminary and permanent injunction enjoining and restraining Defendants, and all those acting in connection with them, from misappropriating, divulging, disseminating, utilizing or otherwise making use of PartMiner's Confidential Information.

b) Granting a preliminary and permanent injunction enjoining and restraining Defendants from directly or indirectly contracting or soliciting business from any PartMiner customer that Defendants gained knowledge about though PartMiner's Confidential Information including, but not limited to, its customer lists.

c) Requiring Defendants, and all those acting in connection with them, to immediately return to PartMiner any and all of PartMiner's Confidential Information (as defined in the Confidentiality and Settlement Agreements), or any document or thing embodying any part of the Confidential Information, in their possession, custody or control;

d) Granting a preliminary and permanent injunction enjoining and restraining Defendants from making any false or misleading statements about PartMiner's business, services or products;

e) Awarding PartMiner compensatory damages in an amount to be proven at trial, but which exceeds $75,000, exclusive of interest and costs;

f) Awarding PartMiner punitive damages in an amount to be proven at trial;

g)     Awarding PartMiner its reasonable attorney's fees, costs of suit and interest; and

h)     Awarding PartMiner such other and further relief as the Court may deem just and proper.

## JURY DEMAND

PartMiner demands trial by jury on all issues so triable.

Dated: New York, New York
        December 21, 2007

                              DLA PIPER US LLP

                              By: _____

                              Eric M. Falkenberry (EF 9001)
                              eric.falkenberry@dlapiper.com
                              Andrew L. Deutsch (AD 5782)
                              andrew.deutsch@dlapiper.com
                              1251 Avenue of the Americas
                              New York, New York 10020
                              (212) 355-4500
                              *Attorneys for Plaintiff*

# EXHIBIT A

# CONFIDENTIALITY AGREEMENT

This Agreement is made effective this *04* day of *May, 2001*, by and between employee *Thomas Casey Reed*, residing at the address set forth below (hereinafter referred to as "the Employee"), and PartMiner, Inc., a New York corporation having its principal place of business at 432 Park Avenue South, 12th Floor, New York, New York 10016 (hereinafter referred to as "the Employer"), in consideration of the hiring, employment, and continued employment of the Employee by the Employer, the current and future compensation, including any possible future increases in compensation, paid in respect to employment, and the responsibilities assigned and access granted to the Employee in connection with the Employer's proprietary and confidential information.

Section 1.  Confidential Information.  The term "Confidential Information," as used in this Agreement, shall mean, individually and collectively, any and all information, including, without limitation, information relating to products; compositions; processes; technologies; inventions; know-how; designs; specifications; formulas; methods, including manufacturing procedures and technical methods; materials; devices; developmental or experimental work; improvements; discoveries; past, current, planned, and future research and data, including financial and cost data; databases; software; manuals; reports; internal policies and procedures; patent applications; licenses; research and development programs or agreements; marketing plans and survey and trade information (including customer lists, customer usages and requirements); and inventions, as described in Section 2, (a) that the Employer may furnish or otherwise make available to the Employee directly or indirectly and which is identified as "confidential", (b) that the Employee originates, conceives, and/or develops as a result of any work for the Employer, the use of the Employer's premises, property, or Confidential Information, or (c) that the Employee in the exercise of reasonable judgment should know is confidential, regardless of whether it is so marked or in an intangible form (e.g. disclosed orally).

Notwithstanding the foregoing, the term "Confidential Information" shall not include information, which as can be demonstrated by written records (a) was already in the Employee's possession or control prior to the date of disclosure (provided that if such information was subject to an earlier confidentiality agreement or other contractual, legal, or fiduciary obligation of secrecy owed by the Employee to the Employer, nothing in this section shall abrogate such earlier duty); (b) was on the date of disclosure within, or thereafter enters, the public domain other than as a result of a disclosure by the Employee; or (c) becomes available to the Employee on a non-confidential basis from a source other than the Employer, provided that such source is not prohibited by a confidentiality agreement with or other contractual, legal, or fiduciary obligation of nondisclosure to the Employer.

Section 2.  Inventions.  The term "Inventions" means discoveries, improvements, and ideas, regardless of whether or not they are patentable or made, conceived or reduced to practice (either solely or jointly with others) during working hours or with the Employer's facilities or otherwise, and any and all copyrightable subject matter and any other matter that may

be protected under intellectual property law in any jurisdiction. The Employee acknowledges that it is his or her obligation to disclose, and the Employee shall disclose without further consideration, immediately in writing to his or her supervisor, or to any other person designated by the Employer to receive these disclosures, each and every invention or improvement, whether or not patentable, that the Employee may make or conceive, either solely or jointly with others, during the period of his or her employment which (a) results from any work for the Employer, any use of the Employer's premises or property, or any use of the Employer's Confidential Information or other resources; (b) relates to any method, process, apparatus, shop practice, or know-how that has been developed, or is in development, by the Employer or that may be useful or valuable to the Employer; or (c) relates to any product, article of manufacture, or composition of matter being developed, made, sold, or used in connection with the Employer's business or the Employer's research or development.

The Employee further acknowledges that it is his or her obligation to assign, and the Employee shall assign without further consideration, his or her rights in any invention or improvement even if no equipment, supplies, facilities, or Confidential Information of the Employer was used, and even if the invention or improvement was developed entirely on the employee's own time, in the event that (a) the invention or improvement relates directly to the Employer's business or to the Employer's actual or demonstrably anticipated research or development or (b) the invention or improvement results from any work performed by the Employee for the Employer.

Section 3. Copyright. The Employee acknowledges that it is his or her obligation to disclose, and the Employee shall disclose without further consideration, immediately in writing to his or her supervisor, or to any other person designated by the Employer to receive these disclosures, each and every original work of authorship, whether or not copyrightable, that the Employee may write, record, or otherwise fix in a tangible medium of expression (including computer media), either solely or jointly with others, during the period of his or her employment which (a) results from any work for the Employer, any use of the Employer's premises or property, or any use of the Employer's Confidential Information or other resources; (b) relates to any method, process, apparatus, shop practice, or know-how that has been developed, or is in development, by the Employer or that may be useful or valuable to the Employer; or (c) relates to any product, article of manufacture, or composition of matter being developed, made, sold, or used in connection with the Employer's business or the Employer's research or development.

The Employee further acknowledges that it is his or her obligation to assign, and the Employee shall assign without further consideration, his or her rights in any original work of authorship even if no equipment, supplies, facilities, or Confidential Information of the Employer was used, and even if the original work of authorship was developed entirely on the employee's own time, in the event that (a) the original work of authorship relates directly to the Employer's business or to the Employer's actual or demonstrably anticipated research or development or (b) the original work of authorship results from any work performed by the Employee for the Employer.

Section 4.  Other Intellectual Property.  The Employee agrees to disclose promptly to the Employer, and that the Employer shall own, any and all additional intellectual property not specified in Sections 2 and 3 above.  Such additional intellectual property shall include, without limitation and to the extent that it is not already specified in Sections 2 and 3, any and all trade secrets; know-how; designations of source or origin, such as trademarks, trade names, and trade dress; mask works; databases; and any and all documentation related to such intellectual property.

Section 5.  Employer Property.  The Employee agrees that all inventions, improvements, and original works of authorship referred to in Sections 2, 3, and 4 shall be the Employer's sole and exclusive property unless the Employer's rights are waived in writing by an elected or appointed officer of the Employer.

Section 6.  Employee Cooperation.  Upon the Employer's request at any time during employment or after its termination, the Employee shall promptly review, sign, and return all documents, communicate all pertinent information, and do anything else reasonably requested by the Employer to transfer all rights to any inventions, improvements, original works of authorship and intellectual property referred to in Sections 2, 3, 4, or 5 to the Employer or its nominee, and to help the Employer apply for, obtain, modify, defend, enforce, and/or transfer its patent, trade secret, copyright, and comparable rights for these inventions, improvements, and original works of authorship anywhere in the world.  The Employee shall be reimbursed for any reasonable expenses actually incurred to comply with this Section.  The Employee shall not be entitled to further consideration for services rendered or rights transferred according to this Section, except that if the Employee is no longer employed by the Employer when services according to this Section are rendered, the Employee shall be entitled to receive reasonable compensation for the time reasonably required to render these services.

Section 7.  Information Access and Confidentiality.  The Employee acknowledges that the Employee occupies a position of trust and confidence with the Employer and will have access to and may develop Confidential Information of actual or potential value to or otherwise useful to the Employer.  The Employee agrees that during and after employment he or she shall treat as confidential and shall not, without written authorization from the Employer, disclose or use in whole or in part any Confidential Information that the Employee may acquire regarding or relating to the Employer's present or future businesses, sales, financials, products, operations, processes, personnel, or business associates, including any present or future subsidiaries or affiliates, or regarding improvements, inventions, or know-how.

Section 8.  Employer Property Return.  The Employee agrees that it will not at any time take from the Employer's premises without written authorization from the Employer any software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever, or copies thereof, which reflect or deal with Confidential Information in relation to the Employer's business, or any Inventions or any physical property of the Employer, and will promptly return

- 3 -

the same to the Employer if taken with the aforesaid consent.  At the termination of the employment or at any other time that the Employer may request, the Employee shall promptly deliver to the Employer all software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever made or compiled by the Employee or in the Employee's possession concerning or relating to any business, product, process, operation, personnel, or business associate of the Employer.  All such items shall be and remain at all times the Employer's property.

Section 9.    At-Will Employment.    This Agreement does not constitute an employment contract for a specific term.  The Employee acknowledges that the Employee is free to resign from employment and the Employer is free to terminate the employee's employment at any time, for any reason or no reason, with or without notice.

Section 10.    Conflict of Interest.    The parties recognize that this Agreement provides certain protections to the Employer, its employees, customers, suppliers, and other business associates.  The Employee represents that he or she is aware of no actual or potential conflict of interest and that he or she possesses no information that may create such a conflict of interest with respect to the Employer and/or its business associates.

Section 11.    Successors and Assigns.    This Agreement shall apply to all work performed by the Employee for the Employer, including any of its past, present, or future affiliates or subsidiaries.  This Agreement shall inure to the benefit of the Employer's successors and assigns and shall be binding upon the Employee's assigns, executors, administrators, and other legal representatives.

Section 12.    Prior Agreements.    This Agreement supersedes any and all prior agreements between the parties to the extent of the subject matter of this Agreement, unless another written agreement expressly provides that it shall not be superseded by this Agreement.  This Agreement can only be amended, altered, or terminated and its provisions can only be waived by agreement in writing signed by the Employee and an executive officer of the Employer.

Section 13.    Separability.    If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid or unenforceable, either in general or as applied to a particular occurrence or circumstance, such determination shall not affect the validity and enforceability of any other provisions of this Agreement.

Section 14.    Remedies.    The Employer and the Employee both recognize that the employee's obligations, more particularly described above, (i) to assign certain inventions to the Employer and (ii) to refrain from disclosing or using Confidential Information are special, unique, and of extraordinary character, such that monetary damages could not be adequate to cure or remedy a breach.  The Employee agrees that for any actual or threatened breach, the Employer shall be entitled, in addition to any other remedies available to it, to an injunction and to secure

- 4 -

specific performance of this Agreement, plus the recovery of reasonable attorney fees and costs incurred in prosecuting an action to obtain such remedies. Any failure in the exercise by either party of its rights to terminate this Agreement or to enforce any provision of this Agreement for default or violation by the other party shall not prejudice that party's right of termination or enforcement for any further or other default or violation.

Section 15.  Applicable Law and Forum.  This Agreement shall be construed and interpreted and its performance shall be enforced according to the laws of the United States and the State of New York.  The Employer and the Employee consent to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

Section 16.  Employee Representation.   The Employee hereby represents and warrants to the Employer that (i) Employee has all requisite power and authority, and does not require the consent of any third party to enter into this Agreement and grant the rights provided herein; (ii) the execution, delivery and performance of this Agreement by the Employee does not and will not conflict with, breach, violate or cause a default under any agreement, contract or instrument to which the Employee is a party or any judgment, order or decree to which the Employee is subject; (iii) the Employee is not a party to or bound by any employment agreement, consulting agreement, non-compete agreement, confidentiality agreement or similar agreement with any other person; (iv) the services performed by the Employee and all items and/or materials furnished by the Employer in connection with or as a result of such services shall not infringe upon or violate the personal, civil or property rights, or the rights of privacy of, or constitute a libel, slander or unfair competition against or violate or infringe upon any common law right, copyright, trademark, trade name, patent or any other right of any person or entity.  If the Employee should cease to be employed by the Employer, the Employee shall not, without the Employer's prior written consent, directly or indirectly solicit or encourage any other employee of the Employer to leave the employment of the Employer or hire any employee who has left the employment of the Employer within two (2) years of said termination of such employee's employment with the Employer.

- 5 -

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

EMPLOYEE

_Thomas Casey Rea_
Employee Signature

_Thomas Casey Read_
Print Employee Name

Employee Home Address:

_1113  Blackwurf  Dr_

_Parker, Co. 80138_

PARTMINER, INC.

By: _Sarah Bachus_

Title: _HR Assistant_

Witness Signature

Print Witness Name and Address

Date Witnessed

- 6 -

# EXHIBIT B

## CONFIDENTIALITY AGREEMENT

This Agreement is made effective this _1st_ day of _July, 2002_, by and between employee _John Kenneth Sharpe_, residing at the address set forth below (hereinafter referred to as "the Employee"), and PartMiner, Inc., a New York corporation having its principal place of business at 432 Park Avenue South, 12th Floor, New York, New York 10016 (hereinafter referred to as "the Employer"), in consideration of the hiring, employment, and continued employment of the Employee by the Employer, the current and future compensation, including any possible future increases in compensation, paid in respect to employment, and the responsibilities assigned and access granted to the Employee in connection with the Employer's proprietary and confidential information.

Section 1. Confidential Information. The term "Confidential Information," as used in this Agreement, shall mean, individually and collectively, any and all information, including, without limitation, information relating to products; compositions; processes; technologies; inventions; know-how; designs; specifications; formulas; methods, including manufacturing procedures and technical methods; materials; devices; developmental or experimental work; improvements; discoveries; past, current, planned, and future research and data, including financial and cost data; databases; software; manuals; reports; internal policies and procedures; patent applications; licenses; research and development programs or agreements; marketing plans and survey and trade information (including customer lists, customer usages and requirements); and inventions, as described in Section 2, (a) that the Employer may furnish or otherwise make available to the Employee directly or indirectly and which is identified as "confidential", (b) that the Employee originates, conceives, and/or develops as a result of any work for the Employer, the use of the Employer's premises, property, or Confidential Information, or (c) that the Employee in the exercise of reasonable judgment should know is confidential, regardless of whether it is so marked or in an intangible form (e.g. disclosed orally).

Notwithstanding the foregoing, the term "Confidential Information" shall not include information, which as can be demonstrated by written records (a) was already in the Employee's possession or control prior to the date of disclosure (provided that if such information was subject to an earlier confidentiality agreement or other contractual, legal, or fiduciary obligation of secrecy owed by the Employee to the Employer, nothing in this section shall abrogate such earlier duty); (b) was on the date of disclosure within, or thereafter enters, the public domain other than as a result of a disclosure by the Employee; or (c) becomes available to the Employee on a non-confidential basis from a source other than the Employer, provided that such source is not prohibited by a confidentiality agreement with or other contractual, legal, or fiduciary obligation of nondisclosure to the Employer.

Section 2. Inventions. The term "Inventions" means discoveries, improvements, and ideas, regardless of whether or not they are patentable or made, conceived or reduced to practice (either solely or jointly with others) during working hours or with the Employer's facilities or otherwise, and any and all copyrightable subject matter and any other matter that may be protected

under intellectual property law in any jurisdiction. The Employee acknowledges that it is his or her obligation to disclose, and the Employee shall disclose without further consideration, immediately in writing to his or her supervisor, or to any other person designated by the Employer to receive these disclosures, each and every invention or improvement, whether or not patentable, that the Employee may make or conceive, either solely or jointly with others, during the period of his or her employment which (a) results from any work for the Employer, any use of the Employer's premises or property, or any use of the Employer's Confidential Information or other resources; (b) relates to any method, process, apparatus, shop practice, or know-how that has been developed, or is in development, by the Employer or that may be useful or valuable to the Employer; or (c) relates to any product, article of manufacture, or composition of matter being developed, made, sold, or used in connection with the Employer's business or the Employer's research or development.

The Employee further acknowledges that it is his or her obligation to assign, and the Employee shall assign without further consideration, his or her rights in any invention or improvement even if no equipment, supplies, facilities, or Confidential Information of the Employer was used, and even if the invention or improvement was developed entirely on the employee's own time, in the event that (a) the invention or improvement relates directly to the Employer's business or to the Employer's actual or demonstrably anticipated research or development or (b) the invention or improvement results from any work performed by the Employee for the Employer.

Section 3.  Copyright. The Employee acknowledges that it is his or her obligation to disclose, and the Employee shall disclose without further consideration, immediately in writing to his or her supervisor, or to any other person designated by the Employer to receive these disclosures, each and every original work of authorship, whether or not copyrightable, that the Employee may write, record, or otherwise fix in a tangible medium of expression (including computer media), either solely or jointly with others, during the period of his or her employment which (a) results from any work for the Employer, any use of the Employer's premises or property, or any use of the Employer's Confidential Information or other resources; (b) relates to any method, process, apparatus, shop practice, or know-how that has been developed, or is in development, by the Employer or that may be useful or valuable to the Employer; or (c) relates to any product, article of manufacture, or composition of matter being developed, made, sold, or used in connection with the Employer's business or the Employer's research or development.

The Employee further acknowledges that it is his or her obligation to assign, and the Employee shall assign without further consideration, his or her rights in any original work of authorship even if no equipment, supplies, facilities, or Confidential Information of the Employer was used, and even if the original work of authorship was developed entirely on the employee's own time, in the event that (a) the original work of authorship relates directly to the Employer's business or to the Employer's actual or demonstrably anticipated research or development or (b) the original work of authorship results from any work performed by the Employee for the Employer.

Section 4.  Other Intellectual Property. The Employee agrees to disclose promptly to the Employer, and that the Employer shall own, any and all additional intellectual property not specified in Sections 2 and 3 above. Such additional intellectual property shall include, without

- 2 -

limitation and to the extent that it is not already specified in Sections 2 and 3, any and all trade secrets; know-how; designations of source or origin, such as trademarks, trade names, and trade dress; mask works; databases; and any and all documentation related to such intellectual property.

Section 5.   Employer Property.   The Employee agrees that all inventions, improvements, and original works of authorship referred to in Sections 2, 3, and 4 shall be the Employer's sole and exclusive property unless the Employer's rights are waived in writing by an elected or appointed officer of the Employer.

Section 6.  Employee Cooperation.  Upon the Employer's request at any time during employment or after its termination, the Employee shall promptly review, sign, and return all documents, communicate all pertinent information, and do anything else reasonably requested by the Employer to transfer all rights to any inventions, improvements, original works of authorship and intellectual property referred to in Sections 2, 3, 4, or 5 to the Employer or its nominee, and to help the Employer apply for, obtain, modify, defend, enforce, and/or transfer its patent, trade secret, copyright, and comparable rights for these inventions, improvements, and original works of authorship anywhere in the world. The Employee shall be reimbursed for any reasonable expenses actually incurred to comply with this Section.  The Employee shall not be entitled to further consideration for services rendered or rights transferred according to this Section, except that if the Employee is no longer employed by the Employer when services according to this Section are rendered, the Employee shall be entitled to receive reasonable compensation for the time reasonably required to render these services.

Section 7.  Information Access and Confidentiality.  The Employee acknowledges that the Employee occupies a position of trust and confidence with the Employer and will have access to and may develop Confidential Information of actual or potential value to or otherwise useful to the Employer.   The Employee agrees that during and after employment he or she shall treat as confidential and shall not, without written authorization from the Employer, disclose or use in whole or in part any Confidential Information that the Employee may acquire regarding or relating to the Employer's present or future businesses, sales, financials, products, operations, processes, personnel, or business associates, including any present or future subsidiaries or affiliates, or regarding improvements, inventions, or know-how.

Section 8.  Employer Property Return.  The Employee agrees that it will not at any time take from the Employer's premises without written authorization from the Employer any software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever, or copies thereof, which reflect or deal with Confidential Information in relation to the Employer's business, or any Inventions or any physical property of the Employer, and will promptly return the same to the Employer if taken with the aforesaid consent. At the termination of the employment or at any other time that the Employer may request, the Employee shall promptly deliver to the Employer all software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever made or compiled by the Employee or in the Employee's possession concerning or relating to any business,

- 3 -

product, process, operation, personnel, or business associate of the Employer. All such items shall be and remain at all times the Employer's property.

Section 9. At-Will Employment. This Agreement does not constitute an employment contract for a specific term. The Employee acknowledges that the Employee is free to resign from employment and the Employer is free to terminate the employee's employment at any time, for any reason or no reason, with or without notice.

Section 10. Conflict of Interest. The parties recognize that this Agreement provides certain protections to the Employer, its employees, customers, suppliers, and other business associates. The Employee represents that he or she is aware of no actual or potential conflict of interest and that he or she possesses no information that may create such a conflict of interest with respect to the Employer and/or its business associates.

Section 11. Successors and Assigns. This Agreement shall apply to all work performed by the Employee for the Employer, including any of its past, present, or future affiliates or subsidiaries. This Agreement shall inure to the benefit of the Employer's successors and assigns and shall be binding upon the Employee's assigns, executors, administrators, and other legal representatives.

Section 12. Prior Agreements. This Agreement supersedes any and all prior agreements between the parties to the extent of the subject matter of this Agreement, unless another written agreement expressly provides that it shall not be superseded by this Agreement. This Agreement can only be amended, altered, or terminated and its provisions can only be waived by agreement in writing signed by the Employee and an executive officer of the Employer.

Section 13. Separability. If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid or unenforceable, either in general or as applied to a particular occurrence or circumstance, such determination shall not affect the validity and enforceability of any other provisions of this Agreement.

Section 14. Remedies. The Employer and the Employee both recognize that the employee's obligations, more particularly described above, (i) to assign certain inventions to the Employer and (ii) to refrain from disclosing or using Confidential Information are special, unique, and of extraordinary character, such that monetary damages could not be adequate to cure or remedy a breach. The Employee agrees that for any actual or threatened breach, the Employer shall be entitled, in addition to any other remedies available to it, to an injunction and to secure specific performance of this Agreement, plus the recovery of reasonable attorney fees and costs incurred in prosecuting an action to obtain such remedies. Any failure in the exercise by either party of its rights to terminate this Agreement or to enforce any provision of this Agreement for default or violation by the other party shall not prejudice that party's right of termination or enforcement for any further or other default or violation.

Section 15. Applicable Law and Forum. This Agreement shall be construed and interpreted and its performance shall be enforced according to the laws of the United States and the State of New York. The Employer and the Employee consent to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

Section 16. Employee Representation. The Employee hereby represents and warrants to the Employer that (i) Employee has all requisite power and authority, and does not require the consent of any third party to enter into this Agreement and grant the rights provided herein; (ii) the execution, delivery and performance of this Agreement by the Employee does not and will not conflict with, breach, violate or cause a default under any agreement, contract or instrument to which the Employee is a party or any judgment, order or decree to which the Employee is subject; (iii) the Employee is not a party to or bound by any employment agreement, consulting agreement, non-compete agreement, confidentiality agreement or similar agreement with any other person; (iv) the services performed by the Employee and all items and/or materials furnished by the Employee in connection with or as a result of such services shall not infringe upon or violate the personal, civil or property rights, or the rights of privacy of, or constitute a libel, slander or unfair competition against or violate or infringe upon any common law right, copyright, trademark, trade name, patent or any other right of any person or entity. If the Employee should cease to be employed by the Employer, the Employee shall not, without the Employer's prior written consent, directly or indirectly solicit or encourage any other employee of the Employer to leave the employment of the Employer or hire any employee who has left the employment of the Employer within two (2) years of said termination of such employee's employment with the Employer.

- 5 -

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

EMPLOYEE

_John Kenneth Sharpe_ (signature)
Employee Signature

_John Kenneth Sharpe_
Print Employee Name

_Suzanne Sharpe_ (signature)
Witness Signature

_Suzanne Sharpe_
Print Witness Name and Address
9018 Copeland St.
Littleton, CO  80126

_6/12/07_
Date Witnessed

Employee Home Address:

9018 Copeland St.

Littleton, CO  80126

PARTMINER, INC.

By: _Michael R Manley_

Title: GENERAL COUNSEL

- 6 -

# EXHIBIT C

## CONFIDENTIALITY AGREEMENT

*November*  This Agreement is made effective this *16* day of _____, by and between employee *NEIL R. VANEK* _____, residing at the address set forth below (hereinafter referred to as ''the Employee''), and PartMiner, Inc., a New York corporation having its principal place of business at 80 Ruland Road, Melville, NY 11747 (hereinafter referred to as ''the Employer''), in consideration of the hiring, employment, and continued employment of the Employee by the Employer, the current and future compensation, including any possible future increases in compensation, paid in respect to employment, and the responsibilities assigned and access granted to the Employee in connection with the Employer's proprietary and confidential information.

Section 1. Confidential Information. The term ''Confidential Information,'' as used in this Agreement, shall mean, individually and collectively, any and all information, including, without limitation, information relating to products; compositions; processes; technologies; inventions; know-how; designs; specifications; formulas; methods, including manufacturing procedures and technical methods; materials; devices; developmental or experimental work; improvements; discoveries; past, current, planned, and future research and data, including financial and cost data; databases; software; manuals; reports; internal policies and procedures; patent applications; licenses; research and development programs or agreements; marketing plans and survey and trade information (including customer lists, customer usages and requirements); and inventions, as described in Section 2, (a) that the Employer may furnish or otherwise make available to the Employee directly or indirectly and which is identified as ''confidential'', (b) that the Employee originates, conceives, and/or develops as a result of any work for the Employer, the use of the Employer's premises, property, or Confidential Information, or (c) that the Employee in the exercise of reasonable judgment should know is confidential, regardless of whether it is so marked or in an intangible form (e.g. disclosed orally).

Notwithstanding the foregoing, the term ''Confidential Information'' shall not include information, which as can be demonstrated by written records (a) was already in the Employee's possession or control prior to the date of disclosure (provided that if such information was subject to an earlier confidentiality agreement or other contractual, legal, or fiduciary obligation of secrecy owed by the Employee to the Employer, nothing in this section shall abrogate such earlier duty); (b) was on the date of disclosure within, or thereafter enters, the public domain other than as a result of a disclosure by the Employee; or (c) becomes available to the Employee on a non-confidential basis from a source

other than the Employer, provided that such source is not prohibited by a confidentiality agreement with or other contractual, legal, or fiduciary obligation of nondisclosure to the Employer.

     Section 2. Inventions. The term ''Inventions'' means discoveries, improvements, and ideas, regardless of whether or not they are patentable or made, conceived or reduced to practice (either solely or jointly with others) during working hours or with the Employer's facilities or otherwise, and any and all copyrightable subject matter and any other matter that may be protected under intellectual property law in any jurisdiction. The Employee acknowledges that it is his or her obligation to disclose, and the Employee shall disclose without further consideration, immediately in writing to his or her supervisor, or to any other person designated by the Employer to receive these disclosures, each and every invention or improvement, whether or not patentable, that the Employee may make or conceive, either solely or jointly with others, during the period of his or her employment which (a) results from any work for the Employer, any use of the Employer's premises or property, or any use of the Employer's Confidential Information or other resources; (b) relates to any method, process, apparatus, shop practice, or know-how that has been developed, or is in development, by the Employer or that may be useful or valuable to the Employer; or (c) relates to any product, article of manufacture, or composition of matter being developed, made, sold, or used in connection with the Employer's business or the Employer's research or development.

     The Employee further acknowledges that it is his or her obligation to assign, and the Employee shall assign without further consideration, his or her rights in any invention or improvement even if no equipment, supplies, facilities, or Confidential Information of the Employer was used, and even if the invention or improvement was developed entirely on the employee's own time, in the event that (a) the invention or improvement relates directly to the Employer's business or to the Employer's actual or demonstrably anticipated research or development or (b) the invention or improvement results from any work performed by the Employee for the Employer.

     Section 3. Copyright. The Employee acknowledges that it is his or her obligation to disclose, and the Employee shall disclose without further consideration, immediately in writing to his or her supervisor, or to any other person designated by the Employer to receive these disclosures, each and every original work of authorship, whether or not copyrightable, that the Employee may write, record, or otherwise fix in a tangible medium of expression (including computer media), either solely or jointly with others, during the period of his or her employment which (a) results from any work for the Employer, any use of the Employer's premises or

- 2 -

property, or any use of the Employer's Confidential Information or other resources; (b) relates to any method, process, apparatus, shop practice, or know-how that has been developed, or is in development, by the Employer or that may be useful or valuable to the Employer; or (c) relates to any product, article of manufacture, or composition of matter being developed, made, sold, or used in connection with the Employer's business or the Employer's research or development.

The Employee further acknowledges that it is his or her obligation to assign, and the Employee shall assign without further consideration, his or her rights in any original work of authorship even if no equipment, supplies, facilities, or Confidential Information of the Employer was used, and even if the original work of authorship was developed entirely on the employee's own time, in the event that (a) the original work of authorship relates directly to the Employer's business or to the Employer's actual or demonstrably anticipated research or development or (b) the original work of authorship results from any work performed by the Employee for the Employer.

Section 4.  Other Intellectual Property.  The Employee agrees to disclose promptly to the Employer, and that the Employer shall own, any and all additional intellectual property not specified in Sections 2 and 3 above.  Such additional intellectual property shall include, without limitation and to the extent that it is not already specified in Sections 2 and 3, any and all trade secrets; know-how; designations of source or origin, such as trademarks, trade names, and trade dress; mask works; databases; and any and all documentation related to such intellectual property.

Section 5.  Employer Property.  The Employee agrees that all inventions, improvements, and original works of authorship referred to in Sections 2, 3, and 4 shall be the Employer's sole and exclusive property unless the Employer's rights are waived in writing by an elected or appointed officer of the Employer.

Section 6.  Employee Cooperation.  Upon the Employer's request at any time during employment or after its termination, the Employee shall promptly review, sign, and return all documents, communicate all pertinent information, and do anything else reasonably requested by the Employer to transfer all rights to any inventions, improvements, original works of authorship and intellectual property referred to in Sections 2, 3, 4, or 5 to the Employer or its nominee, and to help the Employer apply for, obtain, modify, defend, enforce, and/or transfer its patent, trade secret, copyright, and comparable rights for these inventions, improvements, and original works of authorship anywhere in the world.  The Employee shall be reimbursed for any reasonable expenses actually incurred to comply with this Section.  The

- 3 -

Employee shall not be entitled to further consideration for services rendered or rights transferred according to this Section, except that if the Employee is no longer employed by the Employer when services according to this Section are rendered, the Employee shall be entitled to receive reasonable compensation for the time reasonably required to render these services.

Section 7. <u>Information Access and Confidentiality</u>. The Employee acknowledges that the Employee occupies a position of trust and confidence with the Employer and will have access to and may develop Confidential Information of actual or potential value to or otherwise useful to the Employer. The Employee agrees that during and after employment he or she shall treat as confidential and shall not, without written authorization from the Employer, disclose or use in whole or in part any Confidential Information that the Employee may acquire regarding or relating to the Employer's present or future businesses, sales, financials, products, operations, processes, personnel, or business associates, including any present or future subsidiaries or affiliates, or regarding improvements, inventions, or know-how.

Section 8. <u>Employer Property Return</u>. The Employee agrees that it will not at any time take from the Employer's premises without written authorization from the Employer any software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever, or copies thereof, which reflect or deal with Confidential Information in relation to the Employer's business, or any Inventions or any physical property of the Employer, and will promptly return the same to the Employer if taken with the aforesaid consent. At the termination of the employment or at any other time that the Employer may request, the Employee shall promptly deliver to the Employer all software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever made or compiled by the Employee or in the Employee's possession concerning or relating to any business, product, process, operation, personnel, or business associate of the Employer. All such items shall be and remain at all times the Employer's property.

Section 9. <u>At-Will Employment</u>. This Agreement does not constitute an employment contract for a specific term. The Employee acknowledges that the Employee is free to resign from employment and the Employer is free to terminate the employee's employment at any time, for any reason or no reason, with or without notice.

Section 10. <u>Conflict of Interest</u>. The parties recognize that this Agreement provides certain protections to the Employer,

- 4 -

its employees, customers, suppliers, and other business associates. The Employee represents that he or she is aware of no actual or potential conflict of interest and that he or she possesses no information that may create such a conflict of interest with respect to the Employer and/or its business associates.

Section 11.  Successors and Assigns.  This Agreement shall apply to all work performed by the Employee for the Employer, including any of its past, present, or future affiliates or subsidiaries.  This Agreement shall inure to the benefit of the Employer's successors and assigns and shall be binding upon the Employee's assigns, executors, administrators, and other legal representatives.

Section 12.  Prior Agreements.  This Agreement supersedes any and all prior agreements between the parties to the extent of the subject matter of this Agreement, unless another written agreement expressly provides that it shall not be superseded by this Agreement. This Agreement can only be amended, altered, or terminated and its provisions can only be waived by agreement in writing signed by the Employee and an executive officer of the Employer.

Section 13.  Separability.  If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid or unenforceable, either in general or as applied to a particular occurrence or circumstance, such determination shall not affect the validity and enforceability of any other provisions of this Agreement.

Section 14.  Remedies.  The Employer and the Employee both recognize that the employee's obligations, more particularly described above, (i) to assign certain inventions to the Employer and (ii) to refrain from disclosing or using Confidential Information are special, unique, and of extraordinary character, such that monetary damages could not be adequate to cure or remedy a breach.  The Employee agrees that for any actual or threatened breach, the Employer shall be entitled, in addition to any other remedies available to it, to an injunction and to secure specific performance of this Agreement, plus the recovery of reasonable attorney fees and costs incurred in prosecuting an action to obtain such remedies.  Any failure in the exercise by either party of its rights to terminate this Agreement or to enforce any provision of this Agreement for default or violation by the other party shall not prejudice that party's right of termination or enforcement for any further or other default or violation.

Section 15.  Applicable Law and Forum.  This Agreement shall be construed and interpreted and its performance shall be enforced according to the laws of the United States and the State of New York.  The Employer and the Employee consent to personal

- 5 -

jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

Section 16.    Employee Representation.    The Employee hereby represents and warrants to the Employer that (i) Employee has all requisite power and authority, and does not require the consent of any third party to enter into this Agreement and grant the rights provided herein; (ii) the execution, delivery and performance of this Agreement by the Employee does not and will not conflict with, breach, violate or cause a default under any agreement, contract or instrument to which the Employee is a party or any judgment, order or decree to which the Employee is subject; (iii) the Employee is not a party to or bound by any employment agreement, consulting agreement, non-compete agreement, confidentiality agreement or similar agreement with any other person; (iv) the services performed by the Employee and all items and/or materials furnished by the Employee in connection with or as a result of such services shall not infringe upon or violate the personal, civil or property rights, or the rights of privacy of, or constitute a libel, slander or unfair competition against or violate or infringe upon any common law right, copyright, trademark, trade name, patent or any other right of any person or entity.    If the Employee should cease to be employed by the Employer, the Employee shall not, without the Employer's prior written consent, directly or indirectly solicit or encourage any other employee of the Employer to leave the employment of the Employer or hire any employee who has left the employment of the Employer within two (2) years of said termination of such employee's employment with the Employer.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

EMPLOYEE

_Neil Vanek_
Employee Signature

_NEIL VANEK_
Print Employee Name

_6334 SAGE AVE_
_FIRESTONE, CO 80504_
Employee Home Address

PARTMINER, INC.

By: _Lori Hancock_

Title: _HR Assistant_

_Kenny Sharpe_
Witness Signature

_Kenny Sharpe_
_7807 E Peakview Ave - Englewood, CO_
Print Witness Name and Address

_11/17/04_
Date Witnessed

- 7 -

# EXHIBIT D

## SETTLEMENT AGREEMENT, UNDERTAKING AND RELEASE

This Settlement Agreement, Undertaking and Release ("Agreement") is between and/or among PartMiner, Inc., its affiliates, subsidiaries and related entities, ("PartMiner") on the one hand, and Thomas Casey Reed ("Reed"), Neil Vanek ("Vanek"), Kenneth Sharpe ("Sharpe") and Avnet, Inc., its affiliates, subsidiaries and related entities ("Avnet") on the other. This Agreement is in consideration of the promises contained herein.

1.    **RECITALS**

    A.    PartMiner is a New York corporation with offices in Melville, New York.

    B.    Avnet is a New York corporation with offices in Phoenix, Arizona.

    C.    Reed is a former employee of PartMiner and a current employee of Avnet.

    D.    Vanek is a former employee of PartMiner and a current employee of Avnet.

    E.    Sharpe is a former employee of PartMiner and a current employee of Avnet.

    F.    A dispute has arisen between PartMiner and Reed concerning alleged breaches of a Confidentiality Agreement between Reed and PartMiner that was entered into on or about May 4, 2001 (the "Confidentiality Agreement"). A copy of the Confidentiality Agreement is attached as Exhibit A of this Agreement and is incorporated herein by reference.

    G.    On or about December 13, 2005, PartMiner commenced an action in the United States District Court for the Southern District of New York, captioned *PartMiner Information Services, Inc. v. Thomas Casey Reed,* Civil Action No. 05-CV-10486 (the "Federal Court Action") alleging, *inter alia,* breach of contract and claims for injunctive relief. Reed denies the material contentions made by PartMiner in the dispute and in the Federal Court Action, and denies any liability or wrongdoing whatsoever in connection with his dealings with PartMiner.

    H.    The parties hereto desire to settle their dispute, in its entirety, and to resolve all of the remaining differences between them in connection with the Federal Court Action.

**THEREFORE**, IT IS HEREBY AGREED:

2.    **RESOLUTION OF THE FEDERAL COURT ACTION**

    a.    For and in consideration of each of the terms set forth herein, Reed agrees to pay or cause to be paid PartMiner's legal fees to Duane Morris LLP, as counsel for PartMiner, in the sum of Twenty Five Thousand Dollars ($25,000.00) (the "Settlement Payment") within fifteen (15) days following the execution of this Agreement and the Stipulation (as defined below).

b.    For and in consideration of each of the terms set forth herein, PartMiner agrees to dismiss the Federal Court Action, with prejudice and without costs to either party. Counsel for the parties shall execute a Stipulation of Dismissal with Prejudice and without Costs in the form annexed hereto as Exhibit A (the "Stipulation"), and the parties agree to take such further actions as may be necessary to have such Stipulation entered by the Clerk of the Court as a final order.

3.    **THE CONFIDENTIALITY AGREEMENT**

a.    The term "PartMiner's Confidential Information," as contemplated by the parties to this Agreement, shall mean any and all Inventions or Copyrights as such terms are defined or referenced in the Confidentiality Agreement, any and all pipeline reports, sales reports, operation reports, daily registrant reports, pricing reports, proposals, financial reports, internal memoranda, purchase orders, contracts, agreements, correspondence (including without limitation, letters, memoranda and/or email), notes, lists, minutes, charts, images, summaries, reports, forms, or other documents (including information in electronic or other media) containing any confidential PartMiner customer information or any other confidential document obtained by or available to Reed, Vanek or Sharpe in the course of their employment with PartMiner that concerns the business, employees, customers and/or prospects of PartMiner or any of its affiliated companies and that has been and is maintained by PartMiner as confidential ; provided, however, that it is expressly understood that no document or information shall be considered to be "PartMiner's Confidential Information" for purposes of this Agreement if the same:

(i)    was or is in the public domain or is ascertainable from general or public sources;

(ii)    was or is disclosed with the prior written approval of PartMiner;

(iii)    became or becomes known to Reed, Vanek, Sharpe or Avnet from a source other than PartMiner without breach of this Agreement by Reed, Vanek or Sharpe, and without breach by the third party making such disclosure, of any obligation of confidentiality it may have to PartMiner; or

(iv)    is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body;

and, provided further, that nothing in this Agreement or in the Confidentiality Agreement is intended to or shall restrict Reed from utilizing his facilities, skills, talents and experience or the general knowledge acquired in the course of his employment with PartMiner.

b.    Reed hereby represents that he has not in the past disclosed, in whole or in part, any of PartMiner's Confidential Information to any third party, and that he does not have any documents (including any information in electronic or other media) containing PartMiner's Confidential Information in his possession, custody or control.  Reed further represents that any such documents that he had in his possession, custody or control upon his termination of employment from PartMiner or at any time thereafter have been returned to PartMiner or destroyed.

NY\299629.1

  c.  Reed hereby promises not to use or disclose, in whole or in part, any of PartMiner's Confidential Information that he may have acquired while an employee of PartMiner or at any time thereafter, through third parties, without the written authorization of PartMiner.

## 4. AGREEMENT NOT TO HIRE

  In consideration of the dismissal of the Federal Court Action against Reed, and for other good and valuable consideration, the sufficiency of which is acknowledged, Reed and Avnet hereby agree that, for the period of time to and including October 18, 2007, neither Reed nor Avnet will solicit, hire or otherwise employ any individual who, at the time, is then currently employed by PartMiner, provided that nothing in this Agreement shall be deemed to restrict Reed or Avnet in any way from engaging in general solicitations to the public that are not specifically directed or targeted to employees of PartMiner, including but not limited to such as advertisements, internet postings, participation in job fairs, etc.

## 5. RELEASES

  a.  For and in consideration of the execution of this Agreement, and other good and valuable consideration, including the Settlement Payment, the sufficiency of which is hereby acknowledged, PartMiner hereby releases and forever discharges Reed and Avnet (including its parents, subsidiaries, affiliates, predecessors, successors, directors, officers, employees, attorneys, and assigns) from any and all actions, causes of action, suits, claims, cross claims and/or demands whatsoever that were raised or could have been raised in connection with the facts and circumstances surrounding the Federal Court Action or with Avnet's employment of Reed Vanek or Sharpe.

  b.  For and in consideration of the execution of this Agreement, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Reed and Avnet hereby release and forever discharge PartMiner (including its parents, subsidiaries, affiliates, predecessors, successors, directors, officers, employees, attorneys, and assigns), from any and all actions, causes of action, suits, claims, counterclaims, and/or demands whatsoever that were raised or could have been raised in connection with the facts and circumstances surrounding the Federal Court Action.

  c.  With the exception of any claim Vanek may have concerning the reimbursement of expenses from PartMiner, for and in consideration of the execution of this Agreement, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Vanek and PartMiner hereby release and forever discharge each other from any and all actions, causes of action, suits, claims, counterclaims, and/or demands whatsoever that were raised or could have been raised in connection with the facts and circumstances surrounding the Federal Court Action. This clause does not constitute an admission by either party of any wrongful action or violation of any federal or state statute, or common law rights, including those relating to the provisions of any law or statute concerning employment actions, or any other possible or claimed violation of law or rights. Notwithstanding the foregoing, Vanek and PartMiner understand and agree that the Confidentiality Agreement between Vanek and PartMiner that was entered into on or about November 16, 2004, shall remain in full force and effect.

NY\299629.1

(i)    Vanek hereby represents that he has not in the past disclosed, in whole or in part, any of PartMiner's Confidential Information to any third party, and that he does not have any documents (including any information in electronic or other media) containing PartMiner's Confidential Information in his possession, custody or control. Vanek further represents that any such documents that he had in his possession, custody or control upon his termination of employment from PartMiner or at any time thereafter have been returned to PartMiner or destroyed.

(ii)    Vanek hereby promises not to use or disclose, in whole or in part, any of PartMiner's Confidential Information that he may have acquired while an employee of PartMiner or at any time thereafter, through third parties, without the written authorization of PartMiner.

d.    For and in consideration of the execution of this Agreement, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Sharpe and PartMiner hereby release and forever discharge each other from any and all actions, causes of action, suits, claims, counterclaims, and/or demands whatsoever that were raised or could have been raised in connection with the facts and circumstances surrounding the Federal Court Action. This clause does not constitute an admission by either party of any wrongful action or violation of any federal or state statute, or common law rights, including those relating to the provisions of any law or statute concerning employment actions, or any other possible or claimed violation of law or rights. Notwithstanding the foregoing, Sharpe and PartMiner understand and agree that the Confidentiality Agreement between Sharpe and PartMiner that was entered into on or about July 1, 2002, shall remain in full force and effect.

(i)    Sharpe hereby represents that he has not in the past disclosed, in whole or in part, any of PartMiner's Confidential Information to any third party, and that he does not have any documents (including any information in electronic or other media) containing PartMiner's Confidential Information in his possession, custody or control. Sharpe further represents that any such documents that he had in his possession, custody or control upon his termination of employment from PartMiner or at any time thereafter have been returned to PartMiner or destroyed.

(ii)    Sharpe hereby promises not to use or disclose, in whole or in part, any of PartMiner's Confidential Information that he may have acquired while an employee of PartMiner or at any time thereafter, through third parties, without the written authorization of PartMiner.

6.    **CONFIDENTIALITY**

a.    For and in consideration of each of the terms set forth herein, the parties and their attorneys agree that they will keep the terms of this Agreement confidential and that they will not disclose any information concerning this Agreement unless such disclosure is required in order for the party to remain in compliance with this Agreement, other than words to the effect that "the matter has been resolved" to any person or entity without the written consent of the other parties.

Page 4 of 7

b.    Nothing in this Agreement, however, shall preclude any party from:

(i)    complying with any lawful subpoena or court or administrative order;

(ii)    complying with requests of any other federal or state regulatory authority, or complying with any request for information or documents from any federal or state regulator or self-regulatory organization; or

(iii)    making a confidential disclosure to any party's immediate family members, as necessary, attorneys, auditors, accountants, tax preparers and any appropriate local, state or federal taxing authority; or

(iv)    disclosure to a prospective merger partner, a purchaser of a controlling interest in or purchaser of all or substantially all of a party's assets related to the business or rights that are the subject of this Agreement, only to the extent required to conduct due diligence or comply with the provisions of this Agreement.

## 7.    AUTHORITY

The parties represent and warrant that each of them has the authority to enter into the Agreement in their individual and/or representative capacities, as the case may be.

## 8.    NO ADMISSION OF LIABILITY

Each of the parties hereto and their respective attorneys understand, represent and warrant that this Agreement is a compromise and settlement of disputed claims, and that the execution of this Agreement is not to be construed as an admission of liability by the parties hereto.

## 9.    GOVERNING LAW AND FORUM

This Agreement shall be construed, and its terms enforced, in accordance with the substantive laws of the State of New York, without regard to its conflict of laws provision. Each party to this Agreement hereby consents to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

## 10.    REMEDIES

PartMiner agrees that prior to initiating any lawsuit against Reed and/or Avnet with respect to an alleged breach by Reed and/or Avnet of this Agreement, it shall notify Reed and/or Avnet in writing (with copy to Reed's counsel and counsel for Avnet) of such alleged breach, with sufficient details concerning the same, and Reed and/or Avnet will have ten (10) business days from its receipt of such notice to remedy the breach or otherwise respond to such allegations. In the event Reed and/or Avnet breaches Paragraph 3 of this Agreement and Reed

NY\299629.1

and/or Avnet has not remedied such breach within the ten-day period referenced above, Reed and/or Avnet agree and acknowledge that PartMiner will have no adequate remedy at law and will be entitled to seek injunctive relief, in addition to any remedies at law or in equity.

11.    **ENTIRE AGREEMENT**

This writing constitutes the entire agreement and understanding between the parties. No modification of this Agreement shall be valid unless executed in writing by the parties. Furthermore, no party hereto shall be bound by any representations, warranties, promises, statements or information unless set forth herein. The parties agree that notwithstanding the terms of this Agreement, the Confidentiality Agreement between PartMiner and Reed shall remain in full force and effect. If any provisions of Paragraph 3 or Paragraph 4 of this Agreement is determined to be inconsistent with the provisions of the Confidentiality Agreement, the terms of this Agreement shall control.

12.    **CAPTIONS**

The captions of the various paragraphs in the Agreement are for convenience and organization only, and are not intended to be part of the body of this Agreement, nor are they intended to be referred to in construing the provisions of this Agreement.

13.    **SETTLEMENT OF DISPUTED CLAIMS**

a.    The Parties hereto understand and agree that this Agreement is a compromise of disputed claims and that the execution of this Agreement is not to be construed as an admission of liability by the parties hereto.

b.    This Agreement and the provisions contained therein shall not be construed or interpreted for or against any party hereto, because said party drafted or caused the party's legal representative to draft any of its provisions.

c.    This Agreement, and the terms and conditions hereof, shall be binding upon and inure to the benefit of the Parties and to their respective heirs, executors, administrators, parent companies, subsidiaries, divisions, affiliates, successors, assigns, employees, agents and representatives. If any provision of this Agreement shall be or become illegal or unenforceable, in whole or in part, for any reason whatsoever, the remaining provisions shall nevertheless be deemed valid, binding, and subsisting.

14.    **COUNTERPART ORIGINALS**

This Agreement may be executed in counterparts, that is, all signatures need not appear on the same copy. All such executed copies shall together constitute the complete Agreement.

15.    **REPRESENTATION BY COUNSEL**

The parties hereto agree that they enter into this Agreement after having received full advice from counsel of their choice with respect to this Agreement and all other matters related

thereto and that this Agreement shall be deemed to have been drafted jointly by them. None of the parties shall have the right to rescind this Agreement.

16.    <u>COSTS</u>

Except as provided in Paragraph 2(a) herein, the parties to this Agreement agree that they shall each pay their own attorney's fees, costs and expenses, if any, incurred in connection with this matter.

**BY SIGNING THIS AGREEMENT REED, VANEK AND SHARPE STATE INDIVIDUALLY THAT: (1) THEY HAVE READ IT; (2)THEY UNDERSTAND IT AND THEY AGREE WITH EVERYTHING IN IT; (3) THEY WERE TOLD, IN WRITING, TO CONSULT AN ATTORNEY BEFORE SIGNING IT; (4) THAT THEY EACH HAD 21 DAYS TO REVIEW THE AGREEMENT AND THINK ABOUT WHETHER OR NOT THEY WANTED TO SIGN IT; AND (5) EACH HAS SIGNED IT KNOWINGLY AND VOLUNTARILY.**

PartMiner, Inc.                                          Date
by: Michael Manley, Esq.
President and General Counsel

Avnet, Inc.                                             Date
by: David Birk
Senior Vice President, Secretary and General Counsel


Thomas Casey Reed                                       Date


Neil Vanek                                              Date


Kenneth Sharpe                                          Date


Page 7 of 7

NY\299629.1

thereto and that this Agreement shall be deemed to have been drafted jointly by them.  None of the parties shall have the right to rescind this Agreement.

16.    **COSTS**

Except as provided in Paragraph 2(a) herein, the parties to this Agreement agree that they shall each pay their own attorney's fees, costs and expenses, if any, incurred in connection with this matter.

**BY SIGNING THIS AGREEMENT REED, VANEK AND SHARPE STATE INDIVIDUALLY THAT: (1) THEY HAVE READ IT; (2)THEY UNDERSTAND IT AND THEY AGREE WITH EVERYTHING IN IT; (3) THEY WERE TOLD, IN WRITING, TO CONSULT AN ATTORNEY BEFORE SIGNING IT; (4) THAT THEY EACH HAD 21 DAYS TO REVIEW THE AGREEMENT AND THINK ABOUT WHETHER OR NOT THEY WANTED TO SIGN IT; AND (5) EACH HAS SIGNED IT KNOWINGLY AND VOLUNTARILY.**

_____    _____
PartMiner, Inc.                                Date
by: Michael Manley, Esq.
President and General Counsel


_____    _____
Avnet, Inc.                                    Date
by:  David Birk
Senior Vice President, Secretary and General Counsel


_____    _____
Thomas Casey Reed                          Date


_____    _____
Neil Vanek                                     Date


_____    _____
Kenneth Sharpe                               Date

Page 7 of 7

# EXHIBIT E

**PARTMINER ACCOUNTS LOST TO AVNET (2006-2007)**

| Customer | Lost Revenue in US Dollars |
|---|---|
| AAI Corp. | 37,900 |
| Agfa Corporation | 6,720 |
| Agilent Technologies - Loveland | 15,000 |
| Agilent Technologies - Malaysia | 5,000 |
| Artesyn Technologies | 51,765 |
| Component Trends | 24,225 |
| Department National Defence HQ | 7,427 |
| Dept Of National Defence | 4,225 |
| Dictaphone Corp. | 5,250 |
| Dictaphone Corp. | 10,350 |
| DRS Sensors & Targeting Systems, Inc. | 18,960 |
| EMA Design Automation Inc. | 200,000 |
| Emerson Electric | 78,150 |
| Ems Technologies Canada | 19,400 |
| Foxboro Company (Invensys) | 23,000 |
| GE Security, Inc. | 30,000 |
| General Dynamics AIS | 90,000 |
| Goodrich Corp Aerostructures Group | 4,225 |
| Hach Co. | 18,000 |
| Harmonic Inc. | 13,395 |
| ITT Aerospace / Comm. Div. | 17,725 |

**PARTMINER ACCOUNTS LOST TO AVNET (2006-2007)**

| Customer | Lost Revenue in US Dollars |
|---|---|
| ITT Aerospace / Comm. Div | 25,770 |
| ITT Corp. | 12,610 |
| ITT Electronic Systems | 19,400 |
| ITT Industries, Gilfillan Div. | 17,995 |
| Kollsman Inc. | 18,460 |
| Korry Electronics Co. | 9,126 |
| L-3 Communications | 6,500 |
| L3 Communications Display Systems | 5,900 |
| L3 Communications Integrated Systems | 36,985 |
| L-3 Communications IS | 40,000 |
| L-3 Communications System -East | 40,814 |
| L3 Communications, Toronto | 9,800 |
| Labarge, Inc. | 4,875 |
| Mnemonics | 24,735 |
| Panasonic Avionics Corporation | 21,100 |
| Paramit Corp. | 22,000 |
| Performance Technologies, Inc. | 23,000 |
| Sechan Electronics, Inc. | 13,300 |
| Smith & Associates | 44,600 |
| Smith & Associates | 5,735 |
| Stratex Networks | 47,790 |

**PARTMINER ACCOUNTS LOST TO AVNET (2006-2007)**

| Customer | Lost Revenue in US Dollars |
|---|---|
| Symmetricom | 130,000 |
| Tellabs | 19,950 |
| Unisys Roseville | 20,870 |
| Universal Instruments | 3,380 |
| Valleylab Inc. | 16,100 |
| Viasat Inc. | 42,500 |
| Viasat Inc. | 38,500 |
| Woodward Governor | 16,950 |
| **TOTAL LOST REVENUE** | **$1,419,462.00** |