UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- X

PARTMINER INFORMATION SERVICES, INC.,                     :

                  Plaintiff,                               :

                           :         07 Civ. 11482 (LMM)

           - against -                               :

AVNET, INC., THOMAS CASEY REED, JOHN                       :
KENNETH SHARPE, and NEIL R. VANEK,                        :

                Defendants.                             :

----------------------------------------------------------- X


### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTIONS FOR
### PRELIMINARY INJUNCTION AND ORDER GRANTING EXPEDITED DISCOVERY

**DLA PIPER US LLP**
Eric M. Falkenberry
Andrew L. Deutsch
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
*eric.falkenberry@dlapiper.com*
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................... 1

FACTUAL BACKGROUND & PROCEDURAL HISTORY ........................................ 3

ARGUMENT ................................................................................... 9

I.  PARTMINER IS ENTITLED TO A PRELIMINARY INJUNCTION TO
    PREVENT DEFENDANTS' CONTINUED USE OF CONFIDENTIAL
    INFORMATION AND FALSE STATEMENTS TO SOLICIT PARTMINER
    CUSTOMERS AND PROSPECTS ...................................................... 9

    A.  Irreparable Injury Is Established As a Matter of Law ......................... 11

    B.  Plaintiff Is Likely to Succeed on the Merits of Its Claims ................... 12

        1.  Breach of Confidentiality Agreements by Reed, Vanek and Sharpe ....... 12

        2.  Avnet's Tortious Interference with PartMiner's Contractual
            Relations ............................................................... 13

        3.  Fraud in the Inducement (Settlement Agreement) .................... 14

        4.  Breach of Settlement Agreement ..................................... 15

        5.  Misappropriation of Trade Secrets ................................... 16

        6.  Violation of Section 43(a) of the Lanham Act ........................ 21

        7.  Defamation ........................................................... 24

        8.  Business/Product Disparagement ..................................... 26

        9.  Defendants' Tortious Interference with PartMiner's Prospective
            Business Advantage ................................................... 27

        10. Common Law Unfair Competition ..................................... 28

        11. Avnet is Liable for the Actions of Reed, Sharpe and Vanek ............ 29

    C.  The Balance of Hardships Strongly Favors Plaintiff ........................... 30

II. THE COURT SHOULD ORDER EXPEDITED DISCOVERY ..................................... 31

CONCLUSION ................................................................................ 34

## TABLE OF AUTHORITIES

**Page**

*71 Pierrepont Assocs. v. 71 Pierrepont Corp.*,
243 A.D.2d 625, 663 N.Y.S.2d 263 (2d Dep't 1997) ........................................................27

*Advanced Magnification Instruments, Ltd. v. Minuteman Optical Corp.*,
135 A.D.2d 889, 522 N.Y.S.2d 287 (3d Dep't 1987) ...................................................19, 29

*Albert v. Loksen*,
239 F.3d 256 (2d Cir. 2001) ........................................................................................13

*Am. Broad. Companies. v. Wolf*,
52 N.Y.2d 394, 438 N.Y.S.2d 482 (1981)...................................................................12

*Angio-Med. Corp., v. Eli Lilly & Co.*,
720 F. Supp. 269 (S.D.N.Y. 1989) ...............................................................................26

*B.U.S.A. Corp. v. Ecogloves, Inc.*,
No. 05 Civ. 9988, 2006 U.S. Dist. LEXIS 85988 (S.D.N.Y. Jan. 31, 2006)...................13

*Bank Itec N.V. v. J. Henry Schroder Bank & Trust Co.*,
612 F. Supp. 134 (S.D.N.Y. 1985) ................................................................................12

*Bijan Designer for Men v. Katzman*,
No. 96 Civ. 7345, 96 Civ. 7345, 1997 U.S. Dist. LEXIS 1426 (S.D.N.Y. Jan. 6,
1997)...............................................................................................................10, 12

*Bivas v. State*,
97 Misc. 2d 524, 411 N.Y.S.2d 854 (Ct. Cl. 1978) ......................................................26

*Carroll v. Station Managers, Inc.*,
104 Misc. 2d 1014, 429 N.Y.S.2d 825 (N.Y. Civ. Ct. Kings County 1980)...................30

*Chamilia, LLC v. Pandora Jewelry, LLC*,
No. 04-CV-6017, 2007 U.S. Dist. LEXIS 71246 (S.D.N.Y. Sep. 24, 2007) ...................24

*Charles Atlas, Ltd. v. Time-Life Books, Inc.*,
570 F. Supp. 150 (S.D.N.Y. 1983) ...............................................................................26

*Churchill Commc'n Corp. v. Demyanovich*,
668 F. Supp. 207 (S.D.N.Y. 1987) ................................................................................11

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Comprehensive Cmty. Dev. Corp. v Lehach,*
    223 A.D.2d 399, 636 N.Y.S.2d 755 (1st Dep't 1996)...................................................29

*Denburg v. Parker Chapin Flattau & Klimpl,*
    82 N.Y.2d 375, 604 N.Y.S.2d 900 (1993).............................................................15

*Don King Prods., Inc. v. Hopkins,*
    No. 04 Civ. 9705, 2004 U.S. Dist. LEXIS 25917 (S.D.N.Y. Dec. 23, 2004) ..................33

*Doubleclick Inc. v. Henderson,*
    No. 116914/ 1997 N.Y. Misc. LEXIS 577 (Sup. Ct. N.Y. County Nov. 5, 1997)......11, 12, 29

*Drug Res. Corp. v. Curtis Publ'g Co.,*
    7 N.Y.2d 435, 199 N.Y.S.2d 33 (1960)...............................................................26

*Eagle Comtronics, Inc. v. Pico, Inc.,*
    89 A.D.2d 803, 453 N.Y.S.2d 470 (4th Dep't 1982) ..................................................17, 18

*Ecolab Inc. v. Paolo,*
    753 F. Supp. 1100 (E.D.N.Y. 1991) ....................................................................11

*Ecolab Inc. v. K.P. Laundry Mach., Inc.,*
    656 F. Supp. 894 (S.D.N.Y. 1987) .....................................................................11

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,*
    314 F.3d 48 (2d Cir. 2002) ...........................................................................23

*Fed. Express Corp. v. Fed. Espresso, Inc.,*
    201 F.3d 168 (2d Cir. 2000) ..........................................................................10

*Finley v. Giacobbe,*
    79 F.3d 1285 (2d Cir. 1996) ..........................................................................13

*First Interregional Equity Corp. v. Haughton,*
    805 F. Supp. 196 (S.D.N.Y. 1992) .....................................................................30

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.,*
    730 F.2d 61 (2d Cir. 1984) .......................................................................11, 20

*Fresh Del Monte Produce N.V. v. Eastbrook Caribe A.V.V.,*
    40 A.D.3d 415, 836 N.Y.S.2d 160 (1st Dep't 2007)....................................................15

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Genessee Brewing Co. v. Stroh Brewing Co.*,
    124 F.3d 137 (2d Cir. 1997) .................................................................................... 10

*Gidatex, S.R.L. v. Campaniello Imps., Ltd.*,
    13 F. Supp. 2d 417 (S.D.N.Y. 1998) ....................................................................... 33

*Giffords Oil Co. v. Wild*,
    106 A.D.2d 610, 483 N.Y.S.2d 104 (2d Dep't 1984) ............................................ 17

*Guard-Life Corporation v. S. Parker Hardware Manufacturing Corp.*,
    50 N.Y.2d 183, 428 N.Y.S.2d 628 (1980) .............................................................. 27

*Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (U.K.) Ltd.*,
    230 F.3d 549 (2d Cir. 2000) ................................................................................... 11

*Health Consultants Group, LLC v. Dailey*,
    No. 04 Civ. 4586, 2004 U.S. Dist. LEXIS 27318 (S.D.N.Y. Aug. 24, 2004) .................. 30

*Hudson Hotels Corp. v. Choice Hotels, Int'l*,
    995 F.2d 1173 (2d Cir. 1993) ................................................................................. 16

*Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*,
    920 F.2d 171 (2d Cir. 1990) ................................................................................... 18

*Jackson Heights Care Ctr., LLC v. Bloch*,
    39 A.D.3d 477, 833 N.Y.S.2d 581 (2d Dep't 2007) ............................................. 15

*Kasada, Inc. v. Access Capital, Inc.*,
    No. 01-CV-8893, 2004 WL 2903776 (S.D.N.Y. Dec. 14, 2004) ........................... 24

*Kirby v. Wildenstein*,
    784 F. Supp. 1112 (S.D.N.Y. 1992) ....................................................................... 26

*Lehman v. Dow Jones & Co.*,
    783 F.2d 285 (2d Cir. 1986) ............................................................................. 17, 18

*Manno v. Mione*,
    249 A.D.2d 372, 670 N.Y.S.2d 368 (2d Dep't 1998) ........................................... 30

# TABLE OF AUTHORITIES
### (continued)

Page

*McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.,*
938 F.2d 1544 (2d Cir. 1991) ................................................................21

*Mobius Mgmt. Sys. v. Fourth Dimension Software, Inc.,*
880 F. Supp. 1005 (S.D.N.Y. 1994) ..........................................................23

*N. Atl. Instruments, Inc. v. Haber,*
188 F.3d 38 (2d Cir. 1999) ............................................11, 16, 17, 20

*N.Y. City Transit Auth. v. Morris J. Eisen, P.C.,*
276 A.D.2d 78, 715 N.Y.S.2d 232 (1st Dep't 2000)............................14

*Nutmeg Technologies v. Mahshie,*
No. 89-CV-511, 1989 U.S. Dist. LEXIS 6293 (N.D.N.Y. June 2, 1989) ....................17

*Redeye Grill, L.P. v. Restaurant Opportunities Ctr., Inc.,*
13 Misc. 3d 1212A, 2006 WL 272683 (Sup. Ct. N.Y. County 2006)....................27

*Roby v. Corp. of Lloyd's,*
996 F.2d 1353 (2d Cir. 1993) ................................................................11

*Ross v. FSG PrivatAir Inc.,*
No. 03 Civ. 7292, 2004 WL 1837366 (S.D.N.Y. Aug. 17, 2004)....................12

*Ruder & Finn, Inc. v. Seaboard Sur. Co.,*
52 N.Y.2d 663, 439 N.Y.S.2d 858 (1981)..........................................26, 28

*Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship. L.P.,*
380 F.3d 126 (2d Cir. 2004) ................................................................22

*Special Situations Cayman Fund, L.P. v. Dot Com Entm't Group, Inc.,*
No. 03-CV-0811E(F), 2003 U.S. Dist. LEXIS 25083 (W.D.N.Y. Dec. 5, 2003) ............33

*Towers Fin. Corp. v. Dun & Bradstreet, Inc.,*
803 F. Supp. 820 (S.D.N.Y. 1992) ..........................................................21

*WIT Holding Corp. v. Klein,*
282 A.D.2d 527, 724 N.Y.S.2d 66 (2d Dep't 2001) ............................14

**TABLE OF AUTHORITIES**
(continued)

Page

*Webcraft Technologies, Inc. v. McCaw*,
  674 F. Supp. 1039 (S.D.N.Y. 1987) ..................................................................17

**STATUTES**

28 U.S.C. § 1657(a) ..........................................................................................33

Fed. R. Civ. P. 26(d) ........................................................................................33

15 U.S.C. § 1125(a) ..........................................................................................21

## PRELIMINARY STATEMENT

Plaintiff PartMiner Information Services, Inc. ("PartMiner") respectfully submits this memorandum of law in support of its motion for: (1) a preliminary injunction enjoining Defendants Avnet, Inc. ("Avnet"), Thomas Casey Reed ("Reed"), John Kenneth Sharpe ("Sharpe") and Neil R. Vanek ("Vanek") from (a) making competitive use of PartMiner trade secrets and other confidential information, in violation of the individual Defendants' confidentiality agreements and fiduciary duties, and a prior settlement agreement between the individual Defendants and PartMiner and (b) disparaging PartMiner and its products and services through false and misleading advertising and promotion, in violation of the federal Lanham Act and state unfair competition law; and (2) an order granting expedited discovery.

PartMiner has compiled, and sells access to, a unique proprietary database called CAPS™. This database allows electronics manufacturers, engineers, and others to locate the electronic parts they need and identify the vendors for those parts. Reed, Sharpe and Vanek were employed in PartMiner's sales office, and in that role were exposed to some of PartMiner's most valuable and confidential customer and prospect information including, without limitation, information that detailed each customer's (and individual buyer's) contact information, company issues and product preferences, product pricing for the customer or prospect, records of communication, contract start and end dates, and PartMiner's sales strategies for the customer or prospect.

Avnet sells access to a competing electronic parts database. In October 2005, Reed, Sharpe and Vanek left PartMiner and began to work in Avnet's sales office. In violation of their Confidentiality Agreements with PartMiner, a Settlement Agreement and their fiduciary duties of

loyalty, they took with them much of PartMiner's confidential information. They then used, and continue to use, that information for their benefit and that of Avnet, to identify and contact PartMiner customers and prospects, target their preferences, and undercut PartMiner's price immediately before a PartMiner contract is up for renewal. Moreover, in their sales approaches to PartMiner's customers, Defendants have made numerous false and misleading statements about PartMiner, including claims that PartMiner's database lacks integrity. These acts are part of an organized campaign by Avnet and its employees, not merely to take away customers from PartMiner, but to put it out of business.

The Court should grant a preliminary injunction restraining the Defendants from this wrongful conduct. PartMiner has already lost and, without an injunction, will continue to lose numerous customers as a result of Defendants' misconduct. It has been and will continue to suffer irreparable damage because it is unlikely to recapture the business of these customers or repair the damage to its reputation, and its injury cannot be readily calculated in monetary terms. Defendants moreover acknowledged in writing that were they to breach their agreements not to use PartMiner confidential information, PartMiner would suffer irreparable injury entitling it to an immediate injunction.

As shown below, PartMiner is likely to succeed on its claims at trial. The individual Defendants' confidentiality and settlement agreements are valid and enforceable under New York law. New York courts regularly enforce contractual restrictions on the disclosure and use of trade secrets and confidential information. PartMiner is also likely to succeed on its claims for false promotion and disparagement because the evidence shows that the Defendants conducted a widespread campaign of falsehoods to lure PartMiner customers into switching their

business away from PartMiner. The balance of hardships also strongly favors PartMiner. Without an injunction, PartMiner will continue to suffer irreparable loss of customers, reputation, and goodwill; while an injunction will still allow Defendants to engage in fair competition.

Finally, the Court should grant an order permitting PartMiner to take limited expedited discovery. Most of the details of Defendants' breaches and tortious conduct are known only to Defendants, and PartMiner needs prompt access to Defendants' documents and the ability to depose the Defendants in order to fully present the case for a preliminary injunction.

## FACTUAL BACKGROUND & PROCEDURAL HISTORY

**PartMiner**

PartMiner is engaged in the business of selling electronics parts information and software to manage that information. Finding the right electronics parts in a market where millions of parts are sold by thousands of vendors can be very difficult. However, PartMiner has created a product that can make this process significantly easier: the world's largest proprietary and confidential online electronic parts database, known as the CAPS$^{TM}$ database. (*See* Affidavit of Christopher Meyer in Support of Motion for Preliminary Injunction and Expedited Discovery ("Meyer Aff.") ¶ 3.) Engineers, supply chain managers and manufacturers buy subscriptions from PartMiner that allow them to access and use the CAPS$^{TM}$ database to search for electronics parts information. (*Id.*)

PartMiner also offers software and additional database solutions to such businesses to manage their bills of materials for electronic parts (i.e., the lists of the parts that go into products)

3

and their electronic parts inventories. (*Id.*)  These services/software are known as the CAPS<sup>TM</sup> Connect<sup>TM</sup> and CAPS<sup>TM</sup> CONNECT ES<sup>TM</sup> solutions. (*Id.*)

Because its success depends on it, PartMiner has for years expended significant sums to maintain its existing customers and develop relationships with new ones. (*Id.* ¶ 5.) To create and maintain customer relationships, PartMiner pays its sales personnel to locate, learn about and sell to customers and prospects. (*Id.*)  The most important tool used by PartMiner's sales force is an interrelated compilation of confidential information about its customers and prospects, the contents of which is not generally available and which PartMiner has collected at great expense, including contact information, contract start and end dates, company and product preferences, records of communications with companies, sales strategies, the operation of the company's office including the types of individuals who may have a need for the product, business issues the company is having that may be solved by the products, company credit information, budget and key internal approvers, sources of referral, where the company is in the sales process, and the likelihood of closing a sale (collectively, the "Confidential Information") (*Id.*)  PartMiner stores such Confidential Information in a customer relationship management database and program known as GoldMine, and in other electronic forms such as "pipeline" reports on its current sales prospects. (*Id.*)

The Confidential Information is an extremely valuable asset to PartMiner because it allows PartMiner to effectively and efficiently sell its products and services. (*Id.* ¶ 6.)  It has been gathered at substantial expense, it is vital to PartMiner's business, and it cannot be readily ascertained from public sources. (*Id.*)  If disclosed to PartMiner's competitors, this information would allow them to contact PartMiner's customers right before their contracts are about to

expire, target their preferences, undercut PartMiner's prices and obtain an unfair competitive

advantage. (*Id.* ¶ 7.)  Moreover, PartMiner's information would be valuable to competitors

because it would give them a drastic advantage: a shortcut to ready, willing and able buyers. (*Id.*)

The competitors would have this information without having to put in the work and resources

required to develop that information. (*Id.*)  Therefore, PartMiner takes great care in protecting

this information, including company-wide policies that restrict disclosure and use.  These include

the requirement that all employees execute confidentiality agreements in which they agree not to

make any use of the Confidential Information outside of their employment for PartMiner.  (*Id.* ¶

8.)

**Defendants Reed, Sharpe and Vanek**

The individual Defendants in this case, Reed, Sharpe and Vanek, are all former PartMiner

sales employees. (*Id.* ¶ 9.)  Reed was a Vice President with the most significant responsibilities

of the three, including managing a sales team and administering the PartMiner GoldMine

customer database. (*Id.* ¶ 10)  All three had access to PartMiner customer data, sales pipeline

reports, sales records, information regarding the size and costs of customer orders, information

on PartMiner's internal costs and profit margins, and other Confidential Information. (*Id.* ¶¶ 17-

18.)

Because they were to be exposed to PartMiner's Confidential Information, Reed, Sharpe

and Vanek were all required to sign Confidentiality Agreements, which remain in force today.

(*Id.*, Exs 1-3 thereto.)  In their Confidentiality Agreements, each agreed never to "disclose or use

in whole or in part any Confidential Information" of PartMiner, or take any such information

with him upon termination of employment with PartMiner. (*Id.* ¶¶ 11-12 & Exs. 1-3 thereto.)

5

Each further agreed that he would not, for two years after leaving employment with PartMiner, "directly or indirectly solicit or encourage any other employee of [PartMiner] to leave the employment of [PartMiner]…" (*Id.* ¶ 15, Exs. 1-3 thereto.)

**Defendant Avnet**

Reed gave notice to PartMiner that he was resigning employment on or about October 4, 2005. (*Id.* ¶ 19.) About a week before he resigned, Reed asked his sales team at PartMiner to give him updated customer contact information and their respective pipeline sales. (*Id.*) Almost immediately after resigning, Reed opened a sales office for Avnet, PartMiner's competitor. (*Id.* ¶ 20.) Upon information and belief, as an officer of Avnet, Reed then solicited Vanek and Sharpe to leave PartMiner and join him at Avnet, and both did so within a month of Reed's resignation. (*Id.* ¶ 21.) On the way out of PartMiner's door, Sharpe and Vanek both obtained copies of up-to-the-minute active and prospective PartMiner Confidential Information, which they took with them upon leaving the company. (*Id.* ¶ 19.) In short, Reed, Sharpe and Vanek all breached their respective Confidentiality Agreements by removing PartMiner Confidential Information and using it for the benefit of PartMiner's competitor, Avnet.

**Prior Litigation**

On December 13, 2005, PartMiner commenced an action against Reed in this Court seeking injunctive relief and damages arising from Reed's solicitation of PartMiner employees and his use of PartMiner's Confidential Information to compete with PartMiner, all in breach of his Confidentiality Agreement (Civil Action No. 05-CV-10486) (the "First Federal Action"). (Declaration of Eric M. Falkenberry in Support of Motions for Preliminary Injunction and Expedited Discovery ("Falkenberry Decl.") ¶ 3, Ex. A thereto). The First Federal Action was

voluntarily resolved through a Settlement Agreement, Undertaking and Release (the "Settlement Agreement") which was signed by all of the parties to this litigation. (Meyer Aff. ¶ 22, Ex. 6 thereto.)  Reed agreed to pay (or cause to be paid) PartMiner's legal fees in the sum of $25,000.00. (*Id.* ¶ 24.)  The Court entered an Order on January 4, 2006, discontinuing the action and closing the case.  (*Id.*, Ex. 7 thereto.)

Reed, Sharpe and Vanek warranted in the Settlement Agreement that they did not have any PartMiner Confidential Information in their possession, custody or control and that any PartMiner Confidential Information they may have had at the time of their termination of employment with PartMiner was either returned to PartMiner or destroyed. (*Id.* ¶ 26, Ex. 6 thereto.)  They further represented that they had not in the past disclosed any of PartMiner's Confidential Information. (*Id.*)  In addition, Reed, Sharpe and Vanek promised "not to use or disclose, in whole or in part, any of PartMiner's Confidential Information that [they] may have acquired while an employee of PartMiner or at any time thereafter, through third parties, without written authorization of PartMiner." (*Id.* ¶ 27, Ex. 6 thereto.)

Avnet and Reed made additional promises in the Settlement Agreement, including an agreement not to "solicit, hire or otherwise employ any individual who, at the time, is then currently employed by PartMiner," for the period of time up to and including October 18, 2007. (*Id.* ¶ 28, Ex. 6 thereto.)

All parties agreed that in the event of Defendants' breach of the Settlement Agreement, "PartMiner will have no adequate remedy at law and will be entitled to seek injunctive relief, in addition to any remedies at law or in equity." (*Id.* ¶ 29, Ex. 6 thereto.)

7

Within the last year, PartMiner began to learn that not only Reed, but the other Defendants, were continuing to use PartMiner's Confidential Information. It received eyewitness accounts stating that Defendants not only had possession of the Confidential Information, but were using it to sell to PartMiner customers and undercut PartMiner's pricing. ((*Id.* ¶ 30); Affidavit of Katie Wetherbee in Support of Motion for Preliminary Injunction and Expedited Discovery ("Wetherbee Aff.") ¶¶ 6-7; Affidavit of Andrew Sbravati in Support of Motion for Preliminary Injunction and Expedited Discovery ("Sbravati Aff.) ¶¶ 5-7)). PartMiner has also received information that Reed has solicited other individuals at PartMiner to provide him with additional PartMiner Confidential Information concerning PartMiner customers, sales and sales efforts. ((*Id.*); (Affidavit of David McBarron in Support of Motion for Preliminary Injunction and Expedited Discovery ("McBarron Aff.") ¶ 5; Affidavit of Ken Auga in Support of Motion for Preliminary Injunction and Expedited Discovery ("Auga Aff.") ¶ 4; Wetherbee Aff. ¶ 12).)

Moreover, PartMiner learned that Avnet and its employees were engaged in an organized, widespread and sustained campaign to take away PartMiner's current and prospective customers by making the following false statements to such customers:

a. PartMiner's data cannot be trusted due to integrity issues, including the fact that the data is out-of-date, not good, contains inconsistent information and that there is nothing new in the database;

b. The individual Defendants "jumped ship" because of PartMiner's data integrity issues;

c. There are many more engineers inputting information into the database marketed by Avnet relative to the number of PartMiner engineers performing the same task, and specifically that there are 300 to 500 engineers inputting information into the database marketed by Avnet;

8

    d.  PartMiner makes up part numbers to make it appear that it has more parts in its database than Avnet;

    e.  The database marketed by Avnet is updated and made available to customers every night; and

    f.  PartMiner is going out of business.

As a result of the above conduct, PartMiner, on September 13, 2007, sued the defendants in Colorado State Court.  (<u>PartMiner v. Avnet, et al.</u>, Colorado, District Court, Arapahoe County (Case Number: 2007cv1868)) (Falkenberry Decl. ¶ 5, Ex. C thereto). The Colorado Court held that the dispute should be venued in New York, and thereby dismissed the case without prejudice to PartMiner refiling in New York. (*Id.* ¶ 6, Ex. D thereto).  On December 18, 2007 the Colorado State Court refused reargument on its decision.  (*Id.* ¶ 7, Ex. E thereto).  Accordingly, PartMiner filed its Complaint in this Court and now seeks preliminary injunctive relief, as explained below. (*Id.* ¶ 8, Ex. F thereto).

## ARGUMENT

## I.    PARTMINER IS ENTITLED TO A PRELIMINARY INJUNCTION TO PREVENT DEFENDANTS' CONTINUED USE OF CONFIDENTIAL INFORMATION AND FALSE STATEMENTS TO SOLICIT PARTMINER CUSTOMERS AND PROSPECTS

The standards for a preliminary injunction in this Circuit are well-settled.  A plaintiff must:

> demonstrate (1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000) (citing *Genessee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997)). These standards are applied where a plaintiff seeks a preliminary injunction to restrain a former employee from violating a confidentiality agreement. *Bijan Designer for Men v. Katzman*, No. 96 Civ. 7345, 96 Civ. 7345, 1997 U.S. Dist. LEXIS 1426 (S.D.N.Y. Jan. 6, 1997).

Both of the alternate standards for a preliminary injunction are satisfied on this record. PartMiner has suffered and is threatened with further loss of active and potential customers and goodwill as a result of Defendants' breaches of their agreements and wrongful conduct. This harm, which will continue in the absence of injunctive relief, constitutes irreparable injury as a matter of law because it is not readily compensable in terms of money damages. PartMiner is likely to succeed on the merits of its case because the facts establish that the Defendants breached enforceable confidentiality agreements and made false and misleading statements concerning PartMiner, in violation of both section 43(a) of the federal Lanham Act and unfair competition law. On the other hand, Defendants will suffer no hardship from an injunction because (1) the individual Defendants have previously agreed that they would not use the Confidential Information and (2) all Defendants are fully capable of competing with PartMiner without resorting to either wrongful use of PartMiner's Confidential Information or spreading false and misleading statements about PartMiner's products, services and viability.

NEWY1\8176284.7

A.      **Irreparable Injury Is Established As a Matter of Law.**

As a matter of New York law[1], breach by the Defendants of the Confidentiality

Agreements and Settlement Agreement will cause irreparable injury to PartMiner.

Both this Circuit and the New York State courts have determined that an automatic

presumption of irreparable harm arises when an employee defendant uses and discloses an

employer's confidential information or misappropriates a trade secret. *N. Atl. Instruments, Inc. v.*

*Haber*, 188 F.3d 38, 49 (2d Cir. 1999) ("'loss of trade secrets cannot be measured in money

damages' because '[a] trade secret once lost is, of course, lost forever.'") (*citing FMC Corp. v.*

*Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)); *Ecolab Inc. v. Paolo*, 753 F.

Supp. 1100, 1110 (E.D.N.Y. 1991) ("The use and disclosure of an employer's confidential

customer information and the possibility of loss of customers through such usage constitute

irreparable harm.") (*citing Churchill Commc'n Corp. v. Demyanovich*, 668 F. Supp. 207, 214

(S.D.N.Y. 1987); *Ecolab Inc. v. K.P. Laundry Mach., Inc.*, 656 F. Supp. 894, 898 (S.D.N.Y.

1987)); *Doubleclick Inc. v. Henderson,* No. 116914/97, 1997 N.Y. Misc. LEXIS 577 (Sup. Ct.

N.Y. County Nov. 5, 1997) (court concluded that irreparable harm is presumed where trade

secrets have been misappropriated in violation of a confidentiality agreement).

Moreover, Section 14 of the Confidentiality Agreement that each individual Defendant

signed, recognizes that there is no adequate legal remedy for misuse of the Confidential

Information: PartMiner "shall be entitled, in addition to any other remedies available to it, to an

---

[1] Pursuant to the Confidentiality Agreements and the Settlement Agreement, the substantive laws of New York apply to these claims. Where, as here, the parties have chosen a particular state's law in a negotiated contract, New York will enforce that choice of law as long as there are sufficient contacts between the chosen state and the contract. *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (U.K.) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000). Choice of law provisions in a contract are presumed to be valid. *Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1362 (2d Cir. 1993).

11

injunction and to secure specific performance of this Agreement." (Meyer Aff. ¶ 16, Exs. 1-3, thereto).

**B.      Plaintiff Is Likely to Succeed on the Merits of Its Claims.**

PartMiner's Complaint includes ten causes of action, and it is likely to succeed on all its claims.  (Falkenberry Decl. ¶ 8, Ex. F thereto).

### 1.      Breach of Confidentiality Agreements by Reed, Vanek and Sharpe

The elements of a breach of contract claim under New York law are (1) the existence of a contract; (2) plaintiff's performance of the contract; (3) defendant's breach of contract; and (4) resulting damages. *Bank Itec N.V. v. J. Henry Schroder Bank & Trust Co.,* 612 F. Supp. 134, 137-38 (S.D.N.Y. 1985); *Ross v. FSG PrivatAir Inc.,* No. 03 Civ. 7292, 2004 WL 1837366, at *3 (S.D.N.Y. Aug. 17, 2004).

During their employment with PartMiner, Reed, Sharpe and Vanek entered into Confidentiality Agreements with PartMiner. (Meyer Aff. ¶ 11, Exs. 1-3).  Confidentiality agreements are enforceable contracts under New York Law. *See Am. Broad. Companies. v. Wolf,* 52 N.Y.2d 394, 438 N.Y.S.2d 482 (1981); *Bijan,* 1997 U.S. Dist. LEXIS 1426; *Doubleclick Inc.*, 1997 N.Y. Misc. LEXIS 577.

The evidence that Defendants deliberately breached their Confidentiality Agreements is overwhelming.  About a week before he resigned, Reed asked his sales team to provide him with updated customer contact information and their respective pipeline sales. (Meyer Aff. ¶ 19.) Sharpe and Vanek engaged in the same type of conduct. (*Id.*)  Immediately prior to leaving PartMiner, Sharpe asked his sales team to provide him with updated sales pipelines. (*Id.*)  On the

12

day of his resignation, Vanek emailed to himself, at a personal email address, roughly eighty-five separate emails containing numerous PartMiner spreadsheets and pipeline reports which were filled with PartMiner Confidential Information regarding customers and sales prospects. (*Id.*)

The Defendants continue to possess and use PartMiner Confidential Information. Reed and his Avnet sales team are still in possession of PartMiner's Confidential Information, including its customer lists, which they are still using to solicit both active and prospective PartMiner customers. (Wetherbee Aff. ¶¶ 6-8; Sbravati Aff. ¶¶ 6-8.) As a result, PartMiner has lost several valuable customers to Avnet and stands to lose many more should Defendants not be enjoined from engaging in such conduct. (Meyer Aff. ¶ 32.)

### 2.    Avnet's Tortious Interference with PartMiner's Contractual Relations

The elements of a tortious interference claim under New York law are: (1) existence of a valid contract; (2) knowledge of the contract by a third party; (3) intentional and improper procurement of a contract breach by the third party; and (4) damages resulting from the breach. *See Albert v. Loksen,* 239 F.3d 256, 274 (2d Cir. 2001); *Finley v. Giacobbe*, 79 F.3d 1285, 1294 (2d Cir. 1996); *B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05 Civ. 9988, 2006 U.S. Dist. LEXIS 85988, at *19 (S.D.N.Y. Jan. 31, 2006).

Each of these elements are satisfied on the facts shown in PartMiner's affidavits. As shown above, the Confidentiality Agreements signed by Reed, Sharpe and Vanek are valid and enforceable contracts under New York Law. Avnet had knowledge of the existence of the Confidentiality Agreements, and their prohibition on use of PartMiner's Confidential Information, no later than December 2005, when Reed was sued in the First Federal Action.

13

Despite this knowledge, Avnet has permitted and, upon information and belief, induced Reed, Sharpe and Vanek to utilize PartMiner Confidential Information, including PartMiner's customer lists, in their solicitation of business for Avnet. In fact, it was Defendants' stated policy to use the knowledge about PartMiner's customer base to target and undercut PartMiner's price right before the customer's PartMiner contract was up. (Wetherbee Aff. ¶ 8; Sbravati Aff. ¶ 7.) At several of Avnet's sales meetings, Reed would openly assert that "[w]e know all of PartMiner's customers and we are going to take them all away and put PartMiner out of business." (Sbvarti Aff. ¶ 7.) These acts are clearly violative of the individuals' Confidentiality Agreements. By inducing and allowing Reed, Sharpe and Vanek to use PartMiner Confidential Information in breach of the Confidentiality Agreements, Avnet has caused PartMiner to lose active and prospective customers.

### 3.      Fraud in the Inducement (Settlement Agreement)

Under New York law, "[a]n actionable fraud claim requires proof that defendant made a misrepresentation of fact [that was] known to be false…[and intended] to induce another party's reliance upon it." *N.Y. City Transit Auth. v. Morris J. Eisen*, P.C., 276 A.D.2d 78, 85, 715 N.Y.S.2d 232, 237 (1st Dep't 2000). New York courts have further concluded that "a misrepresentation of material fact, which is collateral to the contract and serves as an inducement for the contract, is sufficient to sustain a cause of action for fraud." *WIT Holding Corp. v. Klein*, 282 A.D.2d 527, 528, 724 N.Y.S.2d 66, 68 (2d Dep't 2001). The defendant is liable for all harm caused by plaintiff's justifiable reliance upon the misrepresentation. *N.Y. City Transit Auth.*, 276 A.D.2d at 85, 715 N.Y.S.2d at 238.

14

PartMiner would not have entered into the Settlement Agreement if the individual Defendants had not represented that they did not have any Confidential Information in their possession. (Meyer Aff. ¶ 26.) Based on the evidence of Defendants' continued possession and use of PartMiner's Confidential Information, it is obvious that Defendants' warranty was a misrepresentation and that they never had any intention of adhering to the promises made in the Settlement Agreement. Thus, it is clear that Defendants fraudulently represented that they did not possess PartMiner's Confidential Information in order to induce PartMiner to enter into the Settlement Agreement and end the litigation. PartMiner is entitled to all damages flowing from its reliance on Defendant's misrepresentations, including all business lost as a result of Defendants' continued use of PartMiner's Confidential Information.

### 4.    Breach of Settlement Agreement

New York Courts enforce settlement agreements in the same manner as most other contracts. *See Fresh Del Monte Produce N.V. v. Eastbrook Caribe A.V.V.*, 40 A.D.3d 415, 836 N.Y.S.2d 160 (1st Dep't 2007); *Jackson Heights Care Ctr., LLC v. Bloch*, 39 A.D.3d 477, 833 N.Y.S.2d 581 (2d Dep't 2007); *Denburg v. Parker Chapin Flattau & Klimpl*, 82 N.Y.2d 375, 383, 604 N.Y.S.2d 900, 905 (1993) ("Strong policy considerations favor the enforcement of settlement agreements."). Thus, the standard for breach of contract, as set forth above, applies equally to this cause of action. (*See supra* Section B(1).)

As shown in PartMiner's affidavits, despite the promises made in the Settlement Agreement, Defendants continue to possess and use Confidential Information to solicit active and prospective PartMiner customers. (Meyer Aff. ¶¶ 30-32; Wetherbee Aff. ¶¶ 6-10; Sbravati Aff. ¶¶ 5-7; and McBarron Aff. ¶¶ 5). Furthermore, upon information and belief, Defendants

have solicited PartMiner employees to provide additional PartMiner Confidential Information.

For example, upon information and belief, Defendants solicited Jeff Dwyer, a former PartMiner

account manager, for employment with Avnet and for PartMiner Confidential Information.

(McBarron Aff. ¶ 5.) Defendants' actions are in direct contravention of the Settlement

Agreement and have resulted in PartMiner's loss of active and prospective customers.

### 5.    Misappropriation of Trade Secrets

Defendants' use of PartMiner's Confidential Information, including its customer lists,

constitutes a misappropriation of PartMiner's trade secrets.  To succeed on a claim for the

misappropriation of trade secrets under New York law, PartMiner must demonstrate that: "(1) it

possessed a trade secret, and (2) . . . the defendants used that trade secret in breach of an

agreement, confidential relationship or duty, or as a result of discovery by improper means." *N.*

*Atl. Instruments,* 188 F.3d 38 at 43-44 (*citing Hudson Hotels Corp. v. Choice Hotels, Int'l*, 995

F.2d 1173, 1176 (2d Cir. 1993)).

### (a)    PartMiner's Customer List and Related Confidential Information are Trade Secrets

Under New York law, a trade secret

> may consist of any formula, pattern, device or compilation of
> information which is used in one's business, and which gives him
> an opportunity to obtain an advantage over competitors who do not
> know or use it. It may be a formula for a chemical compound, a
> process of manufacturing, treating or preserving materials, a
> pattern for a machine or other device, or a list of customers. It
> differs from other secret information in a business . . . in that it is
> not simply information as to single or ephemeral events in the
> conduct of the business, as, for example, the amount or other terms
> of a secret bid for a contract or the salary of certain employees, or
> the security investments made or contemplated, or the date fixed
> for the announcement of a new policy or for bringing out a new

16

model or the like. A trade secret is a process or device for
continuous use in the operation of the business. Generally it relates
to the production of goods, as, for example, a machine or formula
for the production of an article. It may, however, relate to the sale
of goods or to other operations in the business, such as a code for
determining discounts, rebates or other concessions in a price list
or catalogue, or a list of specialized customers, or a method of
bookkeeping or other office management.

*Lehman v. Dow Jones & Co.*, 783 F.2d 285, 297-98 (2d Cir. 1986) (*citing* Restatement of Torts §

797, cmt. b (1939); *see Eagle Comtronics, Inc. v. Pico, Inc.,* 89 A.D.2d 803, 803, 453 N.Y.S.2d

470, 472 (4th Dep't 1982).

New York courts have consistently held that customer lists are trade secrets. *See N. Atl.*

*Instruments*, 188 F.3d 38; *Webcraft Technologies, Inc. v. McCaw*, 674 F. Supp. 1039, 1046

(S.D.N.Y. 1987) (protecting as a trade secret a customer list that took great time and effort to

compile, including "development of a specialized knowledge of the customer's operations and

needs."); *Nutmeg Technologies v. Mahshie*, No. 89-CV-511, 1989 U.S. Dist. LEXIS 6293

(N.D.N.Y. June 2, 1989) (holding that a customer list whose "customers are only cultivated after

extensive efforts [by plaintiff]" was a trade secret.); *Giffords Oil Co. v. Wild*, 106 A.D.2d 610,

611, 483 N.Y.S.2d 104, 106 (2d Dep't 1984) (holding that a customer list that required

substantial time and money to compile and that contained information "which could only be

achieved through personal solicitation" was a protectable trade secret.)

In determining whether a trade secret exists, the New York courts have considered the

following factors to be relevant:

(1) the value of the information to [it] and to [its] competitors;

17

(2) the amount of effort or money expended by [it] in developing the information;

(3) the extent to which the information is known outside of [its] business;

(4) the extent to which it is known by employees and others involved in [its] business;

(5) the ease or difficulty with which the information could be properly acquired or duplicated by others; and

(6) extent of measures taken . . . to guard the secrecy of the information;

*See Restatement of Torts* § 757, cmt. b (1939); *see Eagle Comtronics*, 89 A.D.2d at 803-04, 453 N.Y.S.2d at 472; *Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc.*, 920 F.2d 171, 172 (2d Cir. 1990); *see Lehman v. Dow Jones & Co.*, 783 F.2d 285, 297 (2d Cir. 1986).

### (i)    PartMiner's Confidential Information is Valuable and Requires Significant Investment to Develop

PartMiner's success depends on finding new customers and maintaining its existing ones. (Meyer Aff. ¶ 5.) To that end, PartMiner spends significant time, resources and money in developing and maintaining detailed information about its existing customers, including contact information for the key customer employees who are responsible for purchasing and who use the product, the operation of the customers' office including the types of individuals who may have need for the product, business issues the customer is having that may be solved by the products, customer preferences, records of communication, contract start and end dates, contract pricing, credit information, budget and key internal approvers, sales strategies, and other details concerning the customer's relationship and the terms and conditions of their agreements with PartMiner. (Meyer Aff. ¶ 5.) PartMiner spends an equal amount of time, resources and money

18

developing and maintaining similar information concerning prospective customers (*Id.*)

PartMiner could not effectively compete without this information and, therefore, it is essential to

PartMiner's business. Disclosure to and use by a competitor of this information would be

devastating to PartMiner (*Id.* ¶¶ 6-7.) Allowing competitors to have PartMiner Confidential

Information in their possession would permit them to anticipate the PartMiner customer's every

need and want without ever having to do any of the research, due diligence, and data gathering

completed by PartMiner at great expense. (*See* Meyer Aff. ¶¶ 5-7.) Specifically, having such

information would allow a competitor to contact a customer right before its PartMiner contract is

about to expire, target the customer's preferences, and undercut PartMiner's price. (*See id.*)

      (ii)    **Knowledge of Confidential Information Outside of PartMiner and the Difficulties Associated with Properly Acquiring or Duplicating Same**

It is not purely customer names that PartMiner seeks to keep confidential. The

individualized information about each customer, which can only be obtained through an ongoing

business relationship, is even more valuable, because it allows PartMiner to service and

anticipate the needs of the customer, and thus keep the customer against the efforts of

competitors to take them away. (*See id.*) This information is not readily ascertainable or

duplicable. (Meyer Aff. ¶¶ 5-6); *see Advanced Magnification Instruments, Ltd. v. Minuteman

Optical Corp.*, 135 A.D.2d 889, 890, 522 N.Y.S.2d 287, 289 (3d Dep't 1987) (court held

customer list was a trade secret where it contained detailed customer information, including the

extent of each customer's sales activity, current information on the customer's credit rating,

which customers were susceptible to telemarketing, and other information relating to the

customer and the operation of the customer's office, gathered by sales personnel in the course of

developing and servicing the customers by telephone). As set out above, PartMiner's

Confidential Information contains details about a customer or prospect, including contact

information, contract start and end dates, company and product preferences, records of

communications with companies, sales strategies, the operation of the company's office

including the types of individuals who may have a need for the product, business issues the

company is having that may be solved by the products, company credit information, budget and

key internal approvers, source of referral, where the company is in the sales process, and the

likelihood of closing a sale. (Meyer Aff. ¶ 5.)

This detailed compilation of information is not available from any public source, but

rather is the product of information gathering by PartMiner personnel through sales and customer

relationship communications over an extended period of time. (*Id.* ¶¶ 6-7.)

Further, given the nature of and manner in which the Confidential Information is

gathered, it is not of the sort that could be easily duplicated or acquired by others. Where, as

here, "it would be difficult to duplicate a customer list because it reflected individual customer

preferences, trade secret protection should apply." *N. Atl. Instruments*, 188 F.3d at 46

(referencing *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)).

    **(iii)**    **Measures taken by PartMiner to guard the secrecy of its
Trade Secrets**

PartMiner has created several layers of security to protect its Confidential Information.

First, PartMiner adopted a company-wide policy restricting the disclosure of Confidential

Information, including its customer lists. (Meyer Aff. ¶ 8.) Second, PartMiner requires all of its

employees to sign Confidentiality Agreements. (*Id.*, Exs. 1-3.) Third, PartMiner's Employee

Manual and Electronic Code of Conduct prohibits employees from using or disclosing PartMiner

20

Confidential Information outside the scope of their jobs for PartMiner. (*Id.*, Exs. 4-5.) Fourth,

PartMiner password-protects all of its databases and restricts access to persons having an internal

business need to see that information. (*Id.*) Finally, employees are required to return all

PartMiner materials when their employment ends and are prohibited from taking any copies of

that information with them. (*Id.*)

### (b) Defendants Used PartMiner's Customer Lists and Related Confidential Information in Breach of Confidentiality Agreements and the Settlement Agreement

As previously indicated in Sections B(1) and B(4), supra, Defendants' misappropriation

and use of PartMiner Confidential Information, including PartMiner's customer lists, is in direct

contravention to the individual Defendants' Confidentiality Agreements and the Settlement

Agreement. Defendants' breaches of the respective Agreements has resulted in significant

damage to PartMiner including loss of current and prospective customers.

### 6. Violation of Section 43(a) of the Lanham Act.

In order to establish a violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a),

the plaintiff must show that defendant: (1) made "false or misleading factual representations

regarding the nature, characteristics, or qualities" of defendant's or plaintiff's goods or services;

(2) "used the false or misleading representations 'in commerce'"; (3) made false or misleading

representations "in the context of commercial advertising or commercial promotion"; and (4) that

plaintiff is " likely to be damaged by the false or misleading factual representations." *Towers*

*Fin. Corp. v. Dun & Bradstreet, Inc.*, 803 F. Supp. 820, 823 (S.D.N.Y. 1992) (citing *McNeil-*

*P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1548-49 (2d Cir. 1991)); *Accord*

21

*Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship. L.P.*, 380 F.3d 126 (2d Cir. 2004). The evidence shows that each of these elements are satisfied here.

### (a)  False and Misleading Factual Statements about PartMiner's Goods and Services Made in Commerce

PartMiner and Avnet are business competitors with respect to the sale of access to databases of electronics parts information, and software to manage the use of that information. (Meyer Aff. ¶ 20.)  To influence PartMiner's active and prospective customers to leave PartMiner and/or go with Avnet, the individual Defendants, acting for and at the instigation of Avnet, have made repeated false statements to numerous PartMiner customers, including the following:

a.  PartMiner's data cannot be trusted due to integrity issues, including the fact that the data is out-of-date, not good, contains inconsistent information and that there is nothing new in the database;

b.  The individual Defendants "jumped ship" because of PartMiner's data integrity issues;

c.  There are many more engineers inputting information into the database marketed by Avnet relative to the number of PartMiner engineers performing the same task, and specifically that there are 300 to 500 engineers inputting information into the database marketed by Avnet;

d.  PartMiner makes up part numbers to make it appear that it has more parts in its database than Avnet;

e.  The database marketed by Avnet is updated and made available to customers every night; and

f.  PartMiner is going out of business.

(*See* Sbravati Aff. ¶¶ 8-9; Wetherbee Aff. ¶¶ 9-11.)  These false statements, which were an integral part of a widespread and organized promotional campaign directed at PartMiner's

22

customers and prospects, were made via telephone and email, the standard instrumentalities of interstate commerce. (Wetherbee Aff. ¶ 9.)  This satisfies the "commerce" requirement. *Mobius Mgmt. Sys. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1019 (S.D.N.Y. 1994)

### (b)  Commercial Promotion

"The touchstone of whether a defendant's actions may be considered commercial advertising or promotion under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 57 (2d Cir. 2002) [internal citations omitted].  That touchstone is met here.

The Defendants organized widespread email and telephone campaigns, directed to current and prospective PartMiner customers, using scripts that contained the false statements set out above. (*See* Sbravati Aff. ¶¶ 8-9; Wetherbee Aff. ¶¶ 9-11.)  In fact, PartMiner has learned from former Avnet employees that all or part of this script was used in solicitations nearly everyday for at least a year. (*Id.*)  There can be no question that the statements were made as part of an organized campaign to penetrate the relevant market.

### (c)  Likelihood of Damages

By making these statements, Defendants have disparaged the quality of PartMiner's products and services, injured PartMiner's business reputation and goodwill, and caused it to suffer irreparable harm in the form of (1) confusion in the marketplace as to the quality of PartMiner's products and services and (2) a belief in customers and prospects that PartMiner would be going out of business, leaving them without support for their part sourcing and

23

management needs. There is no question that this conduct has damaged PartMiner in the form of lost customers and prospects, and is likely to cause further injury in the absence of an injunction.

7.    **Defamation**

Under New York law, the elements of a defamation cause of action are: "(1) a defamatory statement of fact concerning the plaintiff, (2) publication to a third party by the defendant, (3) falsity of the defamatory statement, (4) some degree of fault, and (5) special damages or per se actionability (defamatory on its face)." *Chamilia, LLC v. Pandora Jewelry, LLC,* No. 04-CV-6017, 2007 U.S. Dist. LEXIS 71246, at * 39 (S.D.N.Y. Sep. 24, 2007) (*citing Kasada, Inc. v. Access Capital, Inc.,* No. 01-CV-8893, 2004 WL 2903776, at *55 (S.D.N.Y. Dec. 14, 2004).)

There is little question that the defamatory promotional campaign set out above qualifies as defamation under New York law. The above-cited statements used in the campaign are factual in nature, provably false and were publicized to most, if not all, of PartMiner's customers. Defendants have repeatedly disseminated information with full knowledge that not one of their statements is truthful. This is particularly reprehensible because they advertise their previous employment with PartMiner in order to bolster their credibility when making the false statements about PartMiner.

Special damages need not be pled in this case. "When a defamatory statement concerns the nature of a person's business, that statement is defamatory per se, and, at the pleading stage, special damages are presumed." *Chamilia,* 2007 U.S. Dist. LEXIS 71246, 48-49. The defamatory statements published by Defendants go to the very heart of PartMiner's business and its integrity. Therefore, PartMiner can prove special damages.

24

Even though PartMiner is not required to plead special damages in this case, PartMiner has pled such damages in its Complaint. (Falkenberry Decl. ¶ 8, Ex. F thereto). Over the last two years, Defendants have used PartMiner's Confidential Information and false promotion about PartMiner to lure at least fifty-one different accounts away from PartMiner, resulting in a loss of over $1.4 million in revenue to PartMiner. (*Id.*, Ex 8.) PartMiner also believes that it has lost many more than fifty-one customers, and expects discovery in this matter to provide ample evidence that many more PartMiner customers were lost through the use of PartMiner's Confidential Information and false promotion. (*Id.*) Defendants' wrongful conduct has also resulted in the loss of many prospective customers, and PartMiner expects discovery to provide sufficient evidence of these losses as well. (*Id.*)

Loss of these sales hurts PartMiner in multiple ways. (*Id.* ¶ 34.) First, PartMiner loses the revenue related to the particular lost sale. (*Id.*) Beyond this, PartMiner loses opportunities—both the opportunities for repeat business, as well as the opportunities for referrals from each customer lost. (*Id.*)

Moreover, loss of customers damages PartMiner in the valuation of its company. (*Id.*) PartMiner is contemplating raising capital through an IPO and, therefore, its valuation is critical in determining how much money PartMiner can raise in the market. PartMiner's valuation is sensitive to revenue fluctuations, and its losses to Avnet are significantly lowering PartMiner's revenues. (*Id.*) These reduced revenues are jeopardizing PartMiner's ability to have a successful IPO. (*Id.*)

In addition, PartMiner has spent a great deal of time, energy and money on significant efforts to combat Defendants' wrongful conduct and convince its current customers and

prospects to choose PartMiner. (*Id.* ¶ 35.) If the Defendants had not used PartMiner's

Confidential Information and false promotion to try to lure customers from PartMiner, PartMiner

would not have had to make these extra efforts, including contract price reductions, concerning

such customers and prospects. (*Id.*)

### 8.    Business/Product Disparagement[2]

In order to prevail on its claim of business/product disparagement, PartMiner must

establish the following four elements: "(1) the falsity of [Defendant's] statements; (2) publication

to a third person; (3) malice; and (4) special damages." *Kirby v. Wildenstein,* 784 F. Supp. 1112,

1115 (S.D.N.Y. 1992); *Angio-Med. Corp., v. Eli Lilly & Co.,* 720 F. Supp. 269 (S.D.N.Y. 1989)

(applying New York law); *Drug Res. Corp. v. Curtis Publ'g Co.,* 7 N.Y.2d 435, 440, 199

N.Y.S.2d 33, 37 (1960).

PartMiner has already shown that Defendants' promotional campaigns contained false

statements which were published to third-parties and resulted in special damages.  (*Supra.* at §

I(B)(6) and (7))  With respect to malice, New York courts have defined it as "knowledge of the

alleged false statement or reckless disregard as to the truth of the statement." *Charles Atlas, Ltd.*

*v. Time-Life Books, Inc.,* 570 F. Supp. 150, 154 (S.D.N.Y. 1983); *see Bivas v. State*, 97 Misc. 2d

524, 528, 411 N.Y.S.2d 854, 858 (Ct. Cl. 1978) (summarizing W. Prosser, Handbook of the Law

of Torts § 128, at 921-22 (4th ed. 1971) (to support a claim for product disparagement, "malice,

---

[2] "[A]lthough defamation and disparagement in the commercial context are allied in that the gravamen of both are falsehoods published to third parties, there is a distinction.  Where a statement impugns the basic integrity or creditworthiness of a business, an action for defamation lies and injury is conclusively presumed.  Where, however, the statement is confined to denigrating the quality of the business' goods or services, it could support an action for disparagement, but will do so only if malice and special damages are proven." *Ruder & Finn, Inc. v. Seaboard Sur. Co.,* 52 N.Y.2d 663, 670-71, 439 N.Y.S.2d 858, 862 (1981).  PartMiner submits that it can prove both defamation and disparagement under the facts of this case.

comprising either ill will, scienter or deliberate falsification, is necessary"); Restatement (Second) of Torts § 623A, cmt.d (1977) ("A principal basis for liability for injurious falsehood [that is, product disparagement] has been that the publisher knew that the statement was false or that he did not have the basis of knowledge or belief professed by his assertion.").

As previous PartMiner employees, the individual Defendants had access to PartMiner materials, including information pertaining to PartMiner's financial health, databases, workforce and product integrity. As such, Defendants knew that the claims they made were false and, therefore, their conduct was malicious. Moreover, Reed expressly stated to his sales staff at Avnet that their goal was to put PartMiner out of business. (Sbravati Aff. ¶ 7.) Finally, PartMiner has sufficiently pled special damages which resulted from Defendants' disparagement of PartMiner's business, products and services to PartMiner's customers and prospects. (*See supra* Section B(7).)

### 9.    Defendants' Tortious Interference with PartMiner's Prospective Business Advantage

For a cause of action for tortious interference with business advantage to stand, PartMiner must demonstrate that Defendants "interfered with the plaintiff's business relationships either with the sole purpose of harming the plaintiff, or by means that were unlawful or improper." *Redeye Grill, L.P. v. Restaurant Opportunities Ctr., Inc.,* 13 Misc. 3d 1212A, 2006 WL 272683, at *5 (Sup. Ct. N.Y. County 2006) (*citing 71 Pierrepont Assocs. v. 71 Pierrepont Corp.,* 243 A.D.2d 625, 625-26, 663 N.Y.S.2d 263, 264 (2d Dep't 1997). *See also, Guard-Life Corporation v. S. Parker Hardware Manufacturing Corp.,* 50 N.Y.2d 183, 191, 428 N.Y.S.2d 628 (1980).

27

Here, Reed, Sharpe and Vanek interfered with PartMiner's business through improper means <u>and</u> with the sole purpose of harming PartMiner. Its means of interference are clearly improper because they have used and continue to use PartMiner Confidential Information in contravention of the Confidentiality and Settlement Agreements. Upon information and belief, the Defendants have also been paying PartMiner employees for additional Confidential Information, or otherwise improperly soliciting PartMiner employees to provide information. (Wetherbee Aff. ¶ 12; McBarron Aff. ¶ 5; Auga Aff. ¶ 4.) Moreover, there is little doubt that making false promotional statements about PartMiner's business amounts to improper interference.

There is also little doubt that the sole purpose of the wrongful conduct described above was to harm PartMiner's relationship with its current and prospective customers. Defendants' conduct shows that it intended to use the Confidential Information and false promotion to steal PartMiner customers and run it out of business. (Sbravati Aff. ¶ 7; See Wetherbee Aff.). In fact, Reed not only expressly stated to his sales team at Avnet that Defendants wanted to put PartMiner out of business, but also that his sales model was to target PartMiner customers, as opposed to trying to get new business from current Avnet customers. (Wetherbee Aff. ¶ 8; Sbravati Aff. ¶ 7.)

### 10.    Common Law Unfair Competition

Under New York law, "the primary concern in unfair competition is the protection of a business from another's misappropriation of the business' 'organization [or its] expenditure of labor, skill, and money.'" *Ruder & Finn, Inc. v. Seaboard Sur. Co.,* 52 N.Y.2d 663, 671, 439 N.Y.S.2d 858, 862 (1981). A claim of unfair competition will lie where a former employee

28

misappropriates and exploits confidential information belonging to her former employer in abuse of her relationship of trust. *Doubleclick Inc.*, 1997 N.Y. Misc. LEXIS 577; *Comprehensive Cmty. Dev. Corp. v Lehach,* 223 A.D.2d 399, 636 N.Y.S.2d 755 (1st Dep't 1996); *Advanced Magnification Instruments, Ltd. v. Minuteman Optical Corp.*, 135 A.D.2d 889, 522 N.Y.S.2d 287 (3d Cir. 1987).

As set out in Section I.B.3, *supra*, Defendants misappropriated PartMiner's Customer Information, including PartMiner's customer lists. The customer list and other Confidential Information does not create itself, but rather is the product of vast expenditures of PartMiner's resources. It requires years of labor, skills and resources, including paying sales people to find, learn about, and sell to customers and prospects, and compile all information regarding their efforts and outcomes.

What is most egregious about Defendants' misappropriation of PartMiner's Confidential Information is that is was used specifically to target PartMiner customers and prospects in false advertising and promotional campaigns. Such actions by Defendants are an extreme abuse of the trust between the individual Defendants and PartMiner. Thus, Defendants misappropriation of PartMiner's Confidential Information and use of false promotion to steal PartMiner's customers and prospects constitutes unfair competition.

**11.    Avnet is Liable for the Actions of Reed, Sharpe and Vanek**

Avnet is vicariously liable for all causes of action in the Complaint directed to the individual Defendants. "An employer is vicariously liable, under the theory of *respondeat superior*, for the torts of its employee, if the actions complained of were committed while the employee was acting within the scope of his employment, even if the acts are done irregularly, or

29

in disregard of instruction." *Manno v. Mione*, 249 A.D.2d 372, 372, 670 N.Y.S.2d 368, 369 (2d Dep't 1998). Here, Avnet is vicariously liable for Reed, Sharpe and Vanek's actions because they were each acting in the scope of their employment and in furtherance of Avnet's business when they committed these torts.

Moreover, because Reed is an officer of Avnet, his knowledge and participation in any such wrongful conduct is imputed to Avnet. *See First Interregional Equity Corp. v. Haughton*, 805 F. Supp. 196, 202 (S.D.N.Y. 1992); *Carroll v. Station Managers, Inc.*, 104 Misc. 2d 1014, 429 N.Y.S.2d 825, 827 (N.Y. Civ. Ct. Kings County 1980).

**C.    The Balance of Hardships Strongly Favors Plaintiff.**

Although PartMiner has established a likelihood of success on the merits, it would also be entitled to a preliminary injunction under the alternate test of demonstrating serious questions going to the merits plus a balance of hardships tipping strongly towards PartMiner.

The purpose of the requested preliminary injunction is to preserve the status quo — that is, to prevent the unfair loss of PartMiner's relationships with customers and prospects. Without a preliminary injunction, PartMiner risks losing its most important revenue-generating clients through unfair means. Once this business is lost, it is very unlikely to be reclaimed. *See Health Consultants Group, LLC v. Dailey*, No. 04 Civ. 4586, 2004 U.S. Dist. LEXIS 27318, at *17-18 (S.D.N.Y. Aug. 24, 2004). In contrast, if a preliminary injunction is granted, Defendants will still remain free to advertise, seek new customers and serve their existing customers. They will simply have to do so without the use of PartMiner's Confidential Information and without using false and defamatory promotion. Thus, the balance of hardship strongly favors PartMiner.

30

For the reasons stated above, the Court should enter a preliminary injunction enjoining and restraining Defendants, and all those acting in connection with them, from:

    a.  Misappropriating, divulging, disseminating, utilizing or otherwise making use of PartMiner's trade secrets and Confidential Information

    b.  Directly or indirectly contacting or soliciting business from any PartMiner customer that Defendants gained knowledge about through PartMiner's Confidential Information including, but not limited to, its customer lists; and

    c.  Making any false or misleading statements about PartMiner's business, services or products.

Additionally, Defendants and all those acting in connection with them, should be required to immediately return to PartMiner any and all of PartMiner's Confidential Information. Finally, because Defendants fraudulently induced PartMiner to enter into the Settlement Agreement, the Settlement Agreement is subject to rescission.

## II.    THE COURT SHOULD ORDER EXPEDITED DISCOVERY

PartMiner asks the Court for an order granting leave to take expedited discovery of the Defendants. PartMiner's discovery would be limited to the depositions of Reed, Sharpe, Vanek, Marc Brewer, Steve Burrell, a knowledgeable representative of Avnet (to be determined through discovery) involved in the hiring and supervision of Reed, Sharpe and Vanek and up to two (2) non-parties, the identities of whom will be determined through discovery. In addition, PartMiner would seek the production of documents by the Defendants relevant to (1) Reed, Sharpe and Vanek's employment with Avnet, (2) efforts by Defendants to solicit the business of PartMiner customers and prospects, and (3) the precise nature of the Confidential Information that Defendants took from PartMiner and have been using. These documents include the following:

31

1. All documents containing any PartMiner Confidential Information as defined in the Confidentiality and Settlement Agreements;

2. All correspondence, emails, and records of communications (electronic or otherwise) sent or received by Avnet, Avnet Promiere, Reed, Sharpe, Vanek, Marc Brewer, Steve Burrell, Katie Wetherbee or Andrew Sbravati from October 1, 2005 to the present that concern or mention PartMiner or specified PartMiner customers or prospects (to be provided after a confidentiality order is entered);

3. All Avnet or Avnet Promiere marketing and promotional materials utilized from October 1, 2005 to the present that were sent to specified PartMiner customers or prospects (to be provided after a confidentiality order is entered);

4. All telephone records from Avnet, Avnet Promiere, Avnet/Avnet Promiere employee business, personal cell and home telephones from October 1, 2005 to the present concerning calls between Avnet/Avnet Promiere, Reed, Sharpe, Vanek, Marc Brewer, or Steve Burrell and PartMiner customers or prospects (to be provided after a confidentiality order is entered);

5. All telephone records from Avnet, Avnet Promiere, Avnet/Avnet Promiere employee business, personal cell and home telephones from October 1, 2005 to the present concerning calls between Avnet/Avnet Promiere, Reed, Sharpe, Vanek and any current or former PartMiner employees or representatives;

6. All Goldmine, pipeline, and any similar sales, prospects or customer relationship management documentation, entries or reports from October 1, 2005 to the present;

7. A list of all Avnet Promiere customers from October 1, 2005 to the present; and

8. All relevant materials which are found during the course of discovery to be in the possession of third-parties.

The parties would complete this discovery within ninety (90) days of the entry of an expedited discovery scheduling order. This limited expedited discovery is needed so that the Court can set the motion for preliminary injunction for an early hearing, and so PartMiner can present a full record at the hearing.

32

The Federal Rules of Civil Procedure give this Court broad powers to permit expedited discovery and hearings where a preliminary injunction is sought. 28 U.S.C. § 1657(a) provides that "the court shall expedite the consideration of . . . any action for temporary or preliminary injunctive relief." In addition, Rule 26(d) of the Federal Rules of Civil Procedure authorizes the Court to allow discovery on an expedited basis. *See* Fed. R. Civ. P. 26(d) 1993 Advisory Committee Note (order providing for expedited discovery "will be appropriate in some cases, such as those involving requests for a preliminary injunction").

Where expedited discovery is requested, the courts consider four factors: "(1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of irreparable injury; and (4) some evidence that the injury that will result without the expedited discovery looms greater than the injury defendant will suffer if the expedited relief is granted." *Don King Prods., Inc. v. Hopkins*, No. 04 Civ. 9705, 2004 U.S. Dist. LEXIS 25917, at *5-6 (S.D.N.Y. Dec. 23, 2004) (*quoting Gidatex, S.R.L. v. Campaniello Imps., Ltd.*, 13 F. Supp. 2d 417, 420 (S.D.N.Y. 1998)). The test essentially parallels the showing needed for a preliminary injunction. *Special Situations Cayman Fund, L.P. v. Dot Com Entm't Group, Inc.*, No. 03-CV-0811E(F), 2003 U.S. Dist. LEXIS 25083, at *5 (W.D.N.Y. Dec. 5, 2003).

PartMiner has shown above that it meets the first two factors for expedited discovery: it will be irreparably injured if Defendants are permitted to continue certain conduct and it is likely to succeed on the merits of its claims. The other two factors are also satisfied. There is a close connection between the expedited discovery PartMiner seeks and avoidance of irreparable injury because such discovery will allow PartMiner's preliminary injunction motion to be heard at an

33

earlier date and on a fuller record. This will permit the Court to learn from the most knowledgeable witnesses – Defendants themselves – about which PartMiner customers Defendants have solicited, along with the manner in which they solicited them. This information will allow the Court to fashion a more effective preliminary injunction, and early entry of the injunction will prevent Defendants from unfair solicitation of PartMiner customers using PartMiner Confidential Information and false promotion, thereby preventing further irreparable injury.

Conversely, if expedited discovery is denied, PartMiner will certainly suffer greater irreparable injury. In that case, the preliminary injunction motion would most probably not be heard, much less decided, for a number of months. In the interim, Defendants would certainly continue their wrongful solicitation and false promotion, resulting in an irretrievable loss of more of PartMiner's most important customers and further tarnishment of PartMiner's business reputation.

Accordingly, PartMiner respectfully requests that the Court order expedited discovery in this case, allowing the parties to demand production of documents within two weeks of service of requests for production and to take depositions within two weeks of service of notices of deposition. PartMiner also requests that the Court set the motion for preliminary injunction for hearing within two months of the date of its decision on the motion for expedited discovery.

**CONCLUSION**

For the reasons stated above, the Court should grant a preliminary injunction against

Defendants and order expedited discovery.


Dated: New York, New York
       January 11, 2008

                                        DLA PIPER US LLP



                                        By: _____
                                        Eric M. Falkenberry
                                        /s/ Andrew L. Deutsch
                                        1251 Avenue of the Americas
                                        New York, New York 10020
                                        (212) 355-4500
                                        *eric.falkenberry@dlapiper.com*
                                        *Attorneys for Plaintif*

35