DLA PIPER US LLP
Eric M. Falkenberry
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
eric.falkenberry@dlapiper.com
*Attorneys for Plaintiff*


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X

| | | |
|---|---|---|
| PARTMINER INFORMATION SERVICES, INC., | : | 07 Civ. 11482 (LMM) |
| | : | |
| Plaintiff, | : | |
| | : | **DECLARATION OF ERIC M.** |
| - against - | : | **FALKENBERRY IN SUPPORT** |
| | : | **OF MOTION FOR** |
| AVNET, INC., THOMAS CASEY REED, JOHN | : | **PRELIMINARY INJUNCTION** |
| KENNETH SHARPE, and NEIL R. VANEK, | : | **AND EXPEDITED DISCOVERY** |
| | : | |
| Defendants. | : | |

-------------------------------------------------------- X

**ERIC M. FALKENBERRY,** declares under the penalties of perjury:

1.      I am a partner with the law firm of DLA Piper US LLP.  I am a member in good standing of the bar of the state of New York and of the United States District Court for the Southern District of New York, and I am licensed to practice law before all courts in the state of New York.  I make this affidavit based on personal knowledge.


2.      This affidavit is submitted in support of PartMiner Information Services, Inc's ("PartMiner") Motion for Preliminary Injunction and Order Granting Expedited Discovery.


3.      Attached hereto as Exhibit A is a true and accurate copy of PartMiner's Complaint brought in the United States District Court, Southern District of New York (*PartMiner v. Thomas Casey Reed* (Docket No. 05-10486(WHP)) on December 13, 2005.

4.    Attached hereto as Exhibit B is a true and accurate copy of the Voluntary Dismissal by Stipulation of the Parties filed in *PartMiner v. Thomas Casey Reed* (Docket No. 05-10486(WHP)) on February 6, 2006.

5.    Attached hereto as Exhibit C is a true and accurate copy of PartMiner's Complaint brought in Colorado state court (*PartMiner v. Avnet, et al.,* Colorado, District Court, Arapahoe County (Case Number: 2007cv1868)) on September 13, 2007.

6.    Attached hereto as Exhibit D is a true and accurate copy of the Order Granting Defendants' Motion to Dismiss without prejudice to re-file in New York entered in *PartMiner v. Avnet, et al.,* Colorado, District Court, Arapahoe County (Case Number: 2007cv1868) dated November 2, 2007.

7.    Attached hereto as Exhibit E is a true and accurate copy of the Order Denying Plaintiff's Motion for Reconsideration of Interpretation of the Forum Selection Clause Under Governing New York Law entered in *PartMiner v. Avnet, et al.,* Colorado, District Court, Arapahoe County (Case Number: 2007cv1868) on December 18, 2007.

8.    Attached hereto as Exhibit F is a true and accurate copy of PartMiner's Complaint brought in the United States District Court, Southern District of New York (*PartMiner v. Avnet,*

*Inc., Thomas Casey Reed, John Kenneth Sharpe and Neil R. Vanek* (Docket No. 07-

11482(LLM)) on December 21, 2007.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this

11th day of January 2008.

DLA PIPER US LLP

By:

Eric M. Falkenberry
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
eric.falkenberry@dlapiper.com
*Attorneys for Plaintiff*

# EXHIBIT A

DUANE MORRIS LLP
James A. Tricarico, Jr. (JT 9159)
Christopher Lewis (CL 6410)
380 Lexington Avenue
New York, New York 10168
(212) 692-1000
*Attorneys for Plaintiff*



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

PARTMINER INFORMATION SERVICES, INC.,

      Plaintiff,

      v.

THOMAS CASEY REED,

      Defendant.

---

**05 CV 10486**

Docket No.:

:
:
:
:
:
:   COMPLAINT FOR
:   PRELIMINARY and
:   INJUNCTIVE RELIEF
:
:
:
:

    Plaintiff PartMiner Information Services, Inc. ("PartMiner") by its attorneys Duane

Morris LLP, respectfully alleges as follows:

### THE PARTIES

    1.    PartMiner Information Services, Inc. is a corporation duly organized and existing

under the laws of the State of New York with its principal place of business at 80 Ruland Road,

Melville, New York. The company is a wholly owned subsidiary of PartMiner, Inc., a New

York Corporation with its principal place of business in Melville, New York. PartMiner is a

cutting-edge, online, provider of component information, software and services needed by engineers, purchasers, and other supply chain professionals in the electronics industry.

2.     Upon information and belief, Defendant Thomas Casey Reed ("Defendant") is a citizen of the State of Colorado, and resides in Parker, Colorado. Defendant is a former employee and officer of PartMiner.

## PARTMINER'S BUSINESS

3.     PartMiner is a leading global provider of component information needed by engineers, purchasers and other supply chain professionals in the electronics industry. PartMiner is also a major supplier of electronic components.

4.     PartMiner has customers (most of whom are institutional in nature) throughout the United States and the world.

5.     PartMiner maintains a number of confidential databases that contain confidential information regarding its customer lists, prospects and contacts, including the names and contact information concerning key individuals at its institutional clients.

6.     PartMiner has consistently taken the necessary steps to keep its customer lists and related information confidential, including limiting access to such information to senior executives and other designated employees of PartMiner.

7.     Since 1993, PartMiner and its predecessors have been providing specialized services in the nature of business-to-business sourcing and reselling of electronic components to manufacturing customers. These transactions are often facilitated through the Free Trade Zone®, an online procurement platform PartMiner developed and owns. The Free Trade Zone® ("FTZ") is located at www.partminer.com.

2

8.    Through the FTZ, *PartMiner's customers* can research, locate and purchase electronic components and can obtain design and other technical information needed to manufacture a myriad of commercial products.

9.    The operation of the FTZ is vastly enhanced by its use of a group of proprietary and confidential databases known as the CAPS™ Databases.

10.    The CAPS™ Databases are owned by PartMiner and are the largest, most extensive databases of electronic component information in the world.

11.    PartMiner has invested many millions of dollars to obtain, update and improve the CAPS™ Databases.

12.    PartMiner not only uses the CAPS™ Databases to support the FTZ, but PartMiner also licenses the CAPS™ Databases to customers under restrictive license agreements for their own internal use and every licensee must agree to kept the CAPS™ databases and their contacts confidential.

13.    In PartMiner's efforts to maintain the confidentiality of its trade secrets and other proprietary materials, PartMiner employees are asked to enter into a confidentiality agreement with the company whereby the employee agrees to keep all confidential information and trade secrets of the firm, including without limitation, information concerning the CAPS™ Databases and PartMiner's customer lists, confidential.

14.    This action arises out of Defendant's breach of the explicit terms of a Confidentiality Agreement (the "Agreement") between Defendant and PartMiner and the Defendant's continuing acts in breach of the Agreement.  A copy of the Agreement is attached hereto at Exhibit A.

3

15.    Defendant became employed with PartMiner in 1999 and, thereafter, attained the position of Vice President, CAPS Sales and Service. In that position, Defendant was responsible for selling products and services of PartMiner, managing the sales efforts of certain sales staff that reported to him and managing the customer support group.

16.    By virtue of his role as an officer and employee of PartMiner and his length of tenure with the company, Defendant gained access to information and materials that are unique to PartMiner's business and are confidential in nature. Defendant had full access to the CAPS™ Databases. He also was the administrator of the primary database in which PartMiner retained its customer lists. In addition, he received copies of pipeline reports and other reports that contained client-specific data and other proprietary information concerning the company's operation.

## NATURE OF THIS ACTION AND RELIEF REQUESTED

17.    Defendant entered into the Agreement in or about May, 2001. Pursuant to the Agreement, Defendant acknowledged and agreed to the following:

a.    Section 7. Information Access and Confidentiality. Employee acknowledges that the Employee occupies a position of trust and confidence with the Employer and will have access to and may develop Confidential Information[1] of actual or potential value to or otherwise useful to the Employer. The Employee agrees that during and after employment he or she shall treat as confidential and shall not, without written authorization from the Employer, disclose or use in whole or in part any Confidential Information that the Employee may acquire regarding or relating to the Employer's present or future business, sales, financials, products, operations, processes, personnel, or business associates, including any present or

---

[1]    Section 1 of the Agreement defines "Confidential Information" to include . . . "financial and cost data; . . . internal policies and procedures; . . . marketing plans and survey and trade information (including customer lists, customer usages and requirements) . . . .

4

future subsidiaries or affiliates, or regarding improvements, inventions, or know-how.

b.   Section 8.  Employer Property Return.  The Employee agrees that it will not at any time take from the Employer's premises without written authorization from the Employer any software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever, or copies thereof, which reflect or deal with Confidential Information in relation to the Employer's business, or any Inventions or any physical property of the Employer, and will promptly return the same to the Employer if taken with the aforesaid consent.  At the termination or the employment or at any other time that the Employer may request, the Employee shall promptly deliver to the Employer all software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever made or compiled by the Employee or in the Employee's possession concerning or relating to any business, product, process, operation, personnel, or business associate of the employer.  All such items shall be and remain at all times the Employer's property.

c.   Section 11.  Successors and Assigns.  This Agreement shall apply to all work performed by the Employee for Employer, including any of its past, present, or future affiliates or subsidiaries.  This Agreement shall inure to the benefit of the Employer's successors and assigns and shall be binding upon the Employee's assigns, executors, administrators, and other legal representatives.

d.   Section 16.  Employee Representation.  . . . If the Employee should cease to be employed by the Employer, the Employee shall not, without the Employer's prior written consent, directly or indirectly solicit or encourage any other employee of the Employer to leave the employment of the Employer or hire any employee who has left the employment of the Employer within two (2) years of said termination of such employee's employment with the employer.

e.   Section 14.  Remedies.  The Employer and the Employee both recognize that the employee's obligations, more particularly described above, (i) to assign certain inventions to the Employer and (ii) to refrain from disclosing or using Confidential Information are special, unique, and of extraordinary character, such that monetary damages could not adequately cure or remedy a breach.  The Employee agrees that for any actual or threatened breach, the Employer shall be entitled, in addition to other remedies available to it, to an injunction and to secure specific performance of this Agreement, plus the recovery or reasonable attorney fees and costs incurred in prosecuting an action to obtain such remedies.  Any failure in the exercise by either party of its rights to terminate this Agreement or to enforce any provision of this Agreement for default or violation by the other party shall not prejudice that party's right of termination or enforcement for any further or other default or violation.

5

f.  Section 15.  Applicable Law and Forum.  This Agreement shall be construed and interpreted and its performance shall be enforced according to the laws of the United States and the State of New York.  The Employer and the Employee consent to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for the purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

18.  On or about October 18, 2005, Defendant resigned his position as an employee and officer of PartMiner and accepted employment with Avnet, Inc., a direct competitor of PartMiner ("Avnet").

19.  Since his resignation Defendant has actively solicited and/or encouraged PartMiner employees to leave the company and, on information and belief, has caused Avnet, his current employer, to hire two former PartMiner employees.  Such actions are in direct breach of Section 16 of the Agreement.

20.  Said former employees are Kenneth Sharpe and Neil Vanek.  Upon information and belief Defendant has furthermore used confidential information he obtained as an officer and employee of PartMiner in his efforts to directly or indirectly solicit, encourage and/or hire PartMiner employees, in further breach of the Agreement, and has encouraged and/or caused the above-referenced Mr. Vanek to improperly remove confidential information from PartMiner.

21.  Among the materials Mr. Vanek improperly removed from PartMiner were proprietary reports regarding the CAPS™ Databases, data concerning PartMiner's customer lists and other customer specific data.

6

22.    Upon information and belief Defendant has used a copy of PartMiner's customer list to contact PartMiner's customers.

23.    Upon receiving notice of Defendant's conduct in breach of the Agreement, PartMiner sent a letter (the "Cease and Desist Letter") to the Defendant instructing him to cease and desist from any further conduct that violated his obligations to PartMiner. (See Exhibit B). Defendant nevertheless continues to solicit and/or encourage PartMiner employees to leave the company and to commit other actions in violation of the Agreement.

24.    Upon information and belief, Defendant directly solicited and/or encouraged another current PartMiner employee, one Jeffrey Williams, to leave PartMiner and join Avnet and thereafter, had discussions with him subsequent to or concurrent with receipt of the Cease and Desist Letter.

25.    In addition, upon information and belief, Defendant has recently improperly used or caused to be used confidential information and materials belonging to PartMiner, including without limitation, PartMiner's customer lists, and has himself contacted PartMiner clients or caused such clients to be contacted by Avnet.

26.    Defendant's actions are in breach of the Agreement and have caused direct harm to PartMiner. His continued breach of the Agreement constituteS an ongoing threat to PartMiner, and continues to cause irreparable harm to the company.

27.    By this action, PartMiner seeks damages for breach of contract and injunctive relief to enforce the terms of the Agreement (a) enjoining Defendant from soliciting and/or encouraging PartMiner employees from leaving the company; (b) enjoining Defendant from

NY\298205 1

using and/or disclosing confidential information and/or trade secrets of PartMiner and compelling the return of any such materials in his possession whether obtained directly by him or through other former employees he has caused to be hired by Avnet; (d) enjoining Defendant from contacting PartMiner's customers; (e) an award of attorneys' fees and costs associated with this action; and (e) such additional relief as determined by the Court.

## JURISDICTION AND VENUE

28.     This action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

30.     Pursuant to the Agreement, the parties have agreed and consented to this Court's jurisdiction over this action and have agreed and consented to venue in United States District Court for the Southern District of New York.

31.     Pursuant to the Agreement, the Defendant has consented to and agreed to be subject to the personal jurisdiction of this Court.

32.     An actual controversy exists necessitating injunctive relief because Defendant continues to directly or indirectly hire, solicit and/or encourage PartMiner employees to leave the company, causing irreparable harm to PartMiner, and the Defendant continues to engage in other harmful acts against the company in breach of the Agreement.

8

NY\298305 1

## GENERAL ALLEGATIONS

33.    In or about 1999, Defendant became an employee of PartMiner, and was employed by the company in various capacities until October 2005. In or about August 2004, Defendant attained the position of Vice President of Sales and Services for the company.

34.    On or about May, 2001, Defendant executed the Agreement (See Exhibit A). The Agreement was entered into voluntarily by Defendant and was supported by adequate consideration that included, among other things, Defendant's hiring, continued employment and compensation.

35.    PartMiner fully performed all its obligations under the Agreement in all respects.

36    On or about October 18, 2005, Defendant terminated his employment with PartMiner. Upon information and belief, upon terminating his employment with PartMiner Defendant immediately accepted employment with Avnet.

37.    Defendant knew and understood that the terms of the Agreement remained in full force and effect after his termination. Nevertheless, subsequent to his termination from PartMiner, Defendant has engaged in ongoing conduct that blatantly breaches the Agreement.

38.    Defendant has breached the express terms of the Agreement by, among other things:

a.    Improperly soliciting and/or otherwise encouraging employees of PartMiner, to leave the company, and/or facilitating such actions by third parties, in direct breach of Section 16 of the Agreement;

9

b. Hiring or causing employees of PartMiner to be hired by Avnet in direct breach of Section 16 of the Agreement; and

c. Improperly using confidential information belonging to PartMiner, or causing such information to be used in contacting PartMiner clients.

39. At no time did PartMiner, in writing or otherwise, ever consent to Defendant's solicitation or encouragement of its employees to leave the company, or to Defendant's use or disclosure of PartMiner's confidential information.

40. By letter, on or about November 22, 2005, PartMiner notified Defendant that his actions were in breach of the Agreement, and asked him to cease and desist from further breaches of the Agreement. (Exhibit B).

41. Despite his receipt of the letter, Defendant has continued to engage in actions in breach of the Agreement, to the detriment of PartMiner.

<u>**CLAIM FOR RELIEF**</u>

**COUNT ONE**
**(Breach of Contract)**

42. PartMiner repeats and realleges paragraphs 1 through 41 of this Complaint as if more fully set forth herein.

43. The Agreement is a valid contract between Defendant and PartMiner, which remained in full force and effect after Defendant's termination.

44. PartMiner has and continues to fully perform all its obligations under the Agreement.

10

45.     Defendant breached the Agreement by, among other things, engaging in the acts described in Paragraph 38, above.

46.     Defendant's breach of the Agreement has resulted in damages to PartMiner.

## COUNT TWO
### (Injunctive Relief Pursuant to Rule 65, Fed. R. Civ. Proc.)

47.     PartMiner realleges and incorporates paragraphs 1 through 46 above.

48.     Despite PartMiner's demand that he cease and desist from further conduct in breach of the Agreement, Defendant has continued to solicit and/or PartMiner employees to leave the company, has used or disclosed confidential information belonging to PartMiner, and has engaged in other acts in violation of his obligations to the company.

49.     PartMiner will suffer irreparable harm if Defendant is not enjoined from further breaches of the Agreement to the detriment of the Company. Defendant's continuing actions constitute an ongoing threat to PartMiner for which money damages are an insufficient remedy.

50.     Pursuant to the Agreement, Defendant agreed that "for any actual or threatened breach, the Employer shall be entitled, in addition to other remedies available to it, to an injunction and to secure specific performance of this Agreement, plus the recovery or reasonable attorney fees and costs incurred in prosecuting an action to obtain such remedies" (Exhibit A, Section 14).

51.     As a former officer and employee of PartMiner, Defendant is aware that PartMiner invests significant assets and resources in the hiring, training and retention of its employees and in protecting its confidential information, such as its customer lists, from

11

disclosure. The importance of these employee resources and confidential information to the company is what resulted in the restrictions contained in the Agreement against soliciting such employees and the disclosure or use of such confidential information by Defendant in the event Defendant left the company. In executing the Agreement, Defendant agreed to such restrictions.

52.    The irreparable harm to PartMiner if Defendant is not enjoined far outweighs any alleged harm to Defendant as a result of injunctive relief. An injunction would not preclude Defendant from seeking or engaging in employment with Avnet or any other company of his choosing. Rather, he would simply be enjoined from further interference with the ongoing business of PartMiner, and enjoined from further violation of his ongoing obligations to the Company as contained in the Agreement.

53.    PartMiner has no adequate remedy at law in the event of continued breach of the Agreement if Defendant's actions are not enjoined. As stated herein, in spite of his receipt of the Cease and Desist Letter, Defendant has continued to solicit and/or encourage current PartMiner employees to leave the company and has directly or indirectly used PartMiner's confidential information to contact PartMiner's customers.

54.    PartMiner is entitled to an injunction enjoining Defendant from continuing to act in breach of the Agreement. A grant of injunctive relief will not harm Defendant, and will further the public interest and judicial policy in favor of honoring such Agreements.

55.    PartMiner requests that this Court issue a preliminary injunction enjoining Defendant from any further breach of the Agreement.

**WHEREFORE,** Petitioner PartMiner requests an order and judgment as follows:

(a)     That this Court award PartMiner damages in an amount no less than $1,000,000 in connection with Defendant's breach of the Agreement;

(b)     That Defendant be enjoined in the future from soliciting and/or otherwise encouraging PartMiner employees to leave the firm in breach of the Agreement;

(c)     That Defendant be enjoined from further use or disclosure of PartMiner's confidential information and/or trade secrets, including without limitation, PartMiner's customer lists;

(d)     That Defendant be enjoined from directly or indirectly contacting PartMiner clients, or soliciting or encouraging others to do so;

(e)     That Defendant be compelled to return any of PartMiner's confidential materials and/or trade secrets in his possession, custody or control, to PartMiner;

(f)     That Defendant and his attorneys, representatives, successors and assigns, and all those controlled by them, be preliminarily and permanently enjoined from further breaches of the Agreement;

(g)     That PartMiner be awarded its reasonable attorneys' fees and costs of this action; and

(h)     That this Court grant PartMiner such other and further relief as the Court deems

just and proper.

Dated: New York, New York
        December 13, 2005

DUANE MORRIS LLP

By:    James A. Tricarico, Jr. (JT 9159)
       Christopher Lewis (CL 6410)
       380 Lexington Avenue
       New York, NY  10168
       212.692.1000
       *Attorneys for Plaintiff*
       *PartMiner Information Services, Inc.*

14

**VERIFICATION**

State of New York,                    )
                                      ) ss.:
County of *New York*                  )

*Christopher Lewis*____, being duly sworn, states that he is the attorney for Plaintiff in this action and that the foregoing Petition is true to his knowledge, except as to matters therein stated on information and belief and as to those matters he believes to be true; that the grounds of his belief as to all matters not stated upon his knowledge are correspondence and other writings furnished to him by Plaintiff and interviews with employees of Plaintiff.

Subscribed and sworn before me
On this date *17th day of December, 2005*

_____
Notary Public

LORNA A. WOODHAM
Notary Public, State of New York
No. 01WO6103698
Qualified in New York County
Commission Expires January 5, 20_08_

15

# EXHIBIT B

COURTESY
COPY

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/8/06

FEB 06 2006

CHAMBERS OF
WILLIAM H. PAULEY III
U.S.D.J.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
PARTMINER INFORMATION SERVICES, INC., :
                                      :
                         Plaintiff,   :
                                      :
        -against -                    :          Civil Action No. 05-CV-10486 (WHP)
                                      :
THOMAS CASEY REED,                    :
                                      :
                         Defendant.   :
-------------------------------------------------------------x

## VOLUNTARY DISMISSAL BY STIPULATION OF THE PARTIES

Pursuant to Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure, plaintiff PartMiner

Information Services, Inc. ("PartMiner") and defendant Thomas Casey Reed ("Reed") hereby

stipulate, by their attorneys, to a dismissal with prejudice of the above-entitled action, with each

party to bear its own costs and attorneys' fees.

Dated: New York, New York
       February 2, 2006

DUANE MORRIS LLP                        KASOWITZ, BENSON, TORRES
                                          & FRIEDMAN LLP

By: _____           By: _____
    James A. Tricarico (JT 9159)            Brian S. Kaplan (BK 4922)
    Christopher Lewis (CL 6410)             Jodi Horowitz-Vickers (JH 2044)

380 Lexington Avenue                    1633 Broadway
New York, New York 10168                New York, New York 10019

Attorneys for Plaintiff                 Attorneys for Defendant
PartMiner Information Services, Inc.     Thomas Casey Reed

SO ORDERED:

_____
United States District Judge
            2/7/06

NY\300798.1

# EXHIBIT C

| | |
|---|---|
| DISTRICT COURT<br>ARAPAHOE COUNTY, COLORADO<br>Arapahoe County Justice Center<br>7325 S. Potomac Street<br>Englewood, CO 80112 | |
| **Plaintiff:**<br><br>PARTMINER INFORMATION SERVICES, INC<br><br><br>**Defendant:**<br><br>AVNET, INC., THOMAS CASEY REED, JOHN<br>KENNETH SHARPE, AND NEIL R. VANEK | ▲ COURT USE ONLY ▲ |
| HOLME ROBERTS & OWEN LLP<br>Randall Miller, # 33694<br>Sven Collins, # 30890<br>1700 Lincoln Street, Suite 4100<br>Denver, Colorado 80203-4541<br>Telephone: (303) 861-7000<br>Facsimile: (303) 866-0200<br><br>E-mail: randy.miller@hro.com<br>        sven.collins@hro.com<br>Attorneys for Plaintiff | Case Number: _____<br><br><br><br>Ctrm/Div: _____ |
| **COMPLAINT** | |

PartMiner Information Services, Inc. ("PartMiner") for its complaint in this action alleges as follows:

## INTRODUCTION

1.    PartMiner brings this action for an injunction and damages to remedy the customer and employee raiding by Defendants using PartMiner trade secrets and other unfair tactics. The individual defendants are all former PartMiner sales employees, who left one after another to establish a competing sales office for defendant Avnet, Inc. Defendants got the PartMiner trade secrets by, among other ways, improperly keeping and obtaining detailed PartMiner customer lists, renewal and pipeline reports.

2.     Defendants' actions are all the more egregious because PartMiner already sued Defendant Reed once and resolved that dispute with all Defendants in January 2006. Since that time, Defendants have secretly resumed their conspiracy, using improper tactics and PartMiner's confidential sales information, to "take [PartMiner's customer base] all away and put PartMiner out of business."

3.     PartMiner is seeking an injunction and damages for the harm caused by Defendants' improper customer and employee raiding.

## PARTIES

4.     PartMiner is a New York corporation with its principal place of business located at 7807 E. Peakview Avenue, Suite 400, Centennial, Colorado 80111. PartMiner is registered with the Secretary of State of Colorado and is duly authorized to practice business here.

5.     Defendant Avnet, Inc. ("Avnet") is a New York corporation with a branch office located at 12600 East Arapahoe Road, Suite C, Englewood, Colorado 80112.

6.     Defendant Thomas Casey Reed ("Reed") is a former PartMiner Vice President, CAPS Sales and Service, and resides in Arapahoe County, Colorado.

7.     Defendant John Kenneth Sharpe ("Sharpe") is a former PartMiner Senior Account Manager, CAPS Sales and Service, and resides in Arapahoe County, Colorado.

8.     Defendant Neil R. Vanek ("Vanek") is a former PartMiner Account Manager, CAPS Sales and Service, and resides in Arapahoe County, Colorado.

## JURISDICTION AND VENUE

9.     The District Court has original jurisdiction over this matter under Art. VI, Sec. 9 of the Constitution of the State of Colorado.

10.     Venue is proper in this Court under C.R.C.P. 98(c) because one or more of the individual defendants resides in Arapahoe County.

## GENERAL ALLEGATIONS

A.     **PartMiner**

### The Business of PartMiner

11.     PartMiner is a global provider of online electronics part information needed by engineers, supply chain managers and manufacturing purchasers in the electronics industry.

12.     PartMiner's customers are located throughout the world including the United States.

2

#1274632 v1

13.    PartMiner offers a subscription-based proprietary and confidential online electronic parts database, known as the CAPS™ Database.  PartMiner also offers enterprise solutions for managing electronic component bills of materials and electronic components inventories, known as CAPS™ Connect™ and CAPS™ Connect ES™ (collectively with the CAPS™ Database, the "CAPS™ Databases").

14.    PartMiner allows customers to use the CAPS™ Databases under restrictive subscription license agreements that prohibit unauthorized commercial use of the databases, software and related data and that require customers to keep the contents of the databases confidential.

### PartMiner's Customers

15.    PartMiner's success depends on finding new customers and maintaining its existing ones.

16.    PartMiner spends significant time, resources, and money in maintaining its relationships with existing customers.

17.    PartMiner develops and maintains detailed information about its existing customers, including their contact information, their contract start and end dates, their preferences, records of communications, and other details concerning the customers' relationship and/or the terms and conditions of their agreement(s) with PartMiner.

18.    PartMiner's information regarding its existing customers, including their contact information, their contract start and end dates, their preferences, records of communications, and other details concerning their relationship and/or the terms and conditions of their agreement(s) with PartMiner, has value to PartMiner.

19.    PartMiner's specific customer information is not readily available from any public source.

20.    PartMiner's information regarding its existing customers, including their contact information, their contract start and end dates, their preferences, records of communications, and other details concerning their relationship and/or the terms and conditions of their agreement(s) with PartMiner, would be valuable to competitors of PartMiner.

21.    PartMiner spends significant time, resources, and money identifying and marketing to prospective customers.

22.    PartMiner develops and maintains detailed information about its sales prospects, including their contact information, source of referral, where they are in the sales process, communications with the prospects, sales strategies for the prospects, how likely and how soon they are to become a customer, and products and pricing offered.

3

23.    PartMiner's information regarding its prospects, including their contact information, source of referral, where they are in the sales process, communications with the prospects, sales strategies for the prospects, how likely and how soon they are to become a customer, and products and pricing offered, has value to PartMiner.

24.    PartMiner's specific prospect information is not readily available from any public source.

25.    PartMiner's information regarding its prospects, including their contact information, source of referral, where they are in the sales process, communications with the prospects, sales strategies for the prospects, how likely and how soon they are to become a customer, and products and pricing offered, would be valuable to competitors of PartMiner.

26.    PartMiner has invested considerable time, resources and money into developing a customer relationship management program, known as CARES, for PartMiner sales.

27.    The CARES customer relationship management program has value to PartMiner.

28.    The information regarding PartMiner's CARES customer relationship management program is not readily available from any public source.

29.    The information regarding PartMiner's CARES customer relationship management program would be valuable to competitors of PartMiner.

30.    PartMiner takes reasonable measures to maintain the confidentiality of its proprietary information, including information about its customers, sales prospects, and the CARES customer relationship management program.

**B.    Reed's, Sharpe's and Vanek's employment with PartMiner**

31.    PartMiner employed Reed as its Vice President, CAPS Sales and Service.  In that position, Reed was responsible for selling products and services of PartMiner, managing the sales efforts of certain sales staff that reported to him and managing the customer support group.

32.    PartMiner employed Sharpe as its Senior Account Manager, CAPS Sales and Service, reporting to Reed and managing the sales efforts and support of customers and prospects assigned to him.

33.    PartMiner employed Vanek as its Account Manager, CAPS Sales and Service, reporting to Reed and managing the sales efforts and support of customers and prospects assigned to him.

<u>**Confidentiality Agreements**</u>

34.    In consideration for their respective employment by PartMiner, Reed, Sharpe and Vanek each entered into a Confidentiality Agreement (copies attached) prohibiting them, absent

4

PartMiner's consent, "during and after employment" from "disclos[ing] or us[ing] in whole or in part any Confidential Information."

35.    The Confidentiality Agreement defined "Confidential Information" in pertinent part as follows:

> Section 1.    Confidential Information.    The term "Confidential Information" as used in this Agreement, shall mean, individually and collectively, any and all information, including, without limitation, information relating to products; compositions; processes; technologies; inventions; know how; designs, specifications formulas; methods, including manufacturing procedures and technical methods; materials; devices; developmental or experimental work; improvements; discoveries; past, current, planned, and future research and data, including financial and cost data; databases; software; manuals; reports; internal policies and procedures; patent applications; licenses; research and development programs or agreements; marketing plans and survey and trade information (including customer lists, customer usages and requirements); and inventions, as described in Section 2, (a) that [PartMiner] may furnish or otherwise make available to the Employee directly or indirectly and which is identified as "confidential", (b) that the Employee originates, conceives, and/or develops as a result of any work for [PartMiner], the use of [PartMiner]'s premises, property, or Confidential Information, or (c) that the Employee in the exercise of reasonable judgment should know is confidential, regardless of whether it is so marked or in an intangible form (e.g. disclosed orally).

36.    Under Section 7 of the Confidentiality Agreement, Reed, Sharpe and Vanek, respectively, acknowledged and agreed that:

> [They] occupie[d] a position of trust and confidence with the [PartMiner] and will have access to and may develop Confidential Information of actual or potential value to or otherwise useful to [PartMiner].  [Reed, Sharpe and Vanek] agree[] that during and after employment he or she shall treat as confidential and shall not, without written authorization from [PartMiner], disclose or use in whole or in party and Confidential Information that the Employee may acquire regarding or relating to [PartMiner]'s present or future businesses, sales, financials, products, operations, processes, personnel, or business associates, including any present or future subsidiaries or affiliates, or regarding improvements, inventions, or know-how.

#1274632 v1

37.    Under Section 8 of the Confidentiality Agreement, Reed, Sharpe and Vanek, respectively, also agreed that they would not:

> at any time take from [PartMiner's] premises without written authorization from [PartMiner] any software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever, or copies thereof, which reflect or deal with Confidential Information in relation to [PartMiner]'s business.

38.    Each Confidentiality Agreements signed by Reed, Sharpe and Vanek also contains a covenant that they each would not, for two years post employment with PartMiner, "directly or indirectly solicit or encourage any other employee of [PartMiner] to leave the employment of [PartMiner] . . . .

## Confidential Information

39.    As Vice President, CAPS Sales and Service, Reed had access to and used PartMiner's Confidential Information, as defined in his Confidentiality Agreement, concerning PartMiner customers, sales prospects and employees.

40.    Reed also helped to develop the CARES customer relationship management program for PartMiner.

41.    As Senior Account Manager, CAPS Sales and Service, Sharpe had access to and used PartMiner's Confidential Information, as defined in his Confidentiality Agreement, concerning PartMiner customers and sales prospects.

42.    As Account Manager, CAPS Sales and Service, Vanek had access to and used PartMiner's Confidential Information, as defined in his Confidentiality Agreement, concerning PartMiner customers and sales prospects.

**C.    Reed, followed closely by Sharpe and Vanek, resigns to join Avnet**

43.    Reed, Sharpe and Vanek gave notice that they were resigning from employment with PartMiner, respectively, on or about October 4, 2005, November 18, 2005, and November 21, 2005.

44.    On the way out the door they each took steps to secure up-to-the-minute PartMiner customer and prospect information.

45.    About a week before he resigned, Reed asked his sales team to give him updated customer contact information and their respective sales pipelines.

6

46.    Around that same time, Reed also removed his own sales pipeline from PartMiner's database.

47.    Similar to Reed, Sharpe asked the sales team to give him updated sales pipelines about a week before resigning.

48.    Likewise, Vanek emailed to a personal email address on the day of his resignation roughly eighty-five PartMiner documents, such as spreadsheets and pipeline reports, containing PartMiner Confidential Information concerning customers and sales prospects.

49.    Following their respective resignations, Avnet hired Reed, Sharpe and Vanek in sales positions substantially similar to their PartMiner sales positions.

50.    Avnet is a competitor of PartMiner in the business of selling subscriptions to an online electronic parts database.

51.    Avnet's sales office is located about 3 miles from PartMiner's headquarters.

52.    Upon information and belief, Reed solicited and encouraged Sharpe and Vanek to take a job with Avnet, and hired Sharpe and Vanek in their new positions at Avnet.

53.    Upon information and belief, Sharpe solicited and encouraged Vanek to take a job with Avnet.

54.    Upon information and belief, Reed took Confidential Information about PartMiner's sales prospects, customers, and other confidential information with him at or about the time he resigned from PartMiner.

55.    Upon information and belief, Sharpe took Confidential Information about PartMiner's sales prospects, customers, and other confidential information with him at or about the time he resigned from PartMiner.

56.    Upon information and belief, Vanek took Confidential Information about PartMiner's sales prospects, customers, and other confidential information with him at or about the time he resigned from PartMiner.

57.    Upon information and belief, Reed, Sharpe and Vanek each took PartMiner's Confidential Information with the intention of using it in their employment with Avnet to compete against PartMiner.

58.    Upon information and belief, Avnet had reason to know that Reed, Sharpe and Vanek were each obligated to maintain the confidentiality of PartMiner's Confidential Information.

7

59.     Upon information and belief, when the individual defendants began employment with Avnet, Defendants started using PartMiner Confidential Information about its sales prospects, customers and other information to compete against PartMiner.

**D.    PartMiner sues Reed in U.S. District Court for the Southern District of New York, and the matter was resolved with all Defendants**

60.     Shortly after Reed, Sharpe and Vanek resigned, PartMiner received information causing it to suspect that Defendants were using PartMiner Confidential Information about its sales prospects, customers and other information to compete against PartMiner.

61.     Around that same time, PartMiner also got information that Reed had recruited Sharpe and Vanek and was soliciting other PartMiner employees to work for Avnet in violation of Reed's Confidentiality Agreement.

62.     Accordingly, on or about December 13, 2005, PartMiner filed suit against Reed in the United States District Court for the Southern District of New York (Civil Action No. 05-CV-10486) (the "Federal Court Action") alleging, among other things, breach of contract and claims for injunctive relief.

63.     The Federal Court Action was resolved by the parties, as specifically described below in PartMiner's Seventh Claim, filed under seal in this matter.

**E.    After the resolution of the U.S. District Court case, Defendants proceeded to use PartMiner Confidential Information to compete unfairly against PartMiner and try to drive it out of business**

64.     After the parties resolved the Federal Court Action, Defendants persisted in targeting PartMiner customers.

65.     Reed and his sales team would do this by, among other tactics, waiting until after PartMiner had already made a proposal and then jumping in at the last moment and undercutting PartMiner on price.

66.     Defendants have been successful in taking business from PartMiner that PartMiner had expected to get.

67.     Defendants have used PartMiner Confidential Information to take this business from PartMiner.

68.     Among other items of Confidential Information, Defendants have and use a list of PartMiner customers that is detailed and includes customer names, customer buyer contact information, start dates for contracts, and end/renewal dates for contracts. This list is and/or was kept in Reed's office at Avnet.

8

69.    Upon information and belief, the list of PartMiner customers and other PartMiner customer information that Defendants have been using was secretly taken from PartMiner without PartMiner's consent.

70.    Defendants use this list of PartMiner customers to solicit business from PartMiner customers.

71.    Reed has also, on information and belief, continued to obtain additional PartMiner Confidential Information through other improper means, including soliciting other individuals to provide him updated Confidential Information on PartMiner sales efforts.

72.    Defendants have used the additional PartMiner Confidential Information to solicit business from PartMiner customers and prospects.

73.    In addition to using PartMiner Confidential Information to take business from PartMiner, Defendants have been disparaging PartMiner and its products and services in their sales pitches to PartMiner customers and prospects.

74.    Defendants have been stating, among other things, the following in their sales pitches:  the individual defendants "jumped ship" from PartMiner; PartMiner is about to go out of business; the integrity of PartMiner data is bad and that is why they left PartMiner; and PartMiner makes false claims as to the amount of data in its database and makes up numbers to exaggerate the number of parts in the database.

75.    The foregoing statements that Defendants make in their sales pitches are false.

76.    Finally, Defendants have duplicated PartMiner's CARES customer relationship management program, which Reed had access to and helped develop while he was a PartMiner employee, using PartMiner Confidential Information.

77.    The individual defendants' actions described above in misusing PartMiner Confidential Information to improperly solicit business from PartMiner customers and prospects were done pursuant to their duties as Avnet employees.

78.    The individual defendants' actions described above in misusing PartMiner Confidential Information to improperly solicit business from PartMiner customers and prospects were done for the benefit of the individual defendants and for the benefit of Avnet.

#1274632 v1

## CLAIMS FOR RELIEF

### FIRST CLAIM
### (Breach of Contract)

79.    PartMiner incorporates and realleges in full the preceding paragraphs of this Complaint.

80.    Reed has one or more agreements with PartMiner prohibiting him from using or disclosing PartMiner Confidential Information, as that term is defined in the agreement(s).

81.    Sharpe has one or more agreements with PartMiner prohibiting him from using or disclosing PartMiner Confidential Information, as that term is defined in the agreement(s).

82.    Vanek has one or more agreements with PartMiner prohibiting him from using or disclosing PartMiner Confidential Information, as that term is defined in the agreement(s).

83.    All conditions precedent to allowing PartMiner to enforce the agreements with Reed, Sharpe and Vanek have been performed or have occurred.

84.    Reed, Sharpe and Vanek have breached their agreements by using and disclosing PartMiner Confidential Information to solicit PartMiner customers and prospects.

85.    Reed and/or Sharpe have also breached their agreements by soliciting PartMiner employees to work for Avnet.

86.    Reed's, Sharpe's and Vanek's breaches of contract have caused PartMiner irreparable harm and damages in an amount to be proved at trial.

### SECOND CLAIM
### (Conspiracy)

87.    PartMiner incorporates and realleges in full the preceding paragraphs of this Complaint.

88.    The facts and circumstances indicate, and PartMiner believes, that Defendants had, and apparently still have, an express or implied agreement to achieve an unlawful objective or achieve a lawful objective by improper means.

89.    Upon information and belief, Defendants took one or more acts pursuant to their express or implied agreement.

90.    As a proximate result of the agreement between the Defendants to achieve an unlawful objective or to achieve a lawful objective by improper means, and the actions taken by Defendants pursuant to that agreement, PartMiner has been suffering and will continue to suffer actual damages, irreparable injury and harm.

10

## THIRD CLAIM
### (Misappropriation of Trade Secrets, Violation of C.R.S. §§ 7-74-101, et seq.)

91.    PartMiner incorporates and realleges in full the preceding paragraphs of this Complaint.

92.    During their employment with PartMiner, Reed, Sharpe and Vanek gained access to information constituting trade secrets under C.R.S. § 7-74-102(4), including information relating to PartMiner customers, sales prospects, and a customer relationship management program.

93.    Such information is of value.

94.    Such information is secret.

95.    Reed, Sharpe and Vanek acquired such information under circumstances giving rise to a duty to maintain its secrecy or limit its use.

96.    Avnet had reason to know that Reed, Sharpe and Vanek were under a duty not to disclose PartMiner's trade secrets.

97.    Defendants have misappropriated PartMiner's trade secrets, damaging PartMiner in an amount to be proven at trial.

98.    Defendants' conduct has been and continues to be attended by circumstances of malice or willful and wanton disregard of PartMiner's rights.

99.    The conduct of Defendants entitles PartMiner to injunctive relief, damages and attorney fees pursuant to C.R.S. §§ 7-74-103, 104 and 105.

## FOURTH CLAIM
### (Defamation)

100.    PartMiner incorporates and realleges in full the preceding paragraphs of this Complaint.

101.    Defendants have caused to be published to third parties false statements regarding PartMiner and its business.

102.    These false statements include, but are not limited to, statements that: PartMiner is about to go out of business; the integrity of PartMiner data is bad; and PartMiner makes false claims as to the amount of data in its database and makes up numbers to exaggerate the number of parts in the database.

103.    At the time these statements were published, they were false.

11

104.     At the time these statements were published, Defendants knew that these statements were false, or Defendants made them with reckless disregard as to whether or not the statements were true or false.

105.     Defendants' statements constitute libel and slander *per se* because such statements injuriously affect PartMiner's profession and business by imputing to PartMiner a lack of capacity or fitness to perform in its profession or business.

106.     Defendants have actually and proximately caused and will continue to cause PartMiner to suffer damages.

107.     Defendants' actions have been, and will continue to be, willful, wanton, and malicious.

108.     PartMiner continues to be irreparably damaged by Defendants' false and defamatory statements to third parties.  Defendants' unlawful conduct, unless enjoined by the Court, will continue to damage PartMiner.

## FIFTH CLAIM
### (Tortious Interference with Contract)

109.     PartMiner incorporates and realleges in full the preceding paragraphs of this Complaint.

110.     PartMiner had a contractual relationship with Reed, Sharpe and Vanek prohibiting the individual defendants from using or disclosing any PartMiner Confidential Information.

111.     Avnet knew that the individual defendants were contractually prohibited from using or disclosing any PartMiner Confidential Information.

112.     Upon information and belief, Avnet has knowingly and intentionally interfered with PartMiner's contractual relations with Reed, Sharpe and Vanek by inducing them to breach their respective agreements, and continues to do so.

113.     Avnet's tortious interference with PartMiner's contractual relations with Reed, Sharpe and Vanek has irreparably harmed and continues to harm irreparably PartMiner and caused PartMiner damages in an amount to be determined at trial.

114.     Avnet's conduct in inducing Reed, Sharpe and Vanek to breach their respective agreements with PartMiner was malicious, willful and wanton.

## SIXTH CLAIM
### (Tortious Interference with Prospective Contractual Relations)

115.     PartMiner incorporates and realleges in full the preceding paragraphs of this Complaint.

12

116.     PartMiner has the potential to acquire contracts with new customers and continue its relationships with current customers for PartMiner's products and services.

117.     Through their tortious conduct in soliciting business from PartMiner actual and prospective customers, however, including, but not limited to, their intentional and willful misrepresentations and the wrongful and false statements made to PartMiner's current and prospective customers, Defendants have intentionally and improperly interfered with the prospective contractual relations between PartMiner and its potential customers, as well as with PartMiner's ongoing relations with current customers.

118.     Defendants' statements were calculated to cause damage to PartMiner in its business and were made with the intent of causing PartMiner to lose the business of current and/or prospective customers.  Defendants were wrong and unjustified in making these statements.

119.     Defendants' intentional, willful and improper interference with the prospective business and contractual relations between PartMiner and its potential customers and with PartMiner's ongoing relations with current customers induced or otherwise caused current and potential customers not to enter into or continue the prospective relationship with PartMiner, and/or prevented PartMiner from acquiring or continuing the prospective relationship.

120.     These relationships would have continued or been acquired but for Defendants' conduct.

121.     Defendants employed wrongful means to interfere with PartMiner's prospective and ongoing relationships.

122.     Defendants' interference with PartMiner's relationships has actually and proximately caused and will continue to cause PartMiner to suffer irreparable harm and damages.

## SEVENTH CLAIM
### (Fraud)

123-130.     PartMiner's allegations concerning its Seventh Claim are set forth in *Plaintiff's Seventh Claim for Relief (Filed Under Seal)* which will be filed with the Court under seal upon the Court's granting of motion for same.

13

## **PRAYER FOR RELIEF**

WHEREFORE, PartMiner prays for entry of judgment:

(a)    Permanently enjoining Defendants Avnet, Reed, Sharpe and Vanek from misappropriating PartMiner's trade secrets and/or breaching their contracts with PartMiner;

(b)    Instructing Defendants to return to PartMiner all copies of all documents (including electronic documents) in their possession reflecting, alluding to or containing PartMiner Confidential Information;

(c)    Awarding PartMiner:

(1)    Actual damages in an amount to be determined;

(2)    All costs incurred in prosecuting this action;

(3)    Reasonable and necessary attorney fees under C.R.S. § 7-74-104 and as otherwise provided under law; and

(4)    Prejudgment and other interest as permitted by law; and

(d)    Awarding PartMiner such other relief as the Court deems appropriate and just under the circumstances.

### **Plaintiff Demands A Trial By Jury Of All Issues So Triable**

Dated this 13th day of September, 2007.

/s/ Sven Collins
Randall Miller
Sven Collins

*Original Signature on File at Holme Roberts & Owen LLP*

**Plaintiff's Address**:
7807 E. Peakview Avenue, Suite 400
Centennial, Colorado  80111

14

#1274632 v1

# EXHIBIT D

| DISTRICT COURT, ARAPAHOE COUNTY, COLORADO<br>7325 South Potomac Street<br>Centennial, Colorado 80112 | |
|---|---|
| | **EFILED Document**<br>CO Arapahoe County District Court 18th JD<br>Filing Date: Nov 2 2007 1:15PM MDT<br>Filing ID: 16918924<br>Review Clerk: N/A |
| **Plaintiff(s):** PARTMINER INFORMATION SERVICES, INC.<br><br>v.<br><br>**Defendant(s):** AVNET, INC., THOMAS CASEY REED, JOHN KENNETH SHARPE, AND NEIL R. VANEK | ▲ COURT USE ONLY ▲ |
| | Case Number: 07CV1868<br><br>Division: 202 |

## ORDER GRANTING DEFENDANTS' MOTION TO DISMISS

Before the Court is Defendants' Motion to Dismiss, without Prejudice, and to Order the Parties to Proceed in New York County, New York and Plaintiff's Response. THE COURT, being sufficiently advised, FINDS AND ORDERS:

Defendants move this Court to dismiss this matter without prejudice and to direct the parties to litigate their claims in New York County, New York. Defendants argue that the purported claims here were litigated and settled in New York over 18 months ago and that as part of the New York action, the parties agreed that any breach or dispute arising from the settlement agreement would be addressed in a New York forum.

This case arises out of a dispute over a settlement agreement that was executed in a New York case, *PartMiner Information Serv., Inc. v. Reed*, Civ. No. 05-10486 (S.D.N.Y. Dec. 13, 2005). The underlying subject matter of the New York case involved an employment dispute between Defendant Reed and Plaintiff, his employer, a New York corporation. As part of the employment agreement, the parties had executed a confidentiality agreement which contained a forum selection clause in which New York was deemed the appropriate forum. Plaintiff brought the action in New York, alleging that "[p]ursuant to the [Confidentiality] Agreement, the parties have agreed and consented to this Court's jurisdiction over this action and have agreed and consented to venue in the United States District Court for the Southern District of New York." *See* New York Complaint, ¶ 17(f). The New York case was settled and the parties executed a settlement agreement.

The settlement agreement in the New York action states, in relevant part:

Each party to this Agreement hereby consents to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this agreement or any dispute arising out of or in connection with this agreement.

*See Settlement Agreement*, ¶ 9.

Plaintiff argues that the forum selection clause cited above is permissive rather than mandatory, and that it allows for venue in Colorado. However, the Colorado Court of Appeals has recognized that "[w]hen parties designate a mutually agreeable place in a forum selection clause, the language generally is interpreted as mandatory . . . The clause need only contain clear language showing that the appropriate forum consists of that which has been designated." *Vanderbeek v. Vernon Corp.*, 25 P.3d 1242, 1247-48 (Colo. Ct. App. 2000). Although the forum clause in the settlement agreement does not specifically state that all jurisdictions other than New York are excluded, it does indicate that the parties have mutually agreed to New York. Plaintiff has not cited any Colorado state law, and the Court has not been able to locate any, indicating that the *Vanderbeek* rule should not be enforced by this Court. Therefore, the Court will interpret the forum selection clause as mandatory. This action is appropriate in New York County, New York.

Additionally, as discussed above, the Plaintiff brought the original action in New York due to the forum selection clause contained in the confidentiality agreement. A nearly identical forum selection clause is contained in the settlement agreement and should be adhered to. The court in which settlement was reached and approved should have the authority to resolve issues regarding that settlement agreement.

For the reasons stated herein, the Court hereby GRANTS Defendants' Motion to Dismiss. Defendants are hereby DISMISSED WITHOUT PREJUDICE and this action is to be re-filed in New York.

SO ORDERED

Done this ___2nd___ day of November, 2007.

BY THE COURT:

**Cheryl L. Post**
DISTRICT COURT JUDGE

# EXHIBIT E



**DENIED**

The moving party is hereby ORDERED to provide a copy of this Order to any pro se parties who have entered an appearance in this action within 10 days from the date of this order.

*Cheryl L. Post*

**Cheryl. L. Post**
**District Court Judge**
Date of order indicated on attachment
EFILED Document
CO Arapahoe County District Court 18th JD
Filing Date: Dec 18 2007 10:03AM MST
Filing ID: 17701862
Review Clerk: N/A

| | |
|---|---|
| DISTRICT COURT<br>ARAPAHOE COUNTY, COLORADO<br>Arapahoe County Justice Center<br>7325 S. Potomac Street<br>Englewood, CO 80112 | |
| **Plaintiff:**<br><br>PARTMINER INFORMATION SERVICES, INC.<br><br>**Defendant:**<br><br>AVNET, INC., THOMAS CASEY REED, JOHN KENNETH SHARPE, AND NEIL R. VANEK | ▲ COURT USE ONLY ▲ |
| HOLME ROBERTS & OWEN LLP<br>Randall Miller, # 33694<br>Sven Collins, #30890<br>1700 Lincoln Street, Suite 4100<br>Denver, Colorado 80203-4541<br>Telephone: (303) 861-7000<br>Facsimile: (303) 866-0200<br>E-mail: randy.miller@hro.com<br>          sven.collins@hro.com<br>Attorneys for Plaintiff | Case Number: 2007cv1868<br><br>Ctrm/Div: 202 |

### ORDER GRANTING PLAINTIFF'S MOTION FOR RECONSIDERATION OF INTERPRETATION OF FORUM-SELECTION CLAUSE UNDER GOVERNING NEW YORK LAW

Before the Court is Plaintiff PartMiner's Motion for Reconsideration of Interpretation of Forum Selection Clause Under Governing New York law and Defendants' Response.

THE COURT, being sufficiently advised, FINDS AND ORDERS:

1.   Upon reconsideration, the forum clauses at issue should be properly reviewed and enforced in accordance with New York law;

2.   Under New York law, the forum selection clauses at issue in this case are permissive, and thus, venue is proper in this forum;

3.   The November 2, 2007 Order Granting Defendants' Motion to Dismiss is withdrawn;

#1294627 v1

4.    Defendants' Motion to Dismiss is hereby denied; and

5.    This case is hereby reopened, and the parties shall proceed with the case in this Court.

Dated this _____ day of December, 2007.

BY THE COURT:

_____
DISTRICT COURT JUDGE

2

This document constitutes a ruling of the court and should be treated as such

| | |
|---|---|
| **Court:** | CO Arapahoe County District Court 18th JD |
| **File & Serve Transaction ID:** | 17530382 |
| **Current Date:** | Dec 18, 2007 |
| **Case Number:** | 2007CV1868 |
| **Case Name:** | PARTMINER INFORMATION SERVICES vs. AVNET INC et al |

**Court Authorizer Comments:**

Motion denied for the reasons stated in the original order and in the response to motion for reconsideration.

/s/ **Judge Cheryl L Post**

# EXHIBIT F

DLA PIPER US LLP
Eric M. Falkenberry
Andrew L. Deutsch
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
eric.falkenberry@dlapiper.com
*Attorneys for Plaintiff*



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------

PARTMINER INFORMATION SERVICES,
INC.,

                    Plaintiff,

                    -vs-

AVNET, INC., THOMAS CASEY REED,
JOHN KENNETH SHARPE, and NEIL R.
VANEK,

                    Defendants.

------------------------------------------------

## 07 CV 11482

**COMPLAINT FOR INJUNCTIVE
RELIEF AND DAMAGES**

Plaintiff, PartMiner Information Services, Inc. ("PartMiner"), by its attorneys, and as and

for its Complaint for Injunctive Relief and Damages against Defendants, Avnet, Inc. ("Avnet"),

Thomas Casey Reed ("Reed"), John Kenneth Sharpe ("Sharpe") and Neil R. Vanek ("Vanek"),

states as follows:

### NATURE OF THE ACTION

1.      PartMiner brings this action for an injunction and damages to enjoin and remedy

the customer and employee raiding by Defendants through the use of PartMiner's most valuable

trade secrets and other confidential information, and the disparagement of PartMiner and its

products and services through false and misleading advertising and promotion. The individual Defendants are all former PartMiner sales employees who left one after another to establish a competing sales office for Defendant Avnet. Defendants obtained the PartMiner trade secrets by, among other ways, improperly keeping detailed PartMiner customer lists and related confidential information.

2.      Defendants' actions are all the more egregious because PartMiner already sued Defendant Reed and believed that it had resolved the disputes with all Defendants in January 2006. Since that time, Defendants have resumed their improper conduct by utilizing PartMiner confidential sales information and false promotion in an organized campaign to, in Defendant Reed's words, "take [all of PartMiner's customers] away and put PartMiner out of business."

## PARTIES

3.      PartMiner is a New York corporation with its principal place of business located at 7807 East Peakview Avenue, Suite 400, Centennial, Colorado.

4.      Defendant Avnet is a New York corporation with a branch located at 135 Engineers Rd., Suite 140, Hauppauge, New York.

5.      Defendant Reed is a former PartMiner Vice President, CAPS Sales and Service, and resides in Arapahoe County, Colorado.

6.      Defendant Sharpe is a former PartMiner Senior Account Manager, CAPS Sales and Service, and resides in Arapahoe County, Colorado.

7.      Defendant Vanek is a former PartMiner Account Manager, CAPS Sales and Service, and resides in Arapahoe County, Colorado.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over PartMiner's false advertising and promotion cause of action arising under the Lanham Act, 15 U.S.C. § 1125, et seq., pursuant to 28 U.S.C. § 1338(a).

9.     This Court has supplemental jurisdiction over PartMiner's causes of action arising under New York State statutory and common law pursuant to 28 U.S.C. § 1367(a).

10.     This Court has continuing jurisdiction over this matter because some of the causes of action relate to the breach of a Settlement Agreement, signed by all parties to this litigation, which resolved a prior action brought in this Court by PartMiner entitled, *PartMiner Information Services, Inc. v. Thomas Casey Reed*, Civ. Action No. 05-CV-10486 (WHP).

11.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(c) because the Confidentiality Agreements and Settlement Agreement between PartMiner and the individual Defendants, which this action is based upon, provide the following, respectively:

Section 15.  Applicable Law and Forum.  This Agreement shall be construed and interpreted and its performance shall be enforced according to the laws of the United States and the State of New York.  The Employer and the Employee consent to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

9.  Governing Law and Forum

This Agreement shall be construed, and its terms enforced, in accordance with the substantive laws of the State of New York, without regard to its conflict of laws provisions. Each party to this Agreement hereby consents to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

12.     Personal jurisdiction over the Defendants is conferred pursuant to Section 15 of the Confidentiality Agreement, Paragraph 9 of the Settlement Agreement and Rule 4(k) of the Federal Rules of Civil Procedure.

## FACTUAL ALLEGATIONS

### PartMiner's Business

13.     PartMiner is a leading global provider of component information needed by engineers, purchasers and other supply chain professionals in the electronics industry.

14.     PartMiner's customers are located throughout the world, including the United States.

15.     PartMiner offers a subscription-based proprietary and confidential online electronic parts database, known as the CAPS™ Database.  PartMiner also offers enterprise solutions for managing electronic component bills of materials and electronic components inventories, known as CAPS™ Connect™ and Connect ES™ (collectively with the CAPS ™ Database, the "CAPS™ Databases").

16.     The CAPS™ Database is owned by PartMiner and is the largest, most extensive database of electronic component information in the world.

17.     PartMiner has invested many millions of dollars to obtain, update and improve the CAPS™ Database.

18.     PartMiner allows customers to use the CAPS™ Database under restrictive subscription license agreements that prohibit unauthorized commercial use of the database,

software and related data, and that require customers to keep the contents of the database confidential.

## PartMiner's Customers

19. PartMiner's success depends on finding new customers and maintaining existing ones.

20. PartMiner spends significant time, resources and money in maintaining its relationships with existing customers.

21. PartMiner develops and maintains detailed information about its existing customers, including customer contact information, contract start and end dates, customer preferences, records of communications with customers, sales strategies, and other details about the customers' relationship with PartMiner. This information may also include the operation of the customers' office and the types of individuals who may have a need for the product, business issues the customer is having that may be solved by the products, customer credit information, and budget and key internal approvers (collectively, the "Customer Information").

22. PartMiner's Customer Information has significant economic value to PartMiner and gives it an advantage over its competitors.

23. PartMiner's Customer Information is not readily available from any public source.

24. PartMiner's Customer Information would be highly valuable to PartMiner's competitors were they able to obtain it, since they could use it to identify and solicit PartMiner's existing customers and undercut PartMiner's goodwill and terms with customers.

25.    PartMiner spends significant time, resources and money identifying and marketing to prospective customers.

26.    PartMiner develops and maintains detailed information about its sales prospects including, but not limited to, their contact information, source of referral, the products and pricing that PartMiner is offering them, where they are in the sales process, the likelihood of closing a sale, PartMiner's communications with them, and PartMiner's sales strategies, (the "Prospective Customer Information").

27.    PartMiner's Prospective Customer Information has significant value to PartMiner and gives it an advantage over its competitors.

28.    PartMiner's Prospective Customer Information is not readily available from any public source.

29.    PartMiner's Prospective Customer Information would be highly valuable to PartMiner's competitors were they able to obtain it, since they could use it to identify and solicit PartMiner's prospective customers and undercut PartMiner's goodwill and terms with the prospects.

30.    PartMiner has invested considerable time, resources and money into developing a customer relationship management program, known as CARES, for PartMiner sales.

31.    The CARES customer relationship management program has significant value to PartMiner.

32.    The information regarding PartMiner's CARES customer relationship management program is not readily available from any public source.

33.    The information regarding PartMiner's CARES customer relationship management program would be valuable to PartMiner's competitors.

34.     PartMiner takes reasonable measures to maintain the confidentiality of its Customer Information, Prospective Information and the CARES customer relationship management program (collectively, the "Confidential Information") including, but not limited to, the use of employee Confidentiality Agreements, the promulgation of the PartMiner Employee Manual and Electronic Code of Conduct to which all PartMiner employees are bound, limitations on access to Confidential Information contained in databases, and a requirement that PartMiner employees return all PartMiner materials, including Confidential Information, when their employment with PartMiner ends.

## Defendants Reed, Sharpe and Vanek

35.     Reed became employed with PartMiner in 1999 and attained the position of Vice President, CAPS Sales and Service.  In that position, Reed was responsible for selling the products and services of PartMiner, managing sales staff, and managing the customer support group.

36.     By virtue of his role as an officer and employee of PartMiner, as well as his long tenure with the company, Reed had full access to the CAPS™ Databases and Confidential Information.

37.     Reed was also the administrator of the primary database in which PartMiner retained its customer lists and information.

38.     Reed received copies of the pipeline reports and other reports, which the PartMiner sales team used to track and manage sales activity, that contained Confidential Information and other proprietary information concerning the company's operations and sales.

39.   Sharpe became employed with PartMiner in 2002 as a Senior Accounts Manager, CAPS Sales and Service.

40.   Sharpe managed sales efforts directed at current and prospective PartMiner customers.

41.   As a part of his employment with PartMiner, Sharpe had access to and used PartMiner's Confidential Information.

42.   As part of his employment with PartMiner, Sharpe reported to Reed.

43.   Vanek became employed with PartMiner in 2004 as an Account Manager, CAPS Sales and Service.

44.   Vanek managed sales efforts directed at current and prospective PartMiner customers.

45.   As a part of his employment with PartMiner, Vanek had access to and used PartMiner's Confidential Information.

46.   As part of his employment with PartMiner, Vanek reported to Reed.

## PartMiner Confidentiality Agreements

47.   PartMiner maintains a number of databases that contain Confidential Information.

48.   The PartMiner Confidentiality Agreements require employees to keep all Confidential Information, including customer information, confidential.

49.   In consideration for their respective employment with PartMiner, Reed, Sharpe and Vanek each entered into a Confidentiality Agreement.

50.   Reed entered into his Confidentiality Agreement on May 4, 2001. (Attached as Exhibit "A").

51.    Sharpe entered into his Confidentiality Agreement on July 1, 2002. (Attached as Exhibit "B").

52.    Vanek entered into his Confidentiality Agreement on November 16, 2004. (Attached as Exhibit "C").

53.    Reed, Sharpe and Vanek's Confidentiality Agreements are identical in their terms.

54.    The Confidentiality Agreements prohibit Reed, Sharpe and Vanek, "during and after employment" from "disclo[ing] or us[ing] in whole or in part" any PartMiner Confidential Information.

55.    The Confidentiality Agreements define "Confidential Information" in pertinent part as follows:

> Section 1.  Confidential Information.  The term "Confidential Information" as used in this Agreement, shall mean, individually and collectively, any and all information, including, without limitation, information relating to products; compositions; processes; technologies; inventions; know how; designs; specifications; formulas; methods, including manufacturing procedures and technical methods; materials; devices; developmental or experimental work; improvements; discoveries; past, current, planned, and future research and data, including financial and cost data; databases; software; manuals; reports; internal policies and procedures; patent applications; licenses; research and development programs or agreements; marketing plans and survey and trade information (including customer lists, customer usages and requirements); and inventions, as described in Section 2, (a) that the Employer may furnish or otherwise make available to the Employee directly or indirectly and which is identified as "confidential", (b) that the Employee originates, conceives, and/or develops as a result of any work for the Employer, the use of the Employer's premises, property, or Confidential Information, or (c) that the Employee in the exercise of reasonable judgment should know is confidential, regardless of whether it is so marked or in an intangible form (e.g. disclosed orally).

56.    Under Section 7 of the Confidentiality Agreement, Reed, Sharpe and Vanek acknowledged and agreed that:

> [They] occupie[d] a position of trust and confidence with [PartMiner] and will have access to and may develop Confidential Information of actual or potential

value to or otherwise useful to [PartMiner]. [Reed, Sharpe and Vanek] agree[] that during and after employment he or she shall treat as confidential and shall not, without written authorization from [PartMiner], disclose or use in whole or in part any Confidential Information that the Employee may acquire regarding or relating to the Employer's present or future businesses, sales, financials, products, operations, processes, personnel, or business associates, including any present or future subsidiaries or affiliates, or regarding improvements, inventions or know-how.

57.    Under Section 8 of the Confidentiality Agreement, Reed, Sharpe and Vanek agreed that they would not:

...at any time take from the Employer's premises without written authorization from the Employer any software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever, or copies thereof, which reflect or deal with Confidential Information in relation to the Employer's business, or any Inventions or any physical property of the Employer, and will promptly return the same to the Employer if taken with the aforesaid content. At the termination of the employment or at any time that the Employer may request, the Employee shall promptly deliver to the Employer all software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever made or compiled by the Employee or in the Employee's possession concerning or relating to any business, product, process, operation, personnel, or business associate of the Employer. All such items shall be and remain at all times the Employer's property.

58.    Section 16 of each Confidentiality Agreement signed by Reed, Sharpe and Vanek contains a covenant that they would not, for two years post employment with PartMiner, "directly or indirectly solicit or encourage any other employee of [PartMiner] to leave the employment of [PartMiner]..."

59.    With respect to any disputes in connection with the Confidentiality Agreements, the parties agreed that the substantive laws of New York should apply and that each party consented to personal jurisdiction in this Court:

Section 15. Applicable Law and Forum. This Agreement shall be construed and interpreted and its performance shall be enforced according to the laws of the

United States and the State of New York. The Employer and the Employee consent to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

## Defendant Avnet

60.     Avnet is a direct competitor to PartMiner in the business of selling subscriptions to an online electronic parts database.

61.     Avnet's sales office is located about three (3) miles from PartMiner's headquarters.

62.     On or about October 4, 2005, Reed gave notice that he was resigning from his employment with PartMiner.

63.     About a week before he resigned, Reed asked his sales team to give him updated customer contact information and their respective sales pipelines.

64.     Upon information and belief, Reed took additional PartMiner Confidential Information about PartMiner's sales prospects, customers and other related information with him.

65.     Shortly after leaving PartMiner, Reed began employment with Avnet as a Vice President in its sales division, a position substantially similar to his position with PartMiner.

66.     Reed took PartMiner Confidential Information with the intention of using it in his employment with Avnet to compete against PartMiner.

67.     Upon information and belief, Reed solicited and encouraged Sharpe to leave PartMiner and take a job with Avnet.

68.     On or about November 18, 2005, Sharpe gave notice that he was resigning from his employment with PartMiner.

69.     Just prior to leaving PartMiner, Sharpe asked his sales team to give him updated customer contact information and their respective sales pipelines.

70.     Upon information and belief, Sharpe took additional PartMiner Confidential Information about PartMiner's sales prospects, customers and other related information with him.

71.     Shortly after leaving PartMiner, Sharpe began employment with Avnet in a position substantially similar to his position with PartMiner.

72.     Sharpe took PartMiner Confidential Information with the intention of using it in his employment with Avnet to compete against PartMiner.

73.     Upon information and belief, Reed and Sharpe solicited and encouraged Vanek to leave PartMiner and take a job with Avnet.

74.     On or about November 21, 2005, Vanek gave notice that he was resigning from his employment with PartMiner.

75.     On the day of his resignation, Vanek emailed to himself, at a personal email account, approximately eighty-five separate emails containing numerous spreadsheets and pipeline reports which were filled with PartMiner Confidential Information concerning customers and sales prospects.

76.     Upon information and belief, Vanek took additional PartMiner Confidential Information about PartMiner's sales prospects, customers and other related information with him.

77.     Shortly after leaving PartMiner, Vanek began employment with Avnet in a position substantially similar to his position with PartMiner.

78.     Vanek took PartMiner Confidential Information with the intention of using it in his employment with Avnet to compete against PartMiner.

79.     Upon information and belief, at the time that Reed, Sharpe and Vanek began employment with Avnet, Avnet knew that each of them was contractually obligated to maintain the confidentiality of PartMiner's Confidential Information.

80.     When the individual Defendants began employment with Avnet, Defendants started using PartMiner Confidential Information about its customer and sales prospects to compete against PartMiner.

81.     Because Reed is an officer of Avnet, his wrongful actions and knowledge of the other individual Defendants' wrongful actions are imputed to Avnet.

82.     Avnet is vicariously liable for the actions of the individual Defendants.

### First Federal Action

83.     Shortly after Reed, Sharpe and Vanek resigned from PartMiner, PartMiner received information causing it to suspect that Defendants were using PartMiner Confidential Information to compete against PartMiner.

84.     At about the same time, PartMiner received information that Reed had recruited Sharpe and Vanek for employment at Avnet and was soliciting other PartMiner employees to work for Avnet in violation of Reed's Confidentiality Agreement.

85.     On December 13, 2005, PartMiner filed suit against Reed in the United States District Court for the Southern District of New York (Civ. Action No. 05-CV-10486) (WHP)

("the First Federal Action") alleging, among other things, breach of contact and claims for injunctive relief.

## Settlement Agreement

86. On January 31, 2006, the First Federal Action was settled by the parties through a Settlement Agreement, Undertaking and Release (the "Settlement Agreement") (Attached as Exhibit "D").

87. The Settlement Agreement was entered into by PartMiner, on one hand, and by Reed, Sharpe, Vanek and Avnet, on the other. Reed agreed to pay (or cause to be paid) PartMiner's legal fees in the sum of $25,000.00.

88. Paragraph 3 of the Settlement Agreement restated the definition of "Confidential Information" as found in Reed, Sharpe and Vanek's Confidentiality Agreements.

89. In Paragraph 3(b) of the Settlement Agreement, Reed warranted that he did not have any of PartMiner's Confidential Information in his possession and that he had never disclosed any such information:

> Reed hereby represents that he has not in the past disclosed, in whole or in part, any of PartMiner's Confidential Information to any third party, and that he does not have any documents (including any information in electronic or other media) containing PartMiner's Confidential Information in his possession, custody or control. Reed further represents that any such documents that he had in his possession, custody or control upon his termination of employment from PartMiner or at any time thereafter have been returned to PartMiner or destroyed.

90. In Paragraph 3(c) of the Settlement Agreement, Reed promised that he would not use or disclose any PartMiner Confidential Information:

> Reed hereby promises not to use or disclose, in whole or in part, any of

PartMiner's Confidential Information that he may have acquired while an employee of PartMiner or at any time thereafter, through third parties, without the written authorization of PartMiner.

91.    In Paragraph 4 of the Settlement Agreement, Avnet and Reed agreed that they would not solicit employees of PartMiner:

> In consideration of the dismissal of the Federal Court Action against Reed, and for other good and valuable consideration, the sufficiency of which is acknowledged, Reed and Avnet hereby agree that, for the period of time to and including October 18, 2007, neither Reed nor Avnet will solicit, hire or otherwise employ any individual, who, at the time, is then currently employed by PartMiner, provided that nothing in this Agreement shall be deemed to restrict Reed or Avnet in any way from engaging in general solicitation to the public that are not specifically directed or targeted to employees of PartMiner, including but not limited to such as advertisements, internet posting, participation in job fairs, etc.

92.    In Paragraphs 5(c)(i)-(ii) and 5(d)(i)-(ii) of the Settlement Agreement, Vanek and Sharpe, respectively, warranted that they did not have any of PartMiner's Confidential Information in their possession and that they had never disclosed any such information:

> [Vanek and Sharpe] hereby represents that he has not in the past disclosed, in whole or in part, any of PartMiner's Confidential Information to any third party, and that he does not have any documents (including any information in electronic or other media) containing PartMiner's Confidential Information in his possession, custody or control. [Each] further represents that any such documents that he had in his possession, custody or control upon his termination of employment from PartMiner or at any time thereafter have been returned to PartMiner or destroyed.

> [Vanek and Sharpe] hereby promises not to use or disclose, in whole or in part, any of PartMiner's Confidential Information that he may have acquired while an employee of PartMiner or at any time thereafter, through third parties, without the written authorization of PartMiner.

93.    PartMiner entered into the Settlement Agreement with Defendants in reliance on their representations that they did not have PartMiner Confidential Information in their

possession and that they would not further disclose any PartMiner Confidential Information. Without such representations, PartMiner would not have agreed to enter into the Settlement Agreement.

94.    In Paragraph 10 of the Settlement Agreement, Reed and Avnet agreed that PartMiner would be irreparably injured and entitled to an injunction if they violated the Settlement Agreement:

> In the event Reed and/or Avnet breaches Paragraph 3 of this Agreement and Reed and/or Avnet has not remedied such breach within the ten-day period referenced above, Reed and/or Avnet agree and acknowledge that PartMiner will have no adequate remedy at law and will be entitled to seek injunctive relief, in addition to any remedies at law or in equity.

## Defendants' Conduct Subsequent to the Settlement Agreement

95.    After the parties resolved the First Federal Action, PartMiner began to learn that not only Reed, but the other Defendants, were continuing to use PartMiner's Confidential Information.

96.    PartMiner received eyewitness accounts revealing that the Defendants not only had possession of Confidential Information, including customer lists, but were using it to identify and contact PartMiner's customers, target their preferences, and undercut PartMiner's price immediately before a PartMiner contract was up for renewal.

97.    PartMiner also received information that Defendants duplicated PartMiner's CARES customer relationship management program, which Reed had access to and helped develop while he was a PartMiner employee, using PartMiner Confidential Information.

98.    Upon information and belief, Reed has continued to obtain PartMiner Confidential Information by soliciting existing PartMiner employees to provide him with updated Confidential Information on PartMiner customers and sales efforts.

99.    Upon information and belief, since the settlement of the First Federal Action, Reed and Avnet have directly or indirectly solicited other individuals at PartMiner for employment with Avnet.

100.    Upon information and belief, since settlement of the First Federal Action, Defendants have continued to use and benefit from the use of PartMiner Confidential Information to solicit business from PartMiner's current and prospective customers.

101.    Upon information and belief, as a result of this wrongful use of PartMiner Confidential Information, Avnet has obtained the business of PartMiner customers and prospects that, absent such use, PartMiner would have received.

102.    Defendants have also been making false and misleading statements about PartMiner and its products and services in their sales and advertising pitches to PartMiner's current and prospective customers.

103.    For example, on nearly a daily basis between January 2006 and March 2007, one or more of the Defendants made, verbatim or in substance, one or more of the following statements via telephone and/or email to PartMiner's current and prospective customers:

    a.    PartMiner's data cannot be trusted due to integrity issues, including the fact that the data is out-of-date, not good, contains inconsistent information and that there is nothing new in the database;

    b.    The individual Defendants "jumped ship" from PartMiner because of PartMiner's data integrity issues;

    c.    There are many more engineers inputting information into the database marketed by Avnet relative to the number of PartMiner engineers performing

the same task, and specifically that there are 300 to 500 engineers inputting information into the database marketed by Avnet;

d. PartMiner makes up part numbers to make it appear that it has more parts in its database than Avnet;

e. The database marketed by Avnet is updated and made available to customers every night; and

f. PartMiner is going out of business.

104. The foregoing statements are false or misleading and Defendants, at the time they made them, knew that they were false or misleading.

105. Upon information and belief, Defendants continued to make such false and misleading statements to PartMiner's current and prospective customers from March 2007 to the present.

106. The statements described above are part of Defendants' widespread, organized promotional campaign to lure customers away from PartMiner.

107. Over the last two years, Defendants, through the wrongful conduct described above, have acquired at least fifty-one accounts from PartMiner, resulting in a loss of over $1.4 million in revenue to PartMiner. (A chart identifying these lost accounts and itemizing the monetary losses is attached as Exhibit E).

108. Upon information and belief, Defendants' wrongful conduct as alleged above, has caused PartMiner to lose many sales to prospective customers that it would otherwise have made.

109. Defendants' wrongful conduct has also caused PartMiner to lose opportunities for repeat business and the opportunities for referrals from each lost customer.

110. Loss of PartMiner customers has damaged the valuation of PartMiner.

111.    PartMiner is contemplating raising capital through an IPO, and PartMiner's valuation is critical in determining how much money PartMiner can raise in the market. PartMiner's valuation is sensitive to revenue fluctuations, and PartMiner's losses to Avnet, caused by the wrongful conduct alleged above, have significantly decreased PartMiner's revenues. These reduced revenues are jeopardizing PartMiner's ability to have a successful IPO.

112.    PartMiner has also spent a great deal of time, energy and money on significant efforts to combat Defendants' wrongful conduct and convince its current customers and prospects to choose PartMiner over Avnet.  If the Defendants had not used PartMiner's Confidential Information and false and misleading advertising and promotion to try to lure customers to Avnet, PartMiner would not have had to make these extra efforts, including contract price reductions and other concessions, concerning such customers and prospects.

## CLAIMS FOR RELIEF

### First Cause of Action
### Breach of Contract (Confidentiality Agreements)

113.    PartMiner repeats and realleges paragraphs 1 through 112 of its Complaint as if fully set forth herein.

114.    Reed's Confidentiality Agreement with PartMiner prohibits him from possessing, disclosing or using PartMiner Confidential Information as that term is defined in that Agreement.

115.    Sharpe's Confidentiality Agreement with PartMiner prohibits him from possessing, disclosing or using PartMiner Confidential Information as that term is defined in that Agreement.

116.   Vanek's Confidentiality Agreement with PartMiner prohibits him from possessing, disclosing or using PartMiner Confidential Information as that term is defined in that Agreement.

117.   The Confidentiality Agreements signed by Reed, Sharpe and Vanek prohibit them, for two years post employment with PartMiner, from soliciting or encouraging PartMiner employees to leave the employ of PartMiner.

118.   Reed, Sharpe and Vanek have breached their Confidentiality Agreements by possessing, disclosing and using PartMiner Confidential Information to solicit PartMiner customers and prospects.

119.   Reed and Sharpe have also breached their Confidentiality Agreements by soliciting PartMiner employees to work for Avnet.

120.   Defendants' breaches of the Confidentiality Agreements has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

121.   As a direct and proximate result of Defendants' breaches, PartMiner has been damaged in an amount to be proven at trial.

### Second Cause of Action
### Tortious Interference with Contractual Relations

122.   PartMiner repeats and realleges paragraphs 1 through 121 of the Complaint as though fully set forth herein.

123.   PartMiner had a contractual relationship with Reed, Sharpe and Vanek through their Confidentiality Agreements with PartMiner.

124.   The Confidentiality Agreements prohibited the individual Defendants from possessing, disclosing or using or disclosing any PartMiner Confidential Information.

125.   Upon information and belief, prior to Reed, Sharpe and Vanek's breaches of the Confidentiality Agreements, Avnet knew about the Confidentiality Agreements and the fact that the individual Defendants were contractually prohibited from possessing, disclosing or using any PartMiner Confidential Information.

126.   In addition, because Reed is an officer of Avnet, his knowledge that the individual Defendants' Confidentiality Agreements, and the fact that they were contractually prohibited from possessing, disclosing and using PartMiner Confidential Information, is imputed to Avnet.

127.   PartMiner's existing relationships with its customers confer an economic advantage on PartMiner.

128.   Upon information and belief, Avnet has knowingly and intentionally interfered with PartMiner's contractual relations with Reed, Sharpe and Vanek by inducing them to breach their respective Confidentiality Agreements, and continues to do so.

129.   Upon information and belief, Reed knowingly and intentionally interfered with PartMiner's contractual relations with Sharpe and Vanek by inducing them to breach their respective Confidentiality Agreements, and continues to do so.

130.   Because Reed is an officer of Avnet, his wrongful conduct in knowingly and intentionally interfering with PartMiner's contractual relations with Sharpe and Vanek are imputed to Avnet.

131.    Defendants' conduct, as set forth above, was willful, wanton, malicious and/or without due regard for the rights of PartMiner.

132.    Defendants' conduct, as described above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

133.    As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

134.    PartMiner is entitled to recover punitive damages from Defendants.

**Third Cause Of Action**
**Fraud In The Inducement (Settlement Agreement)**

135.    PartMiner repeats and realleges paragraphs 1 through 134 of the Complaint as though fully set forth herein.

136.    In entering into the Settlement Agreement, Defendants made several material misrepresentations of fact including, but not limited to, the claim that:

> [they] had not in the past disclosed, in whole or in part, any of PartMiner's Confidential Information to any third party, and [they do] not have any documents (including any information in electronic or other media) containing PartMiner's Confidential Information in [their] possession, custody or control. [Each] represents that any such documents that he had in his possession, custody of control upon his termination of employment from PartMiner, or at any time thereafter have been returned to PartMiner or destroyed.

137.    Upon information and belief, the Defendants knew these were false representations because they had possession of PartMiner Confidential Information when they entered into the Settlement Agreement.

138. Defendants made such representations with the express intention of inducing PartMiner to rely on them and agree to the Settlement Agreement.

139. The Settlement Agreement is subject to rescission.

140. As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

141. PartMiner is entitled to recover punitive damages from Defendants.

## Fourth Cause of Action
## Breach Of Contract (Settlement Agreement)

142. PartMiner repeats and realleges paragraphs 1 through 141 of the Complaint as though fully set forth herein.

143. The Settlement Agreement prohibits the Defendants from possessing, disclosing or using any PartMiner Confidential Information.

144. The Settlement Agreement also prohibits the Defendants from soliciting PartMiner employees to come work at Avnet.

145. The Defendants have breached the Settlement Agreement by possessing, disclosing and using PartMiner Confidential Information to solicit PartMiner customers and prospects.

146. Upon information and belief, the Defendants have also breached the Settlement Agreement by soliciting PartMiner employees for not only positions with Avnet, but also for additional PartMiner Confidential Information.

147. Defendants' conduct, as described above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including,

but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

148.    As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

## Fifth Cause of Action
## Misappropriation Of Trade Secrets

149.    PartMiner repeats and realleges paragraphs 1 through 148 of the Complaint as though fully set forth herein.

150.    As alleged above, the PartMiner Confidential Information constitutes or includes trade secrets and other information that the law protects against misappropriation and unauthorized disclosure and use.

151.    PartMiner's Confidential Information is highly valuable to PartMiner and requires significant investment to develop and maintain.

152.    PartMiner's Confidential Information is not known outside of PartMiner and is very difficult to acquire or duplicate.

153.    PartMiner takes reasonable measures to guard the secrecy of its trade secrets and Confidential Information, as alleged above.

154.    Reed, Sharpe and Vanek acquired PartMiner Confidential Information during their employment with PartMiner and under circumstances giving rise to a duty to maintain its secrecy and limit its use to the benefit of PartMiner.

155.    Upon information and belief, Defendants are using such Confidential Information in violation of their Confidentiality Agreements, the Settlement Agreement, and duty owed to PartMiner.

156.    Upon information and belief, Avnet knew or had reason to know that Reed, Sharpe and Vanek were under a duty not to disclose PartMiner's Confidential Information or use it for the benefit of Avnet.

157.    Defendants have misappropriated PartMiner's Confidential Information as alleged above.

158.    Defendants' wrongful conduct, as described above, was willful, wanton, malicious and/or committed without due regard for PartMiner's rights.

159.    Defendants' conduct, as described above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

160.    As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

161.    PartMiner is entitled to recover punitive damages from Defendants.

## Sixth Cause of Action
## Violation of Section 43 (a) of the Lanham Act (15 U.S.C. §1125(A))

162.    PartMiner repeats and realleges paragraphs 1 through 161 of the Complaint as though fully set forth herein.

163.    As alleged above, the Defendants organized and conducted widespread promotional campaigns designed to lure current and prospective PartMiner customers to Avnet.

164.    As an integral part of these campaigns, Defendants have repeatedly made the following false and misleading statements concerning the nature and quality of PartMiner's business, services and products to PartMiner's current and prospective customers::

  a.  PartMiner's data cannot be trusted due to integrity issues, including the fact that the data is out-of-date, not good, contains inconsistent information and that there is nothing new in the database;

  b.  The individual Defendants "jumped ship" from PartMiner because of PartMiner's data integrity issues;

  c.  There are many more engineers inputting information into the database marketed by Avnet relative to the number of PartMiner engineers performing the same task, specifically that there are 300 to 500 engineers inputting information into the database marketed by Avnet;

  d.  PartMiner makes up part numbers to make it appear that it has more parts in its database than Avnet;

  e.  The database marketed by Avnet is updated and made available to customers every night; and

  f.  PartMiner is going out of business.

165.    These false and misleading statements have been made in commerce, and specifically in the context of numerous telephone and email sales campaigns directed to current and prospective PartMiner customers.

166.    Upon information and belief, these false and misleading statements were part of a standard script utilized by the Defendants in their widespread and organized promotional campaign.

167.    Upon information and belief, as part of a continuing promotional campaign, Defendants continue to make these false and misleading statements in their sales solicitations to current and prospective PartMiner customers.

168.    The foregoing acts and conduct by Defendants constitute misrepresentation of the nature, characteristics and qualities of PartMiner's goods and services in commercial advertising and promotion in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

169.    Defendants' acts, as set forth above, have caused and continue to cause irreparable injury to PartMiner's goodwill and reputation, and has resulted and will continue to result in PartMiner losing current and prospective customers.  An award of monetary damages alone cannot fully compensate PartMiner for its injuries and, therefore, PartMiner lacks an adequate remedy at law.

170.    PartMiner is entitled to a permanent injunction enjoining Defendants from making false statements, as well as all other remedies available under the Lanham Act including, but not limited to, compensatory damages, treble damages, disgorgement of profits, attorney's fees and costs.

## Seventh Cause of Action
### Defamation

171.    PartMiner repeats and realleges paragraphs 1 through 170 of the Complaint as though fully set forth herein.

172.    As alleged above, the Defendants intentionally published the following defamatory statements about PartMiner's business, products and services through telephone calls and electronic communications to PartMiner's current and prospective customers:

a.   PartMiner's data cannot be trusted due to integrity issues, including the fact that the data is out-of-date, not good, contains inconsistent information and that there is nothing new in the database;

b.   The individual Defendants "jumped ship" from PartMiner because of PartMiner's data integrity issues;

c.   There are many more engineers inputting information into the database marketed by Avnet relative to the number of PartMiner engineers performing the same task, specifically that there are 300 to 500 engineers inputting information into the database marketed by Avnet;

d.   PartMiner makes up part numbers to make it appear that it has more parts in its database than Avnet;

e.   The database marketed by Avnet is updated and made available to customers every night; and

f.   PartMiner is going out of business.

173.   These statements are factual in nature and provably false.

174.   At the time they were made, Defendants knew that the defamatory statements were false or made them with reckless disregard for whether they were true or false.

175.   The defamatory statements constitute defamation per se because they tend to cause injury to PartMiner's business.

176.   Defendants' conduct, as set forth above, was willful, wanton, malicious and/or without due regard for the rights of PartMiner.

177.   Defendants' conduct, as set forth above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

178.   As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

179.   Alternatively, if the defamation does not constitute defamation per se, PartMiner has suffered special damages therefrom, including, but not limited to, loss of fifty-one different accounts to Avnet, resulting in a loss of over $1.4 million in revenue to PartMiner.  (A chart identifying these lost accounts and itemizing the monetary losses is attached hereto as Exhibit E).

180.   PartMiner is entitled to recover punitive damages from Defendants.

### Eighth Cause of Action
### Business/Product Disparagement

181.   PartMiner repeats and realleges paragraphs 1 through 180 of the Complaint as though fully set forth herein.

182.   As alleged above, Defendants intentionally published the following false and disparaging oral and written statements about PartMiner's business, products and services through telephone calls and electronic communications to PartMiner's current and prospective customers:

a.   PartMiner's data cannot be trusted due to integrity issues, including the fact that the data is out-of-date, not good, contains inconsistent information and that there is nothing new in the database;

b.   The individual Defendants "jumped ship" from PartMiner because of PartMiner's data integrity issues;

c.   There are many more engineers inputting information into the database marketed by Avnet relative to the number of PartMiner engineers performing the same task, specifically that there are 300 to 500 engineers inputting information into the database marketed by Avnet;

d.   PartMiner makes up part numbers to make it appear that it has more parts in its database than Avnet;

e.   The database marketed by Avnet is updated and made available to

customers every night; and

f.    PartMiner is going out of business.

183.    Upon information and belief, Defendants published the statements described above with actual knowledge that they were false, or with reckless disregard as to their truth or falsity. Defendants knew or should have known that the publications were substantially likely to cause PartMiner pecuniary injury. Defendants published the statements out of spite in order to harm PartMiner and interfere with PartMiner's relations with its customers and prospects.

184.    Defendants' conduct, as set forth above, was willful, wanton, malicious and/or without due regard for the rights of PartMiner.

185.    Defendants' conduct, as described above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

186.    As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

187.    As a result of Defendants' wrongful conduct as alleged above, PartMiner has suffered special damages including, but not limited to, loss of fifty-one different accounts to Avnet, resulting in a loss of over $1.4 million in revenue to PartMiner. (A chart identifying these lost accounts and itemizing the monetary losses is attached hereto as Exhibit E).

188.    PartMiner is entitled to recover punitive damages from Defendants.

**Ninth Cause of Action**
**Tortious Interference With Prospective Business Advantage**

189.    PartMiner repeats and realleges paragraphs 1 through 188 of the Complaint as though fully set forth herein.

190.    PartMiner has the potential to acquire contracts with new customers and continue its relationships with current customers for PartMiner's products and services.

191.    PartMiner's existing relationships with its customers confer an economic advantage on PartMiner.

192.    Defendants have employed wrongful means to interfere with these prospective and ongoing relationships, including (a) use of Confidential Information to solicit current and prospective customers, in violation of the Confidentiality Agreements and Settlement Agreement and (b) the making of false and defamatory representations to current and prospective customers concerning PartMiner and its goods and services, as alleged above.  As a result of this wrongful conduct, many of PartMiner's existing customers, who would otherwise have renewed their contracts with PartMiner, instead switched their business to Avnet, and many of its prospective customers, which would otherwise have given their business to PartMiner, instead gave that business to Avnet.

193.    Defendants committed such wrongful conduct for the purpose of injuring PartMiner in its prospective business and commercial relations.

194.    Such wrongful conduct constitutes tortious interference with PartMiner's prospective contractual relations.

195.    Defendants' conduct, as set forth above, was willful, wanton, malicious and/or without due regard for the rights of PartMiner.

196. Defendants' conduct, as described above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

197. As a direct and proximate result of Defendants' wrongful conduct, PartMiner has been damaged in an amount to be proven at trial.

198. PartMiner is entitled to recover punitive damages from Defendants.

## Tenth Cause of Action
## Unfair Competition

199. PartMiner repeats and realleges paragraphs 1 through 198 of the Complaint as though fully set forth herein.

200. Defendants wrongful conduct, as alleged above, constitutes unfair competition under New York common law.

201. Defendants' conduct, as set forth above, was willful, wanton, malicious and/or without due regard for the rights of PartMiner.

202. Defendants' conduct, as described above, has caused PartMiner irreparable injury and, unless enjoined, will continue to cause irreparable injury to PartMiner's business including, but not limited to, loss of good will, reputation, customer relationships, and revenues and profits that are impossible to accurately and fully calculate, all for which PartMiner has no adequate remedy at law.

203. As a direct and proximate result of Defendants' conduct, as described above, PartMiner has been damaged in an amount to be proven at trial.

204. PartMiner is entitled to recover punitive damages from Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, PartMiner demands judgment against the Defendants as follows:

a)   Granting a preliminary and permanent injunction enjoining and restraining Defendants, and all those acting in connection with them, from misappropriating, divulging, disseminating, utilizing or otherwise making use of PartMiner's Confidential Information.

b)   Granting a preliminary and permanent injunction enjoining and restraining Defendants from directly or indirectly contracting or soliciting business from any PartMiner customer that Defendants gained knowledge about though PartMiner's Confidential Information including, but not limited to, its customer lists.

c)   Requiring Defendants, and all those acting in connection with them, to immediately return to PartMiner any and all of PartMiner's Confidential Information (as defined in the Confidentiality and Settlement Agreements), or any document or thing embodying any part of the Confidential Information, in their possession, custody or control;

d)   Granting a preliminary and permanent injunction enjoining and restraining Defendants from making any false or misleading statements about PartMiner's business, services or products;

e)   Awarding PartMiner compensatory damages in an amount to be proven at trial, but which exceeds $75,000, exclusive of interest and costs;

f)   Awarding PartMiner punitive damages in an amount to be proven at trial;

g)     Awarding PartMiner its reasonable attorney's fees, costs of suit and interest; and

h)     Awarding PartMiner such other and further relief as the Court may deem just and

proper.

### JURY DEMAND

PartMiner demands trial by jury on all issues so triable.


Dated: New York, New York
       December 21, 2007

DLA PIPER US LLP


By: _____

Eric M. Falkenberry (EF 9001)
eric.falkenberry@dlapiper.com
Andrew L. Deutsch (AD 5782)
andrew.deutsch@dlapiper.com
1251 Avenue of the Americas
New York, New York 10020
(212) 355-4500
*Attorneys for Plaintiff*