DLA PIPER US LLP
Eric M. Falkenberry
Andrew L. Deutsch
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------

| | | |
|---|---|---|
| PARTMINER INFORMATION SERVICES, INC., | : | 07 Civ. 11482 (LMM) |
| | : | |
| | : | **AFFIDAVIT OF CHRISTOPHER** |
| | : | **MEYER IN SUPPORT OF MOTION** |
| Plaintiff, | : | **FOR PRELIMINARY INJUNCTION** |
| | : | **AND EXPEDITED DISCOVERY** |
| -vs- | : | |
| | : | |
| AVNET, INC., THOMAS CASEY REED, | : | |
| JOHN KENNETH SHARPE, and NEIL R. | : | |
| VANEK, | : | |
| | : | |
| Defendants. | : | |

------------------------------------------------------

STATE OF COLORADO)
                                    ss:
COUNTY OF ARAPAHOE)

CHRISTOPHER MEYER, being duly sworn, deposes and says:

1.      I am over the age of 18 and the matters that I state in this affidavit are based on my personal knowledge and the best of my recollection.

2.      I am Chief Executive Officer for PartMiner Information Services, Inc. ("PartMiner"), a position I have held since November 2001.

3.      PartMiner is a global provider of online electronics part information used by engineers, supply chain managers and manufacturing purchasers in the electronics industry.

PartMiner offers the world's largest subscription-based proprietary and confidential online electronic parts database, known as the CAPS™ Database. PartMiner also offers enterprise solutions for managing electronic component bills of materials and electronic components inventories, known as CAPS™ Connect™ and CAPS™ Connect ES™ (collectively with the CAPS™ Database, the "CAPS™ Databases").

4.      PartMiner sells its customers subscription license agreements to the CAPS™ Databases.

5.      PartMiner's success depends on maintaining its current customer base and building upon that base. PartMiner has spent years and significant resources (including employee compensation) in this endeavor.   The process of creating and maintaining our customer relationships involves, among other things, paying sales people to find, learn about and sell to customers, and tracking detailed information about our customers and prospects.  PartMiner has spent, and continues to spend, a great deal of time and money developing information on customers and prospects.   For example, we input our pertinent customer data in a customer relationship management database known as GoldMine.  This data includes customer contact information, contract start and end dates, customer preferences, records of our communications with customers, sales strategies, and other details about the customers' relationship with PartMiner, and may also include the operation of the customers' office including the types of individuals who may have a need for the product, business issues the customer is having that may be solved by the products, customer credit information, and budget and key internal approvers.  We also track the details of our dealings with prospects, including their contact information, source of referral, the products and pricing that we are offering them, where they are in the sales process, the likelihood of closing a sale, our communications with them, and our

sales strategies. This information is summarized in periodic "pipeline" reports that our sales team uses to track and manage sales activity.

6.     PartMiner's customer and prospect information is extremely valuable to us as it allows us to effectively and efficiently sell our products and services. PartMiner's customer and prospect information is not available from any public source. Someone trying to duplicate this information would have to spend similar amounts of time, effort and money as PartMiner has, but with no guarantee that the same results would be achieved.

7.     PartMiner's customer and prospect information would be valuable to PartMiner's competitors because it would give them a huge shortcut to ready, willing and able buyers of electronics parts information and information services, as well as details on how to best sell to those buyers, without having to put in the work and resources required to develop that information. Essentially, if our competitors were able to exploit our confidential customer and prospect information, it would give them an unfair competitive advantage.

8.     Because our customer and prospect information is so valuable, we have adopted company-wide policies restricting its disclosure and use for anything except official PartMiner business. We require all employees to sign Confidentiality Agreements. (True and accurate copies of PartMiner Confidentiality Agreements are attached hereto as Exhibits 1-3). PartMiner's Employee Manual and Electronic Code of Conduct also explains that employees may not use or disclose PartMiner confidential information except to do their jobs for PartMiner. (A true and accurate copy of the relevant sections of these policies are attached hereto as Exhibits 4-5). We also have password protection to restrict access to our databases. Finally, employees have to return all PartMiner materials when their employment ends.

9.      Unfortunately, despite our efforts to keep our customer and prospect information confidential, three of our former employees, Casey Reed, Kenney Sharpe and Neil Vanek, have managed to exploit that information on behalf of their new employer, Avnet, Inc. ("Avnet"), which is our competitor.

10.     Reed began his employment with PartMiner in 1999 and attained the position of Vice President, CAPS Sales and Service.  Reed was responsible for selling PartMiner's products and services, managing his sales staff and managing the customer support group.  Sharpe, who became a PartMiner employee in 2002, was a Senior Account Manager, and Vanek, who became an employee of PartMiner in 2004, was an Account Manager on Reed's sales team.  Both reported to Reed.  All three focused on selling products to and supporting customers and prospects.

11.     As a condition of their employment with PartMiner, Reed, Sharpe and Vanek each signed a Confidentiality Agreement on May 4, 2001, July 1, 2002, and November 16, 2004, respectively.  These Confidentiality Agreements prohibit them from "disclos[ing] or us[ing] in whole or in part any Confidential Information." (Exs. 1-3, Section 7).

12.     The Confidentiality Agreements define "Confidential Information" as follows:

> Section 1. Confidential Information.  The term "Confidential Information" as used in this Agreement, shall mean, individually and collectively, any and all information, including, without limitation, information relating to products; compositions; processes; technologies; inventions; know how; designs, specifications, formulas; methods, including manufacturing procedures and technical methods; materials; devices; developmental or experimental work; improvements; discoveries; past, current, planned, and future research and data, including financial and cost data; databases; software; manuals; reports; internal policies and procedures; patent applications; licenses; research and development programs or agreements; marketing plans and survey and trade information (including customer lists,

customer usages and requirements); and inventions, as described in
Section 2, (a) that [PartMiner] may furnish or otherwise make
available to the Employee directly or indirectly and which is
identified as "confidential", (b) that the Employee originates,
conceives, and/or develops as a result of any work for [PartMiner],
the use of [PartMiner]'s premises, property, or Confidential
Information, or (c) that the Employee in the exercise of reasonable
judgment should know is confidential, regardless of whether it is
so marked or in an intangible form (e.g. disclosed orally).  (Id. at
Section 1).

13.     In their Confidentiality Agreements, Reed, Sharpe and Vanek acknowledged and

agreed that each "occupies a position of trust and confidence" with PartMiner, and as a result of

that position, each "will have access to and may develop Confidential Information" which is of

value to PartMiner.   Reed, Sharpe and Vanek also agreed that they would not disclose any

PartMiner Confidential Information without written authorization from PartMiner. (Exs. 1-3,

Section 7).

14.     Under the Confidentiality Agreement, Reed, Sharpe and Vanek, also agreed that

they would not remove any PartMiner Confidential Information from PartMiner's premises

without written authorization.  (Id. at Section 8).

15.     Each Confidentiality Agreement also contains a promise that Reed, Sharpe and

Vanek each would not, for two years post employment with PartMiner, "directly or indirectly

solicit or encourage any other employee of [PartMiner] to leave the employment of

[PartMiner]…." (Id. at Section 16).

16.     In Section 14 of the Confidentiality Agreement, Reed, Sharpe and Vanek agreed

that PartMiner is entitled to an injunction to remedy any wrongful disclosure or use of the

Confidential Information:

The Employee agrees that for any actual or threatened breach, the
Employer shall be entitled, in addition to any other remedies

available to it, to an injunction and to secure specific performance
of this Agreement, plus the recovery of reasonable attorney fees
and costs incurred in prosecuting an action to obtain such
remedies. (Id. at Section 14).

17.    As Vice President, CAPS Sales and Service, Reed had access to and used virtually all of PartMiner's Confidential Information concerning PartMiner customers, sales prospects and employees.  The information to which he had frequent access included, but was not limited to, PartMiner's GoldMine database (which Reed administered) containing all of PartMiner's customer data, sales pipeline reports with detailed prospect information, sales records, information regarding the size and costs of customer orders, information on PartMiner's internal costs and profit margins, information on employee compensation and performance, and other proprietary information.

18.    Sharpe and Vanek also each had access to and used PartMiner's Confidential Information concerning PartMiner customers and sales prospects.

19.    Reed, Sharpe and Vanek gave notice that they were resigning from employment with PartMiner, respectively, on or about October 4, 2005, November 18, 2005, and November 21, 2005.  About a week before Reed resigned, he had his sales team give him updated customer contact information and their respective sales pipelines.  Sharpe also asked the sales team to give him updated sales pipelines about a week before he resigned.  Even more disturbing, on the day he resigned, Vanek sent to his personal email address about 85 emails containing numerous PartMiner documents, such as spreadsheets and pipeline reports, filled with PartMiner Confidential Information about customers and sales prospects.

20.    Reed, Sharpe and Vanek each joined Avnet to open a sales office three miles from our headquarters in order to compete with PartMiner.

21.     We believe that Reed solicited and encouraged Sharpe and Vanek to take jobs with Avnet, and hired Sharpe and Vanek in their new positions at Avnet. We also believe that Sharpe played a role in soliciting Vanek to join Avnet.

22.     On December 13, 2005, we sued Reed in the U.S. District Court for the Southern District of New York seeking an immediate injunction to block his improper solicitation and to prevent him, Vanek, Sharpe and Avnet from using any PartMiner Confidential Information. On January 31, 2006, the action was voluntarily resolved by the parties through a Settlement Agreement, Undertaking and Release ("Settlement Agreement"). (A true and accurate copy of the Settlement Agreement is attached hereto as Exhibit 6). The Court entered an Order on January 4, 2006 discontinuing the action and closing the case. (A true and accurate copy of the January 4, 2006 Order is attached hereto as Exhibit 7).

23.     The Settlement Agreement was entered into by PartMiner on the one hand, and Reed, Sharpe, Vanek and Avnet, on the other. (See Ex. 6)

24.     For and in consideration of the terms set forth in the Settlement Agreement, Reed agreed to pay (or caused to be paid to) PartMiner legal fees in the sum of $25,000.00. (Ex. 6, Section 2(a)).

25.     The Settlement Agreement defines PartMiner Confidential Information as follows:

> a. The term "PartMiner's Confidential Information," as contemplated by the parties to this Agreement, shall mean any and all Inventions or Copyrights as such terms are defined or referenced in the Confidentiality Agreement, any and all pipeline reports, sales reports, operation reports, daily registrant reports, pricing reports, proposals, financial reports, internal memoranda, purchase orders, contracts, agreements, correspondence (including without limitation, letters, memoranda and/or email), notes, lists, minutes, charts images, summaries, reports, forms, or other documents (including information in electronic or other media) containing any confidential PartMiner customer information or any other

confidential document obtained by or available to Reed, Vanek or Sharpe in the course of their employment with PartMiner that concerns the business, employees, customers and/or prospects of PartMiner or any of its affiliated companies and that has been and is maintained by PartMiner as confidential; provided, however, that it is expressly understood that no document or information shall be considered to be "PartMiner's Confidential Information" for purposes of this Agreement if the same:

   (i)     was or is in the public domain or is ascertainable from general or public sources;

   (ii)    was or is disclosed with the prior written approval of PartMiner;

   (iii)   became or becomes known to Reed, Vanek, Sharpe or Avnet from a source other than PartMiner without breach of this Agreement by Reed, Vanek or Sharpe, and without breach by the third party making such disclosure, of any obligation of confidentiality it may have to PartMiner; or

   (iv)    is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body;

and, provided further, that nothing in this Agreement or in the Confidentiality Agreement is intended to or shall restrict Reed from utilizing his facilities, skills, talents and experience or the general knowledge acquired in the course of his employment with PartMiner. (Ex. 6, Section 3).

26.     Reed, Sharpe and Vanek warranted in Paragraphs 3(b), 5(c)(i) and 5(d)(i) of the Settlement Agreement, respectively, that they did not have any PartMiner Confidential Information in their possession, custody or control and that any PartMiner Confidential Information they may have had at the time of their termination of employment with PartMiner was either returned to PartMiner or destroyed. (Id. at Sections 3(b), 5(c)(i) and 5(d)(i)). They further represented that they had not in the past disclosed any of PartMiner's Confidential Information. (Id.). We would never have entered into the Settlement Agreement had we known that Reed, Sharpe and Vanek continued to possess PartMiner Confidential Information in spite of their warranty that they did not.

27.     In addition, Reed, Sharpe and Vanek promised "not to use or disclose, in whole or in part, any of PartMiner's Confidential Information that [they] may have acquired while an

employee of PartMiner or at any time thereafter, through third parties, without written authorization of PartMiner." (Id. at Sections 3(c), 5(c)(ii) and 5(d)(ii)).

28.    Also included in the Settlement Agreement was an agreement by Reed and Avnet not to "solicit, hire or otherwise employ any individual who, at the time, is then currently employed by PartMiner," for the period of time to and including October 18, 2007.  (Id. at Section 4).

29.    Section 10 of the Settlement Agreement provides that PartMiner is entitled to an injunction to remedy the wrongful disclosure or use of the Confidential Information:

> In the event Reed and/or Avnet breaches Paragraph 3 of this Agreement and Reed and/or Avnet has not remedied such breach within the ten-day period referenced above, Reed and/or Avnet agree and acknowledge that PartMiner will have no adequate remedy at law and will be entitled to seek injunctive relief, in addition to any remedies at law or in equity. (Id. at Section 14).

30.    We thought that the lawsuit had ended Defendants' misuse of PartMiner's Confidential Information. We recently learned, however, from several independent sources, that Defendants are still targeting our customers and prospects using our Confidential Information. (See Affidavits of Katie Wetherbee ("Wetherbee Aff.") and Andrew Sbravati ("Sbravati Aff.") in Support of Motion for Preliminary Injunction and Expedited Discovery)).

31.    Avnet—through Reed, Sharpe and Vanek—keep swooping into our accounts at the last minute, after we have already presented an offer, and then undercuts us on price.  Their timing is uncanny, but is not coincidental, as we recently learned from two former Avnet employees, Andy Sbravati and Katie Wetherbee. (Wetherbee Aff. ¶ 8; Sbravati Aff. ¶ 7).  I am told that another ex-employee of ours, Jeff Dwyer, claimed that he was taking our pipeline reports to Avnet with plans to convert our customers and prospects to Avnet customers.  (See

Affidavits of Ken Auga and David McBarron in Support of Motion for Preliminary Injunction and Expedited Discovery).

32.    In addition, we learned that Defendants are engaged in an organized, widespread and sustained campaign to take away PartMiner customers by making false and misleading promotional statements to PartMiner customers and prospects regarding, among other things, the integrity of PartMiner data.  (Wetherbee Aff. ¶¶ 9-11; Sbravati Aff. ¶¶ 8-9).

33.    Defendants have been and are very successful in taking sales from us that we are close to making and expecting to close.  Over the last two years, Defendants have stolen at least fifty-one different accounts from PartMiner, resulting in a loss of over $1.4 million in revenue to PartMiner. (A chart identifying these lost accounts and itemizing the monetary losses is attached hereto as Exhibit 8).  We believe that we have lost many more than fifty-one customers, and expect discovery in this matter to provide ample evidence that many more PartMiner customers were lost to Avnet through the use of PartMiner's Confidential Information and false promotion. Defendants wrongful conduct has also resulted in the loss of many prospective customers, and we expect discovery to provide sufficient evidence of these losses as well.

34.    Loss of these sales to Avnet hurts us in multiple ways. First, we lose the revenue related to the particular lost sale.  But beyond this, what we lose are opportunities—both the opportunities for repeat business, as well as the opportunities for referrals from each customer lost.  A third way in which losing customers damages us is in the valuation of the company.  The company is contemplating raising capital through an IPO, and PartMiner's valuation is critical in determining how much money we can raise in the market. Our valuation is sensitive to revenue fluctuations, and our losses to Avnet are significantly lowering our revenues.  These reduced revenues are jeopardizing our ability to have a successful IPO.

35.    We have also spent a great deal of time, energy and money on significant efforts to combat Defendants' wrongful conduct and convince our current customers and prospects to choose PartMiner over Avnet.    If the Defendants had not used PartMiner's Confidential Information and false promotion to try to lure customers to Avnet, PartMiner would not have had to make these extra efforts, including contract price reductions, concerning such customers and prospects.    This is yet another significant loss caused by Defendants use of PartMiner Confidential Information and false promotion.

_____

CHRISTOPHER MEYER

Sworn to before me this
19th day of December, 2007

_____
Notary Public



# EXHIBIT 1

# CONFIDENTIALITY AGREEMENT

This Agreement is made effective this _04_ day of _May, 2001_ , by and between employee _Thomas Casey Reed_ , residing at the address set forth below (hereinafter referred to as "the Employee"), and PartMiner, Inc., a New York corporation having its principal place of business at 432 Park Avenue South, 12th Floor, New York, New York 10016 (hereinafter referred to as "the Employer"), in consideration of the hiring, employment, and continued employment of the Employee by the Employer, the current and future compensation, including any possible future increases in compensation, paid in respect to employment, and the responsibilities assigned and access granted to the Employee in connection with the Employer's proprietary and confidential information.

Section 1.  Confidential Information.  The term "Confidential Information," as used in this Agreement, shall mean, individually and collectively, any and all information, including, without limitation, information relating to products; compositions; processes; technologies; inventions; know-how; designs; specifications; formulas; methods, including manufacturing procedures and technical methods; materials; devices; developmental or experimental work; improvements; discoveries; past, current, planned, and future research and data, including financial and cost data; databases; software; manuals; reports; internal policies and procedures; patent applications; licenses; research and development programs or agreements; marketing plans and survey and trade information (including customer lists, customer usages and requirements); and inventions, as described in Section 2, (a) that the Employer may furnish or otherwise make available to the Employee directly or indirectly and which is identified as "confidential", (b) that the Employee originates, conceives, and/or develops as a result of any work for the Employer, the use of the Employer's premises, property, or Confidential Information, or (c) that the Employee in the exercise of reasonable judgment should know is confidential, regardless of whether it is so marked or in an intangible form (e.g. disclosed orally).

Notwithstanding the foregoing, the term "Confidential Information" shall not include information, which as can be demonstrated by written records (a) was already in the Employee's possession or control prior to the date of disclosure (provided that if such information was subject to an earlier confidentiality agreement or other contractual, legal, or fiduciary obligation of secrecy owed by the Employee to the Employer, nothing in this section shall abrogate such earlier duty); (b) was on the date of disclosure within, or thereafter enters, the public domain other than as a result of a disclosure by the Employee; or (c) becomes available to the Employee on a non-confidential basis from a source other than the Employer, provided that such source is not prohibited by a confidentiality agreement with or other contractual, legal, or fiduciary obligation of nondisclosure to the Employer.

Section 2.  Inventions.  The term "Inventions" means discoveries, improvements, and ideas, regardless of whether or not they are patentable or made, conceived or reduced to practice (either solely or jointly with others) during working hours or with the Employer's facilities or otherwise, and any and all copyrightable subject matter and any other matter that may

be protected under intellectual property law in any jurisdiction. The Employee acknowledges that it is his or her obligation to disclose, and the Employee shall disclose without further consideration, immediately in writing to his or her supervisor, or to any other person designated by the Employer to receive these disclosures, each and every invention or improvement, whether or not patentable, that the Employee may make or conceive, either solely or jointly with others, during the period of his or her employment which (a) results from any work for the Employer, any use of the Employer's premises or property, or any use of the Employer's Confidential Information or other resources; (b) relates to any method, process, apparatus, shop practice, or know-how that has been developed, or is in development, by the Employer or that may be useful or valuable to the Employer; or (c) relates to any product, article of manufacture, or composition of matter being developed, made, sold, or used in connection with the Employer's business or the Employer's research or development.

The Employee further acknowledges that it is his or her obligation to assign, and the Employee shall assign without further consideration, his or her rights in any invention or improvement even if no equipment, supplies, facilities, or Confidential Information of the Employer was used, and even if the invention or improvement was developed entirely on the employee's own time, in the event that (a) the invention or improvement relates directly to the Employer's business or to the Employer's actual or demonstrably anticipated research or development or (b) the invention or improvement results from any work performed by the Employee for the Employer.

Section 3. Copyright. The Employee acknowledges that it is his or her obligation to disclose, and the Employee shall disclose without further consideration, immediately in writing to his or her supervisor, or to any other person designated by the Employer to receive these disclosures, each and every original work of authorship, whether or not copyrightable, that the Employee may write, record, or otherwise fix in a tangible medium of expression (including computer media), either solely or jointly with others, during the period of his or her employment which (a) results from any work for the Employer, any use of the Employer's premises or property, or any use of the Employer's Confidential Information or other resources; (b) relates to any method, process, apparatus, shop practice, or know-how that has been developed, or is in development, by the Employer or that may be useful or valuable to the Employer; or (c) relates to any product, article of manufacture, or composition of matter being developed, made, sold, or used in connection with the Employer's business or the Employer's research or development.

The Employee further acknowledges that it is his or her obligation to assign, and the Employee shall assign without further consideration, his or her rights in any original work of authorship even if no equipment, supplies, facilities, or Confidential Information of the Employer was used, and even if the original work of authorship was developed entirely on the employee's own time, in the event that (a) the original work of authorship relates directly to the Employer's business or to the Employer's actual or demonstrably anticipated research or development or (b) the original work of authorship results from any work performed by the Employee for the Employer.

- 2 -

Section 4.  Other Intellectual Property.  The Employee agrees to disclose promptly to the Employer, and that the Employer shall own, any and all additional intellectual property not specified in Sections 2 and 3 above.  Such additional intellectual property shall include, without limitation and to the extent that it is not already specified in Sections 2 and 3, any and all trade secrets; know-how; designations of source or origin, such as trademarks, trade names, and trade dress; mask works; databases; and any and all documentation related to such intellectual property.

Section 5.  Employer Property.  The Employee agrees that all inventions, improvements, and original works of authorship referred to in Sections 2, 3, and 4 shall be the Employer's sole and exclusive property unless the Employer's rights are waived in writing by an elected or appointed officer of the Employer.

Section 6.  Employee Cooperation.  Upon the Employer's request at any time during employment or after its termination, the Employee shall promptly review, sign, and return all documents, communicate all pertinent information, and do anything else reasonably requested by the Employer to transfer all rights to any inventions, improvements, original works of authorship and intellectual property referred to in Sections 2, 3, 4, or 5 to the Employer or its nominee, and to help the Employer apply for, obtain, modify, defend, enforce, and/or transfer its patent, trade secret, copyright, and comparable rights for these inventions, improvements, and original works of authorship anywhere in the world.  The Employee shall be reimbursed for any reasonable expenses actually incurred to comply with this Section.  The Employee shall not be entitled to further consideration for services rendered or rights transferred according to this Section, except that if the Employee is no longer employed by the Employer when services according to this Section are rendered, the Employee shall be entitled to receive reasonable compensation for the time reasonably required to render these services.

Section 7.  Information Access and Confidentiality.  The Employee acknowledges that the Employee occupies a position of trust and confidence with the Employer and will have access to and may develop Confidential Information of actual or potential value to or otherwise useful to the Employer.  The Employee agrees that during and after employment he or she shall treat as confidential and shall not, without written authorization from the Employer, disclose or use in whole or in part any Confidential Information that the Employee may acquire regarding or relating to the Employer's present or future businesses, sales, financials, products, operations, processes, personnel, or business associates, including any present or future subsidiaries or affiliates, or regarding improvements, inventions, or know-how.

Section 8.  Employer Property Return.  The Employee agrees that it will not at any time take from the Employer's premises without written authorization from the Employer any software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever, or copies thereof, which reflect or deal with Confidential Information in relation to the Employer's business, or any Inventions or any physical property of the Employer, and will promptly return

- 3 -

the same to the Employer if taken with the aforesaid consent. At the termination of the employment or at any other time that the Employer may request, the Employee shall promptly deliver to the Employer all software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever made or compiled by the Employee or in the Employee's possession concerning or relating to any business, product, process, operation, personnel, or business associate of the Employer. All such items shall be and remain at all times the Employer's property.

Section 9. <u>At-Will Employment</u>. This Agreement does not constitute an employment contract for a specific term. The Employee acknowledges that the Employee is free to resign from employment and the Employer is free to terminate the employee's employment at any time, for any reason or no reason, with or without notice.

Section 10. <u>Conflict of Interest</u>. The parties recognize that this Agreement provides certain protections to the Employer, its employees, customers, suppliers, and other business associates. The Employee represents that he or she is aware of no actual or potential conflict of interest and that he or she possesses no information that may create such a conflict of interest with respect to the Employer and/or its business associates.

Section 11. <u>Successors and Assigns</u>. This Agreement shall apply to all work performed by the Employee for the Employer, including any of its past, present, or future affiliates or subsidiaries. This Agreement shall inure to the benefit of the Employer's successors and assigns and shall be binding upon the Employee's assigns, executors, administrators, and other legal representatives.

Section 12. <u>Prior Agreements</u>. This Agreement supersedes any and all prior agreements between the parties to the extent of the subject matter of this Agreement, unless another written agreement expressly provides that it shall not be superseded by this Agreement. This Agreement can only be amended, altered, or terminated and its provisions can only be waived by agreement in writing signed by the Employee and an executive officer of the Employer.

Section 13. <u>Separability</u>. If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid or unenforceable, either in general or as applied to a particular occurrence or circumstance, such determination shall not affect the validity and enforceability of any other provisions of this Agreement.

Section 14. <u>Remedies</u>. The Employer and the Employee both recognize that the employee's obligations, more particularly described above, (i) to assign certain inventions to the Employer and (ii) to refrain from disclosing or using Confidential Information are special, unique, and of extraordinary character, such that monetary damages could not be adequate to cure or remedy a breach. The Employee agrees that for any actual or threatened breach, the Employer shall be entitled, in addition to any other remedies available to it, to an injunction and to secure

- 4 -

specific performance of this Agreement, plus the recovery of reasonable attorney fees and costs incurred in prosecuting an action to obtain such remedies. Any failure in the exercise by either party of its rights to terminate this Agreement or to enforce any provision of this Agreement for default or violation by the other party shall not prejudice that party's right of termination or enforcement for any further or other default or violation.

Section 15. Applicable Law and Forum. This Agreement shall be construed and interpreted and its performance shall be enforced according to the laws of the United States and the State of New York. The Employer and the Employee consent to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

Section 16. Employee Representation. The Employee hereby represents and warrants to the Employer that (i) Employee has all requisite power and authority, and does not require the consent of any third party to enter into this Agreement and grant the rights provided herein; (ii) the execution, delivery and performance of this Agreement by the Employee does not and will not conflict with, breach, violate or cause a default under any agreement, contract or instrument to which the Employee is a party or any judgment, order or decree to which the Employee is subject; (iii) the Employee is not a party to or bound by any employment agreement, consulting agreement, non-compete agreement, confidentiality agreement or similar agreement with any other person; (iv) the services performed by the Employee and all items and/or materials furnished by the Employee in connection with or as a result of such services shall not infringe upon or violate the personal, civil or property rights, or the rights of privacy of, or constitute a libel, slander or unfair competition against or violate or infringe upon any common law right, copyright, trademark, trade name, patent or any other right of any person or entity. If the Employee should cease to be employed by the Employer, the Employee shall not, without the Employer's prior written consent, directly or indirectly solicit or encourage any other employee of the Employer to leave the employment of the Employer or hire any employee who has left the employment of the Employer within two (2) years of said termination of such employee's employment with the Employer.

    IN WITNESS WHEREOF, the parties have executed this Agreement as of the date
first above written.

EMPLOYEE

*Thomas Casey Reed*
Employee Signature

*Thomas Casey Reed*
Print Employee Name

Employee Home Address:

*1113 Blackwood Dr*

*Parker, Co. 80138*


PARTMINER, INC.

By:    *Sarah Backus*

Title: *HR Assistant*

_____
Witness Signature

_____
Print Witness Name and Address

_____
Date Witnessed

# EXHIBIT 2

## CONFIDENTIALITY AGREEMENT

This Agreement is made effective this _1st_ day of _July, 2002_, by and between employee _John Kenneth Shavoe_, residing at the address set forth below (hereinafter referred to as "the Employee"), and PartMiner, Inc., a New York corporation having its principal place of business at 432 Park Avenue South, 12th Floor, New York, New York 10016 (hereinafter referred to as "the Employer"), in consideration of the hiring, employment, and continued employment of the Employee by the Employer, the current and future compensation, including any possible future increases in compensation, paid in respect to employment, and the responsibilities assigned and access granted to the Employee in connection with the Employer's proprietary and confidential information.

Section 1. Confidential Information. The term "Confidential Information," as used in this Agreement, shall mean, individually and collectively, any and all information, including, without limitation, information relating to products; compositions; processes; technologies; inventions; know-how; designs; specifications; formulas; methods, including manufacturing procedures and technical methods; materials; devices; developmental or experimental work; improvements; discoveries; past, current, planned, and future research and data, including financial and cost data; databases; software; manuals; reports; internal policies and procedures; patent applications; licenses; research and development programs or agreements; marketing plans and survey and trade information (including customer lists, customer usages and requirements); and inventions, as described in Section 2, (a) that the Employer may furnish or otherwise make available to the Employee directly or indirectly and which is identified as "confidential", (b) that the Employee originates, conceives, and/or develops as a result of any work for the Employer, the use of the Employer's premises, property, or Confidential Information, or (c) that the Employee in the exercise of reasonable judgment should know is confidential, regardless of whether it is so marked or in an intangible form (e.g. disclosed orally).

Notwithstanding the foregoing, the term "Confidential Information" shall not include information, which as can be demonstrated by written records (a) was already in the Employee's possession or control prior to the date of disclosure (provided that if such information was subject to an earlier confidentiality agreement or other contractual, legal, or fiduciary obligation of secrecy owed by the Employee to the Employer, nothing in this section shall abrogate such earlier duty); (b) was on the date of disclosure within, or thereafter enters, the public domain other than as a result of a disclosure by the Employee; or (c) becomes available to the Employee on a non-confidential basis from a source other than the Employer, provided that such source is not prohibited by a confidentiality agreement with or other contractual, legal, or fiduciary obligation of nondisclosure to the Employer.

Section 2. Inventions. The term "Inventions" means discoveries, improvements, and ideas, regardless of whether or not they are patentable or made, conceived or reduced to practice (either solely or jointly with others) during working hours or with the Employer's facilities or otherwise, and any and all copyrightable subject matter and any other matter that may be protected

under intellectual property law in any jurisdiction. The Employee acknowledges that it is his or her obligation to disclose, and the Employee shall disclose without further consideration, immediately in writing to his or her supervisor, or to any other person designated by the Employer to receive these disclosures, each and every invention or improvement, whether or not patentable, that the Employee may make or conceive, either solely or jointly with others, during the period of his or her employment which (a) results from any work for the Employer, any use of the Employer's premises or property, or any use of the Employer's Confidential Information or other resources; (b) relates to any method, process, apparatus, shop practice, or know-how that has been developed, or is in development, by the Employer or that may be useful or valuable to the Employer; or (c) relates to any product, article of manufacture, or composition of matter being developed, made, sold, or used in connection with the Employer's business or the Employer's research or development.

The Employee further acknowledges that it is his or her obligation to assign, and the Employee shall assign without further consideration, his or her rights in any invention or improvement even if no equipment, supplies, facilities, or Confidential Information of the Employer was used, and even if the invention or improvement was developed entirely on the employee's own time, in the event that (a) the invention or improvement relates directly to the Employer's business or to the Employer's actual or demonstrably anticipated research or development or (b) the invention or improvement results from any work performed by the Employee for the Employer.

Section 3. Copyright. The Employee acknowledges that it is his or her obligation to disclose, and the Employee shall disclose without further consideration, immediately in writing to his or her supervisor, or to any other person designated by the Employer to receive these disclosures, each and every original work of authorship, whether or not copyrightable, that the Employee may write, record, or otherwise fix in a tangible medium of expression (including computer media), either solely or jointly with others, during the period of his or her employment which (a) results from any work for the Employer, any use of the Employer's premises or property, or any use of the Employer's Confidential Information or other resources; (b) relates to any method, process, apparatus, shop practice, or know-how that has been developed, or is in development, by the Employer or that may be useful or valuable to the Employer; or (c) relates to any product, article of manufacture, or composition of matter being developed, made, sold, or used in connection with the Employer's business or the Employer's research or development.

The Employee further acknowledges that it is his or her obligation to assign, and the Employee shall assign without further consideration, his or her rights in any original work of authorship even if no equipment, supplies, facilities, or Confidential Information of the Employer was used, and even if the original work of authorship was developed entirely on the employee's own time, in the event that (a) the original work of authorship relates directly to the Employer's business or to the Employer's actual or demonstrably anticipated research or development or (b) the original work of authorship results from any work performed by the Employee for the Employer.

Section 4. Other Intellectual Property. The Employee agrees to disclose promptly to the Employer, and that the Employer shall own, any and all additional intellectual property not specified in Sections 2 and 3 above. Such additional intellectual property shall include, without

- 2 -

limitation and to the extent that it is not already specified in Sections 2 and 3, any and all trade secrets; know-how; designations of source or origin, such as trademarks, trade names, and trade dress; mask works; databases; and any and all documentation related to such intellectual property.

Section 5.    Employer Property.    The Employee agrees that all inventions, improvements, and original works of authorship referred to in Sections 2, 3, and 4 shall be the Employer's sole and exclusive property unless the Employer's rights are waived in writing by an elected or appointed officer of the Employer.

Section 6. Employee Cooperation. Upon the Employer's request at any time during employment or after its termination, the Employee shall promptly review, sign, and return all documents, communicate all pertinent information, and do anything else reasonably requested by the Employer to transfer all rights to any inventions, improvements, original works of authorship and intellectual property referred to in Sections 2, 3, 4, or 5 to the Employer or its nominee, and to help the Employer apply for, obtain, modify, defend, enforce, and/or transfer its patent, trade secret, copyright, and comparable rights for these inventions, improvements, and original works of authorship anywhere in the world. The Employee shall be reimbursed for any reasonable expenses actually incurred to comply with this Section. The Employee shall not be entitled to further consideration for services rendered or rights transferred according to this Section, except that if the Employee is no longer employed by the Employer when services according to this Section are rendered, the Employee shall be entitled to receive reasonable compensation for the time reasonably required to render these services.

Section 7. Information Access and Confidentiality. The Employee acknowledges that the Employee occupies a position of trust and confidence with the Employer and will have access to and may develop Confidential Information of actual or potential value to or otherwise useful to the Employer. The Employee agrees that during and after employment he or she shall treat as confidential and shall not, without written authorization from the Employer, disclose or use in whole or in part any Confidential Information that the Employee may acquire regarding or relating to the Employer's present or future businesses, sales, financials, products, operations, processes, personnel, or business associates, including any present or future subsidiaries or affiliates, or regarding improvements, inventions, or know-how.

Section 8. Employer Property Return. The Employee agrees that it will not at any time take from the Employer's premises without written authorization from the Employer any software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever, or copies thereof, which reflect or deal with Confidential Information in relation to the Employer's business, or any Inventions or any physical property of the Employer, and will promptly return the same to the Employer if taken with the aforesaid consent. At the termination of the employment or at any other time that the Employer may request, the Employee shall promptly deliver to the Employer all software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever made or compiled by the Employee or in the Employee's possession concerning or relating to any business,

- 3 -

product, process, operation, personnel, or business associate of the Employer. All such items shall be and remain at all times the Employer's property.

Section 9. At-Will Employment. This Agreement does not constitute an employment contract for a specific term. The Employee acknowledges that the Employee is free to resign from employment and the Employer is free to terminate the employee's employment at any time, for any reason or no reason, with or without notice.

Section 10. Conflict of Interest. The parties recognize that this Agreement provides certain protections to the Employer, its employees, customers, suppliers, and other business associates. The Employee represents that he or she is aware of no actual or potential conflict of interest and that he or she possesses no information that may create such a conflict of interest with respect to the Employer and/or its business associates.

Section 11. Successors and Assigns. This Agreement shall apply to all work performed by the Employee for the Employer, including any of its past, present, or future affiliates or subsidiaries. This Agreement shall inure to the benefit of the Employer's successors and assigns and shall be binding upon the Employee's assigns, executors, administrators, and other legal representatives.

Section 12. Prior Agreements. This Agreement supersedes any and all prior agreements between the parties to the extent of the subject matter of this Agreement, unless another written agreement expressly provides that it shall not be superseded by this Agreement. This Agreement can only be amended, altered, or terminated and its provisions can only be waived by agreement in writing signed by the Employee and an executive officer of the Employer.

Section 13. Separability. If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid or unenforceable, either in general or as applied to a particular occurrence or circumstance, such determination shall not affect the validity and enforceability of any other provisions of this Agreement.

Section 14. Remedies. The Employer and the Employee both recognize that the employee's obligations, more particularly described above, (i) to assign certain inventions to the Employer and (ii) to refrain from disclosing or using Confidential Information are special, unique, and of extraordinary character, such that monetary damages could not be adequate to cure or remedy a breach. The Employee agrees that for any actual or threatened breach, the Employer shall be entitled, in addition to any other remedies available to it, to an injunction and to secure specific performance of this Agreement, plus the recovery of reasonable attorney fees and costs incurred in prosecuting an action to obtain such remedies. Any failure in the exercise by either party of its rights to terminate this Agreement or to enforce any provision of this Agreement for default or violation by the other party shall not prejudice that party's right of termination or enforcement for any further or other default or violation.

Section 15. Applicable Law and Forum. This Agreement shall be construed and interpreted and its performance shall be enforced according to the laws of the United States and the State of New York. The Employer and the Employee consent to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

Section 16. Employee Representation. The Employee hereby represents and warrants to the Employer that (i) Employee has all requisite power and authority, and does not require the consent of any third party to enter into this Agreement and grant the rights provided herein; (ii) the execution, delivery and performance of this Agreement by the Employee does not and will not conflict with, breach, violate or cause a default under any agreement, contract or instrument to which the Employee is a party or any judgment, order or decree to which the Employee is subject; (iii) the Employee is not a party to or bound by any employment agreement, consulting agreement, non-compete agreement, confidentiality agreement or similar agreement with any other person; (iv) the services performed by the Employee and all items and/or materials furnished by the Employee in connection with or as a result of such services shall not infringe upon or violate the personal, civil or property rights, or the rights of privacy of, or constitute a libel, slander or unfair competition against or violate or infringe upon any common law right, copyright, trademark, trade name, patent or any other right of any person or entity. If the Employee should cease to be employed by the Employer, the Employee shall not, without the Employer's prior written consent, directly or indirectly solicit or encourage any other employee of the Employer to leave the employment of the Employer or hire any employee who has left the employment of the Employer within two (2) years of said termination of such employee's employment with the Employer.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

EMPLOYEE

_John Kenneth Sharpe_
Employee Signature

_John Kenneth Sharpe_
Print Employee Name

Employee Home Address:

_9018 Copeland St._

_Littleton, CO 80126_


_Suzanne Sharpe_
Witness Signature

_Suzanne Sharpe_
Print Witness Name and Address
_9018 Copeland St._
_Littleton, CO 80126_

_6/12/02_
Date Witnessed


PARTMINER, INC.

By: _Michael R Manley_

Title: _GENERAL COUNSEL_

- 6 -

# EXHIBIT 3

## CONFIDENTIALITY AGREEMENT

*November*

This Agreement is made effective this 16 day of _____, by and between _____ employee *NEIL R. VANEK* _____, residing at the address set forth below (hereinafter referred to as ''the Employee''), and PartMiner, Inc., a New York corporation having its principal place of business at 80 Ruland Road, Melville, NY 11747 (hereinafter referred to as ''the Employer''), in consideration of the hiring, employment, and continued employment of the Employee by the Employer, the current and future compensation, including any possible future increases in compensation, paid in respect to employment, and the responsibilities assigned and access granted to the Employee in connection with the Employer's proprietary and confidential information.

Section 1. Confidential Information. The term ''Confidential Information,'' as used in this Agreement, shall mean, individually and collectively, any and all information, including, without limitation, information relating to products; compositions; processes; technologies; inventions; know-how; designs; specifications; formulas; methods, including manufacturing procedures and technical methods; materials; devices; developmental or experimental work; improvements; discoveries; past, current, planned, and future research and data, including financial and cost data; databases; software; manuals; reports; internal policies and procedures; patent applications; licenses; research and development programs or agreements; marketing plans and survey and trade information (including customer lists, customer usages and requirements); and inventions, as described in Section 2, (a) that the Employer may furnish or otherwise make available to the Employee directly or indirectly and which is identified as ''confidential'', (b) that the Employee originates, conceives, and/or develops as a result of any work for the Employer, the use of the Employer's premises, property, or Confidential Information, or (c) that the Employee in the exercise of reasonable judgment should know is confidential, regardless of whether it is so marked or in an intangible form (e.g. disclosed orally).

Notwithstanding the foregoing, the term ''Confidential Information'' shall not include information, which as can be demonstrated by written records (a) was already in the Employee's possession or control prior to the date of disclosure (provided that if such information was subject to an earlier confidentiality agreement or other contractual, legal, or fiduciary obligation of secrecy owed by the Employee to the Employer, nothing in this section shall abrogate such earlier duty); (b) was on the date of disclosure within, or thereafter enters, the public domain other than as a result of a disclosure by the Employee; or (c) becomes available to the Employee on a non-confidential basis from a source

other than the Employer, provided that such source is not
prohibited by a confidentiality agreement with or other
contractual, legal, or fiduciary obligation of nondisclosure to the
Employer.

      Section 2.    Inventions.    The term ''Inventions'' means
discoveries, improvements, and ideas, regardless of whether or not
they are patentable or made, conceived or reduced to practice
(either solely or jointly with others) during working hours or with
the Employer's facilities or otherwise, and any and all
copyrightable subject matter and any other matter that may be
protected under intellectual property law in any jurisdiction.   The
Employee acknowledges that it is his or her obligation to disclose,
and the Employee shall disclose without further consideration,
immediately in writing to his or her supervisor, or to any other
person designated by the Employer to receive these disclosures,
each and every invention or improvement, whether or not patentable,
that the Employee may make or conceive, either solely or jointly
with others, during the period of his or her employment which (a)
results from any work for the Employer, any use of the Employer's
premises or property, or any use of the Employer's Confidential
Information or other resources; (b) relates to any method, process,
apparatus, shop practice, or know-how that has been developed, or
is in development, by the Employer or that may be useful or
valuable to the Employer; or (c) relates to any product, article of
manufacture, or composition of matter being developed, made, sold,
or used in connection with the Employer's business or the
Employer's research or development.

      The Employee further acknowledges that it is his or her
obligation to assign, and the Employee shall assign without further
consideration, his or her rights in any invention or improvement
even if no equipment, supplies, facilities, or Confidential
Information of the Employer was used, and even if the invention or
improvement was developed entirely on the employee's own time, in
the event that (a) the invention or improvement relates directly to
the Employer's business or to the Employer's actual or demonstrably
anticipated research or development or (b) the invention or
improvement results from any work performed by the Employee for the
Employer.

      Section 3.    Copyright. The Employee acknowledges that it
is his or her obligation to disclose, and the Employee shall
disclose without further consideration, immediately in writing to
his or her supervisor, or to any other person designated by the
Employer to receive these disclosures, each and every original work
of authorship, whether or not copyrightable, that the Employee may
write, record, or otherwise fix in a tangible medium of expression
(including computer media), either solely or jointly with others,
during the period of his or her employment which (a) results from
any work for the Employer, any use of the Employer's premises or

- 2 -

property, or any use of the Employer's Confidential Information or other resources; (b) relates to any method, process, apparatus, shop practice, or know-how that has been developed, or is in development, by the Employer or that may be useful or valuable to the Employer; or (c) relates to any product, article of manufacture, or composition of matter being developed, made, sold, or used in connection with the Employer's business or the Employer's research or development.

The Employee further acknowledges that it is his or her obligation to assign, and the Employee shall assign without further consideration, his or her rights in any original work of authorship even if no equipment, supplies, facilities, or Confidential Information of the Employer was used, and even if the original work of authorship was developed entirely on the employee's own time, in the event that (a) the original work of authorship relates directly to the Employer's business or to the Employer's actual or demonstrably anticipated research or development or (b) the original work of authorship results from any work performed by the Employee for the Employer.

Section 4. Other Intellectual Property. The Employee agrees to disclose promptly to the Employer, and that the Employer shall own, any and all additional intellectual property not specified in Sections 2 and 3 above. Such additional intellectual property shall include, without limitation and to the extent that it is not already specified in Sections 2 and 3, any and all trade secrets; know-how; designations of source or origin, such as trademarks, trade names, and trade dress; mask works; databases; and any and all documentation related to such intellectual property.

Section 5. Employer Property. The Employee agrees that all inventions, improvements, and original works of authorship referred to in Sections 2, 3, and 4 shall be the Employer's sole and exclusive property unless the Employer's rights are waived in writing by an elected or appointed officer of the Employer.

Section 6. Employee Cooperation. Upon the Employer's request at any time during employment or after its termination, the Employee shall promptly review, sign, and return all documents, communicate all pertinent information, and do anything else reasonably requested by the Employer to transfer all rights to any inventions, improvements, original works of authorship and intellectual property referred to in Sections 2, 3, 4, or 5 to the Employer or its nominee, and to help the Employer apply for, obtain, modify, defend, enforce, and/or transfer its patent, trade secret, copyright, and comparable rights for these inventions, improvements, and original works of authorship anywhere in the world. The Employee shall be reimbursed for any reasonable expenses actually incurred to comply with this Section. The

- 3 -

Employee shall not be entitled to further consideration for services rendered or rights transferred according to this Section, except that if the Employee is no longer employed by the Employer when services according to this Section are rendered, the Employee shall be entitled to receive reasonable compensation for the time reasonably required to render these services.

Section 7.  <u>Information Access and Confidentiality</u>.  The Employee acknowledges that the Employee occupies a position of trust and confidence with the Employer and will have access to and may develop Confidential Information of actual or potential value to or otherwise useful to the Employer.  The Employee agrees that during and after employment he or she shall treat as confidential and shall not, without written authorization from the Employer, disclose or use in whole or in part any Confidential Information that the Employee may acquire regarding or relating to the Employer's present or future businesses, sales, financials, products, operations, processes, personnel, or business associates, including any present or future subsidiaries or affiliates, or regarding improvements, inventions, or know-how.

Section 8.  <u>Employer Property Return</u>.  The Employee agrees that it will not at any time take from the Employer's premises without written authorization from the Employer any software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever, or copies thereof, which reflect or deal with Confidential Information in relation to the Employer's business, or any Inventions or any physical property of the Employer, and will promptly return the same to the Employer if taken with the aforesaid consent.  At the termination of the employment or at any other time that the Employer may request, the Employee shall promptly deliver to the Employer all software, datafiles, books, drawings, blueprints, specifications, data, formulations, compositions, photos, reports, letters, memoranda, notes or any writings or documents whatsoever made or compiled by the Employee or in the Employee's possession concerning or relating to any business, product, process, operation, personnel, or business associate of the Employer.  All such items shall be and remain at all times the Employer's property.

Section 9.  <u>At-Will Employment</u>.  This Agreement does not constitute an employment contract for a specific term.  The Employee acknowledges that the Employee is free to resign from employment and the Employer is free to terminate the employee's employment at any time, for any reason or no reason, with or without notice.

Section 10.  <u>Conflict of Interest</u>.  The parties recognize that this Agreement provides certain protections to the Employer,

- 4 -

its employees, customers, suppliers, and other business associates. The Employee represents that he or she is aware of no actual or potential conflict of interest and that he or she possesses no information that may create such a conflict of interest with respect to the Employer and/or its business associates.

Section 11. <u>Successors and Assigns</u>. This Agreement shall apply to all work performed by the Employee for the Employer, including any of its past, present, or future affiliates or subsidiaries. This Agreement shall inure to the benefit of the Employer's successors and assigns and shall be binding upon the Employee's assigns, executors, administrators, and other legal representatives.

Section 12. <u>Prior Agreements</u>. This Agreement supersedes any and all prior agreements between the parties to the extent of the subject matter of this Agreement, unless another written agreement expressly provides that it shall not be superseded by this Agreement. This Agreement can only be amended, altered, or terminated and its provisions can only be waived by agreement in writing signed by the Employee and an executive officer of the Employer.

Section 13. <u>Separability</u>. If any provision of this Agreement is adjudicated by a court of competent jurisdiction to be invalid or unenforceable, either in general or as applied to a particular occurrence or circumstance, such determination shall not affect the validity and enforceability of any other provisions of this Agreement.

Section 14. <u>Remedies</u>. The Employer and the Employee both recognize that the employee's obligations, more particularly described above, (i) to assign certain inventions to the Employer and (ii) to refrain from disclosing or using Confidential Information are special, unique, and of extraordinary character, such that monetary damages could not be adequate to cure or remedy a breach. The Employee agrees that for any actual or threatened breach, the Employer shall be entitled, in addition to any other remedies available to it, to an injunction and to secure specific performance of this Agreement, plus the recovery of reasonable attorney fees and costs incurred in prosecuting an action to obtain such remedies. Any failure in the exercise by either party of its rights to terminate this Agreement or to enforce any provision of this Agreement for default or violation by the other party shall not prejudice that party's right of termination or enforcement for any further or other default or violation.

Section 15. <u>Applicable Law and Forum</u>. This Agreement shall be construed and interpreted and its performance shall be enforced according to the laws of the United States and the State of New York. The Employer and the Employee consent to personal

- 5 -

jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

Section 16.    Employee Representation.    The Employee hereby represents and warrants to the Employer that (i) Employee has all requisite power and authority, and does not require the consent of any third party to enter into this Agreement and grant the rights provided herein; (ii) the execution, delivery and performance of this Agreement by the Employee does not and will not conflict with, breach, violate or cause a default under any agreement, contract or instrument to which the Employee is a party or any judgment, order or decree to which the Employee is subject; (iii) the Employee is not a party to or bound by any employment agreement, consulting agreement, non-compete agreement, confidentiality agreement or similar agreement with any other person; (iv) the services performed by the Employee and all items and/or materials furnished by the Employee in connection with or as a result of such services shall not infringe upon or violate the personal, civil or property rights, or the rights of privacy of, or constitute a libel, slander or unfair competition against or violate or infringe upon any common law right, copyright, trademark, trade name, patent or any other right of any person or entity.    If the Employee should cease to be employed by the Employer, the Employee shall not, without the Employer's prior written consent, directly or indirectly solicit or encourage any other employee of the Employer to leave the employment of the Employer or hire any employee who has left the employment of the Employer within two (2) years of said termination of such employee's employment with the Employer.

- 6 -

IN WITNESS WHEREOF, the parties have executed this
Agreement as of the date first above written.

EMPLOYEE

_Neil Vanek_____
Employee Signature

_NEIL VANEK_____
Print Employee Name

_6334 SAGE AVE_____

_FIRESTONE, CO 80504_____
Employee Home Address


PARTMINER, INC.

By: _Lori Hancock_____

Title: _HR Assistant_____


_Kenny Sharpe_____
Witness Signature

_Kenny Sharpe_____

_7807 E Peakview Ave - Englewood, CO_
Print Witness Name and Address

_11/17/04_____
Date Witnessed


- 7 -

# EXHIBIT 4

**PARTMINER, INC.**

**EMPLOYEE MANUAL**

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | FUNCTIONS OF THIS MANUAL | 1 |
| II. | VISION STATEMENT | 2 |
| III. | CULTURE STATEMENT | 3 |
| IV. | POLICIES, PROCEDURES AND BENEFITS | 4 |
| 1. | APPEARANCE OF EMPLOYEES | 4 |
| 2. | ATTENDANCE AND PUNCTUALITY | 4 |
| 3. | AUTOMOBILE USE | 4 |
| 4. | BEHAVIOR OF EMPLOYEES | 5 |
| 5. | BENEFIT PLANS | 5 |
| 6. | BEREAVEMENT | 6 |
| 7. | CONFIDENTIAL NATURE OF COMPANY ACTIVITIES AND INFORMATION | 6 |
| 8. | CONFLICTS OF INTEREST | 7 |
| 9. | CUSTOMER AND VENDOR RELATIONS | 7 |
| 10. | DISCIPLINE | 8 |
| 11. | DISCLOSURE OF INFORMATION | 8 |
| 12. | DISPUTE RESOLUTION PROCEDURE | 9 |
| 13. | DRUGS, NARCOTICS AND ALCOHOL | 10 |
| 14. | EMPLOYMENT REFERENCES AND VERIFICATIONS | 11 |
| 15. | EMPLOYMENT AGREEMENTS | 11 |
| 16. | EMPLOYMENT AT WILL | 12 |
| 17. | EQUAL EMPLOYMENT OPPORTUNITY | 12 |
| 18. | HIRING AND PROMOTIONS | 12 |
| 19. | HOLIDAYS | 12 |
| 20. | HOURS OF WORK | 12 |
| 21. | INTRODUCTORY PERIOD | 13 |
| 22. | JURY DUTY | 13 |
| 23. | LEAVE OF ABSENCE FROM WORK | 13 |
| 24. | MAINTENANCE OF WORK AREAS | 15 |
| 25. | MEDICAL PROCEDURES | 15 |
| 26. | NEPOTISM AND FRATERNIZATION | 15 |
| 27. | OUTSIDE EMPLOYMENT | 16 |
| 28. | PERFORMANCE APPRAISALS | 17 |
| 29. | PERSONAL FINANCES OF EMPLOYEES | 17 |
| 30. | PERSONAL PROPERTY | 18 |
| 31. | PERSONNEL RECORDS | 19 |
| 32. | PRODUCTIVE AND RESPECTFUL WORK ENVIRONMENT / SEXUAL HARASSMENT | 19 |
| 33. | RETIREMENT | 20 |
| 34. | SAFETY OF EMPLOYEES | 21 |
| 35. | SECURITY | 21 |
| 36. | SERIOUS DISEASES | 21 |
| 37. | SERVING OF LEGAL PAPERS | 22 |
| 38. | SHORT TERM ABSENCES | 22 |
| 39. | SMOKING | 23 |
| 40. | TEMPORARY AND PART-TIME EMPLOYEES | 23 |
| 41. | TERMINATION OF EMPLOYMENT | 24 |
| 42. | TRANSFERS | 25 |
| 43. | TRAVEL AND ENTERTAINMENT | 25 |
| 44. | USE OF COMMUNICATIONS SYSTEMS | 25 |
| 45. | VACATION | 26 |
| | APPENDIX A | 27 |
| | APPENDIX B | 29 |
| | APPENDIX C | 32 |
| | APPENDIX D | 40 |

welfare benefits as they apply to all current, former, and retired employees. The Administrator of each benefit plan has the discretionary authority to determine eligibility for benefits and to interpret the plan's terms.

The Company may, from time to time, offer certain benefits to eligible employees, including health, life, dental and disability insurance and retirement plans. Eligibility will depend upon the specific requirements of each benefit plan. The Company also provides a number of other benefits such as leaves of absence and paid vacation, holidays, and sick days.

If applicable, benefits provided by the Company may be described in official documents that are kept on file in the Human Resources Department. These documents are available for examination by any plan participant or beneficiary. In addition, these documents are the only official and binding materials concerning the Company's welfare and other benefits.

The Human Resources Department is responsible for all communications and disclosures concerning Company benefits and is available to answer questions concerning the benefit plans.

## 6. BEREAVEMENT

In the event of the death of an immediate family* member, the Company will grant a maximum of five (5) paid business days off for this time. This time will not be charged against vacation or personal time.

Any time taken off beyond the five-day period for this event will be charged against vacation or personal time entitlement.

Any time taken off for the death of someone who is not an immediate family member will be charged against vacation or personal time.

*Note: "Immediate family" means the employee's spouse, brother, sister, parents, children, stepchildren, father-in-law, mother-in-law, sister-in-law, brother-in-law, daughter-in-law, son-in-law, grandparents, grandchildren, domestic partners, and any other member of the employee's household.*

## 7. CONFIDENTIAL NATURE OF COMPANY ACTIVITIES AND INFORMATION

It is the policy of the Company that the internal business activities and information of the organization, particularly confidential information and trade secrets, represent Company assets that each employee has a continuing obligation to protect.

It is also the policy of the Company that all work product consisting of any document, information, material or idea developed by or provided to an employee in connection with the employee's employment by the Company is the confidential and proprietary property of the Company. As such, no work product may be removed from the Company's premises prior to or after the termination of an employee's employment with the Company.

Confidential information may not be discussed with anyone outside the organization and may be discussed within the organization only on a "need to know" basis. In addition, employees have a responsibility to avoid unnecessary disclosure of non-confidential internal information about the Company, its employees, its customers, and its suppliers.

Employees authorized to have access to confidential information may be required to sign special nondisclosure agreements and must treat the information as proprietary Company property for which they are personally responsible. Employees are prohibited from attempting to access or obtain confidential information for which they have not received authorization. Employees violating this policy will be subject to discipline, up to and including termination, and may be subject to legal action.

All media inquiries and other inquiries of a general nature should be referred to the Chief Financial Officer. In addition, all press releases, publications, speeches, or other official declarations must be approved in advance by the Legal Department. Questions about employee references or other information concerning current or former employees should be referred to the Human Resources Department.

Employees should not discuss with the officers, directors, or employees of competing organizations any topic that might give the impression of an illegal agreement in restraint of trade. These prohibited topics include pricing agreements, customer allocation, and division of sales territories.

Employees are prohibited from disclosing "material inside" information that could affect the market value of the Company's financial securities to anyone outside the organization until that information has been made available to the public by management. Employees also are prohibited from using that information for their own personal profit.

The General Counsel is responsible for coordinating the security and control of Company information and for approving any exceptions to this policy.

For further guidance regarding disclosure of information, see "Disclosure of Information" in this Manual and Appendix A attached hereto, titled "Policy on Trading Securities of PartMiner, Inc."

## 8.   CONFLICTS OF INTEREST

It is the policy of the Company to prohibit its employees from engaging in any activity, practice, or conduct which conflicts with, or appears to conflict with, the interests of the Company, its customers, or its suppliers. Since it is impossible to describe all of the situations that may cause or give the appearance of a conflict of interest, the prohibitions included in this policy are not intended to be exhaustive and include only some of the more clear-cut examples.

(1)     Employees are expected to represent the Company in a positive and ethical manner.  Thus, employees have an obligation to avoid conflicts of interest and to refer questions and concerns about potential conflicts to their supervisor.  Executive management and employees who have contact with customers and suppliers may be required to sign a special statement acknowledging their understanding of and adherence to this policy.

(2)     Employees may not engage in, directly or indirectly either on or off the job, any conduct that is disloyal, disruptive, competitive, or damaging to the Company.  Prohibited activity also includes any illegal acts in restraint of trade.

(3)     Employees may not accept any employment relationship with any organization that does business with, or competes with, the Company.  This prohibition on employment includes serving as an advisor or consultant to any organization of that type, unless the activity is conducted as a representative of the Company.

(4)     Employees must disclose any financial interest they or their immediate family have in any firm that does business with the Company or that competes with the Company.  The Company may require divestiture of the interest if it considers the financial interest to be in conflict with its best interests.

(5)     Employees and their immediate family may not accept gifts, except those of nominal value, or any special discounts or loans from any person or firm doing, or seeking to do, business with the Company.  The meaning of gifts for purposes of this policy includes the acceptance of lavish entertainment and free travel and lodging.

(6)     Employees may not give, offer, or promise, directly or indirectly, anything of value to any representative of a customer, of a potential customer, or of a financial institution in connection with any transaction or business that the Company may have with that customer, potential customer, or financial institution.

(7)     Employees may learn information about the Company, which, if known to the public, might affect the decision of an investor to buy, sell, or hold securities issued by the Company.  Employees are prohibited from misusing inside information, prior to public disclosure, by purchasing or selling the Company's securities for their own benefit or for the benefit of members of their immediate family.  In addition, employees may not disclose inside information to anyone, either inside or outside the organization, who does not have a legitimate business need to know it.

(8)     All officers and directors of the Company and employees who own more than ten percent of the equity securities issued by the Company are prohibited from engaging in "short-swing" trading of securities issued by the Company by purchasing and selling, or selling and repurchasing, those securities within a period of less than six months.   See "Policy on Trading in Securities of PartMiner, Inc."

(9)     Any conflict or potential conflict of interest must be disclosed to the Company.  Failure to do so will result in discipline, up to and including termination.

## 9.   CUSTOMER AND VENDOR RELATIONS

# EXHIBIT 5

**PARTMINER**

## ELECTRONIC CODE OF CONDUCT

### Purpose

The purpose of this Electronic Code of Conduct (the "Code") is to communicate Company expectations regarding employee access to and use of internal electronic communications facilities and public Internet/World Wide Web, including without limitation, obligations regarding licensing compliance, level of privacy, and efficient use of such tools for the purpose for which they are intended.  Consistent use of these tools, respect of the rights of other employees and the avoidance of unnecessary business risks with respect to these tools are required for PartMiner to function effectively as a business.

From time to time, the Company may modify or revoke this Electronic Code of Conduct in its sole discretion.  It is the responsibility of each employee to agree to the terms of this Code as may be in effect for time to time by signing this Code.  It is also the responsibility of each employee to maintain an up-to-date knowledge of this Code.

### Condition of Use

PartMiner grants you permission to use the internal electronic communications facilities necessary for your job on condition that you agree to be bound by this Code for the use of such facilities, plus the additional conditions that apply to the use of restricted facilities. By your signature below, you acknowledge that your use is conditioned on your acceptance of the terms of this Code as may be in effect from time to time, and you agree to be so bound.  Electronic communications facilities include, but are not restricted to, Lotus Notes, the Internal Web, access to other internal systems and databases, gateways, and networked and stand-alone access to the public Internet and the World Wide Web.

### Consequence Of Failure To Comply

Failure to adhere to the terms of this Code can result in withdrawal of permission to use these facilities, and in severe cases could lead to discipline up to and including termination.

### Conditions Of Permission

The conditions for permission to use the internal electronic communications facilities are as follows:

1.   Facilities are to Assist Employees in Performing their Jobs
The internal electronic communications facilities are provided to enable employees to do their jobs more effectively and should only be used for this purpose. These facilities should not be used for personal purposes. Unauthorized networked games and other non-essential software may not be loaded on the internal communications facilities.

2.   Communications are Not Private and Must Not Cause Offense
The communications must in all cases be expressed in a reasonable effort not to cause offense to any person or group and must conform to the Company's policies contained in the Employee Manual, including without limitation, the policies on Confidential Nature of Company Affairs, Disclosure of Information and Productive and Respectful Work Environment.  The nature of electronic communications is such that privacy and confidentiality are not guaranteed, and the Company specifically reserves the right to monitor, review and intercept all electronic communications and files, in any form, whether in transit or stored.  For investigation of security breaches, enforcement of this Code, and possibly disclosure to third parties in connection with judicial and administrative proceedings, files and communications may be subject to management and external scrutiny.

Communications may not include racist, sexist or other potentially offensive and inappropriate references, including in the form of jokes.

3.   Communications are not Confidential
All messages should be sent with the knowledge that they are not private, may be monitored and, at some time in the future, could be examined in public legal proceedings and must not contain anything that could later embarrass the sender, recipient(s) or the Company in the event of disclosure in such legal proceedings or other disclosure to third parties.

4.   Excessive use and storage should be avoided
To avoid wasting resources and the time of recipients, electronic mail messages and copies should only be sent to those who need to see them. Unnecessary copies of filed email messages should be deleted to avoid excessive costs of storage and unnecessary legal discovery in the event of litigation.  Electronic data should not be stored in removable form, such as floppy disc, zip drive discs, or off-site online storage, without the Company's prior written consent.

5.   Chain Letters Are Forbidden
All forms of chain letters are forbidden. If a chain letter is received from an outside source or internally, it should be referred to your immediate supervisor.

6.   Unauthorized Attempts To Access Are Forbidden
It is forbidden to attempt to access information in the accounts of another employee, unless specifically authorized to do so (for example, a secretary or deputy in the absence of an executive).  Mistakes can occur in the addressing of messages.  If you inadvertently receive and read a message not intended for you, immediately inform the sender and thereafter make no use of the information; you must not repeat it or send it to others.  Do not allow your password or other security devices to be known to or used by any unauthorized person.

7.   Information Confidentiality
In keeping with the confidentiality agreements signed by all Company employees, Company software, documentation, and all other types of internal information must not be sold, disclosed or otherwise transferred to any non-Company party for any purposes other than business purposes expressly authorized by Company management.  Exchanges of software and/or data between the Company and any third party may not proceed unless a written agreement providing for such exchange has first been reviewed by legal counsel representing the Company and executed by the Company and the third party.  Regular business practices, such as shipment of product in response to a customer purchase order, need not involve such an individualized agreement because the terms are determined by PartMiner transactional documents.

8.   Anti-Virus Software
All PCs and laptops provided by the Company must run the current standard of anti-virus software.  This must be updated regularly.  No software or files from an external domain, including from personal PCs at home, may be loaded on PCs and laptops provided by the Company without first screening for viruses.

9.   Software Licenses
All PCs and laptops provided by the Company and other software must be covered by a legitimate software license.  Each user is ultimately responsible for ensuring license compliance of his or her respective PCs and/or laptops.  However, the Company's Information Services Technical Support Team will ensure coverage for all applications installed by the Technical Support Team.

10. Activity Subject To Scrutiny
All PC or laptop activity and software and electronic data or communications are subject to scrutiny by network security and by software license management tools where these are implemented.

2

11. Access to Internet and World Wide Web
External Internet and World Wide Web access may only be provided either through the approved gateways (which may only be used with the appropriate authorization), or through stand-alone workstations. Use of these external links is subject to monitoring, and may be subject to filtering through applicable firewalls. They may not be used to access material that is not relevant to the job function and in particular may not access or store any illegal or offensive material. You must not access the public Internet/World Wide Web from countries where doing so would contravene applicable national or local laws.

12. Risks of Internet and the World Wide Web
There are no guarantees regarding delivery of messages, the speed of delivery or the authenticity of any material received from the public Internet/World Wide Web. Visits to World Wide Web sites are likely to be recorded by those sites and the record may be made available to other parties and published.

13. Export Control
Technical documentation and software is subject to United States and other export control regulations and may not be accessed except in accordance with these regulations. Access to such material must be in accordance with the instructions presented at the time of access. All use of encryption software must be approved in writing by legal counsel representing the Company.

14. Recovery In The Event Of Failure
You must be familiar with the procedure, which should be established for your work location, for recovery of important material in the event of a fire or other disaster, and you have responsibility for following procedures for maintenance of backup copies of files and software. You may not use any utility or similar software to reformat or overwrite data on your computer, without the express authorization of the Company's Information Services Technical Support Team.

15. Serious Offenses
If you deliberately attempt to obtain access, without specific authorization, or assist another person to deliberately attempt to obtain access, without specific authorization, to secured accounts, Email, documents or other files, including using software tools to obtain passwords, keys or to effect decryption, you may be subject to discipline, up to and including termination. You also may be subject to discipline, up to and including termination, if you attempt to disrupt or deny service or install any deliberately disruptive virus, logic bomb, Trojan horse, or other device.

16. Emergency Access To Secured Files
When, to protect the company's interests, access is needed to password protected or encrypted files of a previous employee, or where a password has simply been forgotten, access may only be obtained after consulting Information Services Management.

**Confirmation of Acceptance**

I confirm that I have read, understand, and accept the terms of the Electronic Code of Conduct.


_____
*(Employee Name)*


_____     _____
*(Signature)*                        *(Date)*

3

# EXHIBIT 6

## <u>SETTLEMENT AGREEMENT, UNDERTAKING AND RELEASE</u>

This Settlement Agreement, Undertaking and Release ("Agreement") is between and/or among PartMiner, Inc., its affiliates, subsidiaries and related entities, ("PartMiner") on the one hand, and Thomas Casey Reed ("Reed"), Neil Vanek ("Vanek"), Kenneth Sharpe ("Sharpe") and Avnet, Inc., its affiliates, subsidiaries and related entities ("Avnet") on the other. This Agreement is in consideration of the promises contained herein.

1.     <u>RECITALS</u>

     A.     PartMiner is a New York corporation with offices in Melville, New York.

     B.     Avnet is a New York corporation with offices in Phoenix, Arizona.

     C.     Reed is a former employee of PartMiner and a current employee of Avnet.

     D.     Vanek is a former employee of PartMiner and a current employee of Avnet.

     E.     Sharpe is a former employee of PartMiner and a current employee of Avnet.

     F.     A dispute has arisen between PartMiner and Reed concerning alleged breaches of a Confidentiality Agreement between Reed and PartMiner that was entered into on or about May 4, 2001 (the "Confidentiality Agreement"). A copy of the Confidentiality Agreement is attached as Exhibit A of this Agreement and is incorporated herein by reference.

     G.     On or about December 13, 2005, PartMiner commenced an action in the United States District Court for the Southern District of New York, captioned *PartMiner Information Services, Inc. v. Thomas Casey Reed,* Civil Action No. 05-CV-10486 (the "Federal Court Action") alleging, *inter alia,* breach of contract and claims for injunctive relief. Reed denies the material contentions made by PartMiner in the dispute and in the Federal Court Action, and denies any liability or wrongdoing whatsoever in connection with his dealings with PartMiner.

     H.     The parties hereto desire to settle their dispute, in its entirety, and to resolve all of the remaining differences between them in connection with the Federal Court Action.

**THEREFORE, IT IS HEREBY AGREED:**

2.     <u>RESOLUTION OF THE FEDERAL COURT ACTION</u>

     a.     For and in consideration of each of the terms set forth herein, Reed agrees to pay or cause to be paid PartMiner's legal fees to Duane Morris LLP, as counsel for PartMiner, in the sum of Twenty Five Thousand Dollars ($25,000.00) (the "Settlement Payment") within fifteen (15) days following the execution of this Agreement and the Stipulation (as defined below).

b.    For and in consideration of each of the terms set forth herein, PartMiner agrees to dismiss the Federal Court Action, with prejudice and without costs to either party. Counsel for the parties shall execute a Stipulation of Dismissal with Prejudice and without Costs in the form annexed hereto as Exhibit A (the "Stipulation"), and the parties agree to take such further actions as may be necessary to have such Stipulation entered by the Clerk of the Court as a final order.

3.    **THE CONFIDENTIALITY AGREEMENT**

a.    The term "PartMiner's Confidential Information," as contemplated by the parties to this Agreement, shall mean any and all Inventions or Copyrights as such terms are defined or referenced in the Confidentiality Agreement, any and all pipeline reports, sales reports, operation reports, daily registrant reports, pricing reports, proposals, financial reports, internal memoranda, purchase orders, contracts, agreements, correspondence (including without limitation, letters, memoranda and/or email), notes, lists, minutes, charts, images, summaries, reports, forms, or other documents (including information in electronic or other media) containing any confidential PartMiner customer information or any other confidential document obtained by or available to Reed, Vanek or Sharpe in the course of their employment with PartMiner that concerns the business, employees, customers and/or prospects of PartMiner or any of its affiliated companies and that has been and is maintained by PartMiner as confidential ; provided, however, that it is expressly understood that no document or information shall be considered to be "PartMiner's Confidential Information" for purposes of this Agreement if the same:

(i)    was or is in the public domain or is ascertainable from general or public sources;

(ii)    was or is disclosed with the prior written approval of PartMiner;

(iii)    became or becomes known to Reed, Vanek, Sharpe or Avnet from a source other than PartMiner without breach of this Agreement by Reed, Vanek or Sharpe, and without breach by the third party making such disclosure, of any obligation of confidentiality it may have to PartMiner; or

(iv)    is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body;

and, provided further, that nothing in this Agreement or in the Confidentiality Agreement is intended to or shall restrict Reed from utilizing his facilities, skills, talents and experience or the general knowledge acquired in the course of his employment with PartMiner.

b.    Reed hereby represents that he has not in the past disclosed, in whole or in part, any of PartMiner's Confidential Information to any third party, and that he does not have any documents (including any information in electronic or other media) containing PartMiner's Confidential Information in his possession, custody or control. Reed further represents that any such documents that he had in his possession, custody or control upon his termination of employment from PartMiner or at any time thereafter have been returned to PartMiner or destroyed.

c.    Reed hereby promises not to use or disclose, in whole or in part, any of PartMiner's Confidential Information that he may have acquired while an employee of PartMiner or at any time thereafter, through third parties, without the written authorization of PartMiner.

4.    **AGREEMENT NOT TO HIRE**

In consideration of the dismissal of the Federal Court Action against Reed, and for other good and valuable consideration, the sufficiency of which is acknowledged, Reed and Avnet hereby agree that, for the period of time to and including October 18, 2007, neither Reed nor Avnet will solicit, hire or otherwise employ any individual who, at the time, is then currently employed by PartMiner, provided that nothing in this Agreement shall be deemed to restrict Reed or Avnet in any way from engaging in general solicitations to the public that are not specifically directed or targeted to employees of PartMiner, including but not limited to such as advertisements, internet postings, participation in job fairs, etc.

5.    **RELEASES**

a.    For and in consideration of the execution of this Agreement, and other good and valuable consideration, including the Settlement Payment, the sufficiency of which is hereby acknowledged, PartMiner hereby releases and forever discharges Reed and Avnet (including its parents, subsidiaries, affiliates, predecessors, successors, directors, officers, employees, attorneys, and assigns) from any and all actions, causes of action, suits, claims, cross claims and/or demands whatsoever that were raised or could have been raised in connection with the facts and circumstances surrounding the Federal Court Action or with Avnet's employment of Reed Vanek or Sharpe.

b.    For and in consideration of the execution of this Agreement, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Reed and Avnet hereby release and forever discharge PartMiner (including its parents, subsidiaries, affiliates, predecessors, successors, directors, officers, employees, attorneys, and assigns), from any and all actions, causes of action, suits, claims, counterclaims, and/or demands whatsoever that were raised or could have been raised in connection with the facts and circumstances surrounding the Federal Court Action.

c.    With the exception of any claim Vanek may have concerning the reimbursement of expenses from PartMiner, for and in consideration of the execution of this Agreement, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Vanek and PartMiner hereby release and forever discharge each other from any and all actions, causes of action, suits, claims, counterclaims, and/or demands whatsoever that were raised or could have been raised in connection with the facts and circumstances surrounding the Federal Court Action.  This clause does not constitute an admission by either party of any wrongful action or violation of any federal or state statute, or common law rights, including those relating to the provisions of any law or statute concerning employment actions, or any other possible or claimed violation of law or rights.  Notwithstanding the foregoing, Vanek and PartMiner understand and agree that the Confidentiality Agreement between Vanek and PartMiner that was entered into on or about November 16, 2004, shall remain in full force and effect.

(i)     Vanek hereby represents that he has not in the past disclosed, in whole or in part, any of PartMiner's Confidential Information to any third party, and that he does not have any documents (including any information in electronic or other media) containing PartMiner's Confidential Information in his possession, custody or control. Vanek further represents that any such documents that he had in his possession, custody or control upon his termination of employment from PartMiner or at any time thereafter have been returned to PartMiner or destroyed.

(ii)    Vanek hereby promises not to use or disclose, in whole or in part, any of PartMiner's Confidential Information that he may have acquired while an employee of PartMiner or at any time thereafter, through third parties, without the written authorization of PartMiner.

d.      For and in consideration of the execution of this Agreement, and other good and valuable consideration, the sufficiency of which is hereby acknowledged, Sharpe and PartMiner hereby release and forever discharge each other from any and all actions, causes of action, suits, claims, counterclaims, and/or demands whatsoever that were raised or could have been raised in connection with the facts and circumstances surrounding the Federal Court Action. This clause does not constitute an admission by either party of any wrongful action or violation of any federal or state statute, or common law rights, including those relating to the provisions of any law or statute concerning employment actions, or any other possible or claimed violation of law or rights. Notwithstanding the foregoing, Sharpe and PartMiner understand and agree that the Confidentiality Agreement between Sharpe and PartMiner that was entered into on or about July 1, 2002, shall remain in full force and effect.

(i)     Sharpe hereby represents that he has not in the past disclosed, in whole or in part, any of PartMiner's Confidential Information to any third party, and that he does not have any documents (including any information in electronic or other media) containing PartMiner's Confidential Information in his possession, custody or control. Sharpe further represents that any such documents that he had in his possession, custody or control upon his termination of employment from PartMiner or at any time thereafter have been returned to PartMiner or destroyed.

(ii)    Sharpe hereby promises not to use or disclose, in whole or in part, any of PartMiner's Confidential Information that he may have acquired while an employee of PartMiner or at any time thereafter, through third parties, without the written authorization of PartMiner.

6.      **CONFIDENTIALITY**

a.      For and in consideration of each of the terms set forth herein, the parties and their attorneys agree that they will keep the terms of this Agreement confidential and that they will not disclose any information concerning this Agreement unless such disclosure is required in order for the party to remain in compliance with this Agreement, other than words to the effect that "the matter has been resolved" to any person or entity without the written consent of the other parties.

NY0299629.1

b.     Nothing in this Agreement, however, shall preclude any party from:

(i)     complying with any lawful subpoena or court or administrative order;

(ii)     complying with requests of any other federal or state regulatory authority, or complying with any request for information or documents from any federal or state regulator or self-regulatory organization; or

(iii)     making a confidential disclosure to any party's immediate family members, as necessary, attorneys, auditors, accountants, tax preparers and any appropriate local, state or federal taxing authority; or

(iv)     disclosure to a prospective merger partner, a purchaser of a controlling interest in or purchaser of all or substantially all of a party's assets related to the business or rights that are the subject of this Agreement, only to the extent required to conduct due diligence or comply with the provisions of this Agreement.

## 7.    AUTHORITY

The parties represent and warrant that each of them has the authority to enter into the Agreement in their individual and/or representative capacities, as the case may be.

## 8.    NO ADMISSION OF LIABILITY

Each of the parties hereto and their respective attorneys understand, represent and warrant that this Agreement is a compromise and settlement of disputed claims, and that the execution of this Agreement is not to be construed as an admission of liability by the parties hereto.

## 9.    GOVERNING LAW AND FORUM

This Agreement shall be construed, and its terms enforced, in accordance with the substantive laws of the State of New York, without regard to its conflict of laws provision. Each party to this Agreement hereby consents to personal jurisdiction in the United States District Court for the Southern District of New York and/or in the Supreme Court of the State of New York, New York County, for purposes of enforcement of this Agreement or any dispute arising out of or in connection with this Agreement, and the parties waive any claim or defense that such forum is not convenient or proper.

## 10.    REMEDIES

PartMiner agrees that prior to initiating any lawsuit against Reed and/or Avnet with respect to an alleged breach by Reed and/or Avnet of this Agreement, it shall notify Reed and/or Avnet in writing (with copy to Reed's counsel and counsel for Avnet) of such alleged breach, with sufficient details concerning the same, and Reed and/or Avnet will have ten (10) business days from its receipt of such notice to remedy the breach or otherwise respond to such allegations. In the event Reed and/or Avnet breaches Paragraph 3 of this Agreement and Reed

NY\299629.1

and/or Avnet has not remedied such breach within the ten-day period referenced above, Reed and/or Avnet agree and acknowledge that PartMiner will have no adequate remedy at law and will be entitled to seek injunctive relief, in addition to any remedies at law or in equity.

11.   **ENTIRE AGREEMENT**

This writing constitutes the entire agreement and understanding between the parties. No modification of this Agreement shall be valid unless executed in writing by the parties. Furthermore, no party hereto shall be bound by any representations, warranties, promises, statements or information unless set forth herein. The parties agree that notwithstanding the terms of this Agreement, the Confidentiality Agreement between PartMiner and Reed shall remain in full force and effect. If any provisions of Paragraph 3 or Paragraph 4 of this Agreement is determined to be inconsistent with the provisions of the Confidentiality Agreement, the terms of this Agreement shall control.

12.   **CAPTIONS**

The captions of the various paragraphs in the Agreement are for convenience and organization only, and are not intended to be part of the body of this Agreement, nor are they intended to be referred to in construing the provisions of this Agreement.

13.   **SETTLEMENT OF DISPUTED CLAIMS**

a.    The Parties hereto understand and agree that this Agreement is a compromise of disputed claims and that the execution of this Agreement is not to be construed as an admission of liability by the parties hereto.

b.    This Agreement and the provisions contained therein shall not be construed or interpreted for or against any party hereto, because said party drafted or caused the party's legal representative to draft any of its provisions.

c.    This Agreement, and the terms and conditions hereof, shall be binding upon and inure to the benefit of the Parties and to their respective heirs, executors, administrators, parent companies, subsidiaries, divisions, affiliates, successors, assigns, employees, agents and representatives. If any provision of this Agreement shall be or become illegal or unenforceable, in whole or in part, for any reason whatsoever, the remaining provisions shall nevertheless be deemed valid, binding, and subsisting.

14.   **COUNTERPART ORIGINALS**

This Agreement may be executed in counterparts, that is, all signatures need not appear on the same copy. All such executed copies shall together constitute the complete Agreement.

15.   **REPRESENTATION BY COUNSEL**

The parties hereto agree that they enter into this Agreement after having received full advice from counsel of their choice with respect to this Agreement and all other matters related

thereto and that this Agreement shall be deemed to have been drafted jointly by them. None of the parties shall have the right to rescind this Agreement.

16.    COSTS

Except as provided in Paragraph 2(a) herein, the parties to this Agreement agree that they shall each pay their own attorney's fees, costs and expenses, if any, incurred in connection with this matter.

**BY SIGNING THIS AGREEMENT REED, VANEK AND SHARPE STATE INDIVIDUALLY THAT: (1) THEY HAVE READ IT; (2) THEY UNDERSTAND IT AND THEY AGREE WITH EVERYTHING IN IT; (3) THEY WERE TOLD, IN WRITING, TO CONSULT AN ATTORNEY BEFORE SIGNING IT; (4) THAT THEY EACH HAD 21 DAYS TO REVIEW THE AGREEMENT AND THINK ABOUT WHETHER OR NOT THEY WANTED TO SIGN IT; AND (5) EACH HAS SIGNED IT KNOWINGLY AND VOLUNTARILY.**

PartMiner, Inc.
by: Michael Manley, Esq.
President and General Counsel

Date _____

Avnet, Inc.
by: David Birk
Senior Vice President, Secretary and General Counsel

Date _____

_____
Thomas Casey Reed

Date _____

_____
Neil Vanek

Date _____

_____
Kenneth Sharpe

Date _____

Page 7 of 7

thereto and that this Agreement shall be deemed to have been drafted jointly by them. None of the parties shall have the right to rescind this Agreement.

16.    **COSTS**

Except as provided in Paragraph 2(a) herein, the parties to this Agreement agree that they shall each pay their own attorney's fees, costs and expenses, if any, incurred in connection with this matter.

**BY SIGNING THIS AGREEMENT REED, VANEK AND SHARPE STATE INDIVIDUALLY THAT: (1) THEY HAVE READ IT; (2)THEY UNDERSTAND IT AND THEY AGREE WITH EVERYTHING IN IT; (3) THEY WERE TOLD, IN WRITING, TO CONSULT AN ATTORNEY BEFORE SIGNING IT; (4) THAT THEY EACH HAD 21 DAYS TO REVIEW THE AGREEMENT AND THINK ABOUT WHETHER OR NOT THEY WANTED TO SIGN IT; AND (5) EACH HAS SIGNED IT KNOWINGLY AND VOLUNTARILY.**

_____        _____
PartMiner, Inc.                                      Date
by: Michael Manley, Esq.
President and General Counsel


_____        _____
Avnet, Inc.                                          Date
by: David Birk
Senior Vice President, Secretary and General Counsel


_____        _____
Thomas Casey Reed                              Date


_____        _____
Neil Vanek                                          Date


_____        _____
Kenneth Sharpe                                    Date

Page 7 of 7

# EXHIBIT 7

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/4/06

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
PARTMINER INFORMATION            :
SERVICES, INC.

                                 :          05 Civ. 10486 (WHP)
                    Plaintiff,
        -against-                :          ORDER

THOMAS CASEY REED,               :

                    Defendant.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

WILLIAM H. PAULEY III, District Judge:

        It having been reported to this Court that this action has been or will be settled, it

is hereby ordered that this action be discontinued without costs to any party, and without

prejudice to restoring the action to this Court's calendar if the application to restore the action is

made within thirty (30) days of the date of this Order.  The Clerk of the Court is directed to mark

this case closed.

Dated:  January 4, 2006
       New York, New York

                    SO ORDERED:

                    WILLIAM H. PAULEY III
                    U.S.D.J.

*Counsel of Record:*

James A. Tricarico, Esq.
Duane Morris LLP
380 Lexington Avenue
New York, NY 10168
*Counsel for Plaintiff*

Brian S. Kaplan, Esq.
Kasowitz, Benson, Torres
  & Friedman LLP
1633 Broadway
New York, NY 10019
*Counsel for Defendant*

# EXHIBIT 8

**PARTMINER ACCOUNTS LOST TO AVNET (2006-2007)**

| Customer | Lost Revenue in US Dollars |
|---|---|
| AAI Corp. | 37,900 |
| Agfa Corporation | 6,720 |
| Agilent Technologies - Loveland | 15,000 |
| Agilent Technologies - Malaysia | 5,000 |
| Artesyn Technologies | 51,765 |
| Component Trends | 24,225 |
| Department National Defence HQ | 7,427 |
| Dept Of National Defence | 4,225 |
| Dictaphone Corp. | 5,250 |
| Dictaphone Corp. | 10,350 |
| DRS Sensors & Targeting Systems, Inc. | 18,960 |
| EMA Design Automation Inc. | 200,000 |
| Emerson Electric | 78,150 |
| Ems Technologies Canada | 19,400 |
| Foxboro Company (Invensys) | 23,000 |
| GE Security, Inc. | 30,000 |
| General Dynamics AIS | 90,000 |
| Goodrich Corp Aerostructures Group | 4,225 |
| Hach Co. | 18,000 |
| Harmonic Inc. | 13,395 |
| ITT Aerospace / Comm. Div. | 17,725 |

**PARTMINER ACCOUNTS LOST TO AVNET (2006-2007)**

| Customer | Lost Revenue in US Dollars |
|---|---|
| ITT Aerospace / Comm. Div | 25,770 |
| ITT Corp. | 12,610 |
| ITT Electronic Systems | 19,400 |
| ITT Industries, Gilfillan Div. | 17,995 |
| Kollsman Inc. | 18,460 |
| Korry Electronics Co. | 9,126 |
| L-3 Communications | 6,500 |
| L3 Communications Display Systems | 5,900 |
| L3 Communications Integrated Systems | 36,985 |
| L-3 Communications IS | 40,000 |
| L-3 Communications System -East | 40,814 |
| L3 Communications, Toronto | 9,800 |
| Labarge, Inc. | 4,875 |
| Mnemonics | 24,735 |
| Panasonic Avionics Corporation | 21,100 |
| Paramit Corp. | 22,000 |
| Performance Technologies, Inc. | 23,000 |
| Sechan Electronics, Inc. | 13,300 |
| Smith & Associates | 44,600 |
| Smith & Associates | 5,735 |
| Stratex Networks | 47,790 |

**PARTMINER ACCOUNTS LOST TO AVNET (2006-2007)**

| Customer | Lost Revenue in US Dollars |
|---|---|
| Symmetricom | 130,000 |
| Tellabs | 19,950 |
| Unisys Roseville | 20,870 |
| Universal Instruments | 3,380 |
| Valleylab Inc. | 16,100 |
| Viasat Inc. | 42,500 |
| Viasat Inc. | 38,500 |
| Woodward Governor | 16,950 |
| **TOTAL LOST REVENUE** | **$1,419,462.00** |